1  Ryón Nixon, SBN 295150
   *ryon@hrznslc.com*
2  **HORIZONS LAW & CONSULTING GROUP**
3  1550 Bryant St., Suite 750
   San Francisco, CA 94103
4  Tel: (310) 415-4932

5  Aaron M. Zeisler (to be admitted *pro hac vice*)
6  *aaron@zeisler-law.com*
   Brian A. Burns (to be admitted *pro hac vice*)
7  *brian@zeisler-law.com*
8  **ZEISLER PLLC**
   800 Third Avenue, Suite 2800
9  New York, NY 10022
   Tel: (212) 671-1921
10
11 Attorneys for Plaintiffs

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14                     **OAKLAND DIVISION**

15
16 NIRVANA CAPITAL LIMITED, a British          Case No.
   Virgin Islands private limited company; and
17 WINSLOW STRONG, an individual,             **COMPLAINT FOR VIOLATIONS OF**
                                              **SECTIONS 11, 12(A)(1), 12(A)(2) AND**
18        Plaintiffs,                         **15(A) OF THE SECURITIES ACT OF**
                                              **1933 AND FOR FRAUD**
19    v.

20 MOBILE GAMING TECHNOLOGIES, INC., a
21 Delaware Corporation; MIKE REAVES, an
   individual; GEORGE WEINBERG, an            **DEMAND FOR JURY TRIAL**
22 individual; FRED HSU, an individual; and
   DOES 1-10, inclusive,
23
24        Defendants.

25
26
27
28

                         _____
                                   COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................ 1

PARTIES .................................................................................................................... 2

JURISDICTIONAL STATEMENT ............................................................................ 3

FACTUAL ALLEGATIONS ...................................................................................... 3

    I.    Background on Blockchain Technology and ICOs ........................................ 3

    II.   The CashBet Coin ICO ................................................................................ 4

    III.  Mobile Gaming Extends Its ICO and Makes New Misrepresentations to Nirvana and Winslow Strong to Persuade Them to Buy CashBet Coins ........................................ 6

    IV.  The Falsity of Mobile Gaming's Representations Is Revealed and the CashBet Coin Plummets to a Negligible Value ................................................................................ 8

SECOND CAUSE OF ACTION (Violation of Section 12(a)(2) of the Securities Act) ......................... 11

THIRD CAUSE OF ACTION (Violation of Section 15(a) of the Securities Act) .................................. 12

FOURTH CAUSE OF ACTION (Violation of Section 11 of the Securities Act) .................................. 12

FIFTH CAUSE OF ACTION (Fraud) ........................................................................ 13

PRAYER FOR RELIEF ............................................................................................. 13

JURY DEMAND ....................................................................................................... 15

Plaintiffs bring this action to redress their damages arising from the Defendants' numerous securities laws violations under the laws of the United States and for fraud; and allege on knowledge as to themselves and their own acts, and on information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.    Defendant Mobile Gaming Technologies, Inc. ("Mobile Gaming") made numerous false and misleading statements in connection with its fraudulent April 2018 initial coin offering ("ICO") of CashBet Coins ("CashBet Coins") that it tendered through its wholly-owned shell subsidiary, Cashbet Alderney Limited.[1]  Mobile Gaming also directly accepted all of the Plaintiff ICO investors' funds via wire or cryptocurrency transfer to California.

2.    Despite offering the CashBet Coins to United States citizens, such as Plaintiff Winslow Strong, Defendants did not register the offering pursuant to the federal securities laws.   Yet, the CashBet Coins were and are a sham, and the materially false representations of Mobile Gaming and its Defendant executives lured investors into buying these virtually worthless CashBet Coins (which immediately plummeted upon issuance and currently trade at 1.2 cents despite being officially offered at prices between $0.40 and $0.75 USD per Cashbet Coin).

3.    Among other material misrepresentations, Mobile Gaming and its Defendant executives falsely claimed that: (a) CashBet Coins were utility tokens that gamblers supposedly would be able to use in virtual casinos, which was false; (b) they had 4.25 million active players per month, which was false; (c) investors would be able to use CashBet Coins to buy goods or services through Defendants' gambling "ecosystem" and that the tokens would rise in value given the way the ecosystem was created, which was false; (d) Plaintiffs had an opportunity to purchase CashBet Coins at a steep discount of 50% or more, which was false; and (e) that the ICO was closing imminently and their purchases had to be finalized in less than a week's time, which was false.

---

[1] An ICO is similar to an initial public offering of stock, and is a fundraising mechanism by which the founders of a blockchain project sell "tokens" or "coins" in exchange for either cryptocurrencies (*e.g.* Bitcoin, Ethereum) or currency (often referred to as "fiat" currencies, such as the U.S. Dollar).

4.      Based on the facts and circumstances alleged herein, the CashBet Coins were securities pursuant to *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), and its progeny, including the cases discussed by the Securities and Exchange Commission (the "SEC") in its Report of Investigation Pursuant to Section 21(a) Of The Securities Exchange Act of 1934: The DAO (Exchange Act Rel. No. 81207) (July 25, 2017) (the "DAO Report").  Indeed, the SEC has recently brought proceedings against issuers of tokens for violating securities laws in such cases as *In re Paragon Coin, Inc.*, File No. 3-18897 and *SEC v. Maksim Zaslavskiy et. al*, No. 17-CY-5725 (E.D.N.Y. 2018).

5.      Here, Defendants violated the Securities Act of 1933 (the "Securities Act") by offering and selling these securities without having a registration statement filed or in effect with the SEC, and by making numerous material misrepresentations that induced Plaintiffs to purchase the CashBet Coins.

6.      Accordingly, Plaintiffs seek compensatory or rescission damages for violations of the federal securities laws under Sections 11, 12(a)(1), 12(a)(2) and 15(a) of the Securities Act and fraud against Mobile Gaming and certain of its top officials, as well as a compensatory and punitive damages.

## PARTIES

7.      Plaintiff Nirvana Capital Limited ("Nirvana") is a British Virgin Islands private limited company with a principal place of business in San Francisco, California.

8.      Plaintiff Winslow Strong ("Strong") is a U.S. citizen residing in the Commonwealth of Puerto Rico.

9.      Plaintiffs Nirvana and Strong purchased CashBet Coins after being solicited in New York and California by Defendant Fred Hsu, and after reviewing Defendants' offering and promotional materials, which included press releases, management presentations, an ICO pitch, a "white paper" (the "White Paper") and other offering materials listed on Mobile Gaming's website.

10.     Nirvana invested in the ICO on or about May 21, 2018 by transmitting $4,000,000 USD worth of Ethereum ("ETH") to Mobile Gaming in exchange for 11,428,571.4 CashBet Coins.  A copy of the Token Purchase Agreement ("TPA") executed by Nirvana is attached as Exhibit ("Ex.") A to this Complaint.  Strong invested in the ICO on or about May 21, 2018 as well by transmitting $419,532

USD worth of ETH to Mobile Gaming in exchange for 1,118,752 CashBet Coins.  A copy of the TPA executed by Strong is attached as Ex. B.

11.     Given that the current price of CashBet Coins is 1.2 cents, Nirvana and Strong have lost millions of dollars.

12.     Defendant Mobile Gaming is a Delaware corporation with a principal place of business located at 1999 Harrison Street, Suite #740, Oakland, CA 94612.

13.     Defendant Fred Hsu is a Director of Mobile Gaming and, upon information and belief, a resident of California.  Hsu solicited investments in CashBet Coins from Plaintiffs.

14.     Defendant Mike Reaves is an Executive Officer and Director of Mobile Gaming and, upon information and belief, a resident of California.

15.     Defendant George Weinberg is an Executive Officer of Mobile Gaming and, upon information and belief, a resident of California.

## JURISDICTIONAL STATEMENT

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and Section 22 of the Securities Act 15 U.S.C. § 77v because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act 15 U.S.C. §§ 77l(a)(1) and 77o(a).  Venue lies within this District under Section 22 of the Securities Act 15 U.S.C. § 77v, and under 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred in this District, each of the Defendants reside in this District for purposes of 28 U.S.C. § 1391, and/or Defendants have received substantial compensation and transfers of money here and engage in activities having an effect in this District.

## FACTUAL ALLEGATIONS

### I.     Background on Blockchain Technology and ICOs

17.     A "blockchain" is an electronically distributed, public ledger or list of entries that is maintained by various participants in a network of computers or servers. Blockchains use cryptography to process and verify transactions on their ledgers. After a "block" is created (it contains information, such as the details of a transaction, that is cryptographically verified), the information inside the block

cannot be changed. The "block" then becomes part of the "blockchain," and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is completed, another block is created with additional information, and the blockchain continues to grow, stored on a decentralized network of computers or servers.

18.     These decentralized, permission-less, and encrypted ledgers provide comfort to users and potential users. These features are the appeal of notable blockchains like Bitcoin ("BTC"), ETH and other virtual currencies. Furthermore, certain blockchain technologies and distributed ledgers may be used to create and disseminate virtual "coins" or "tokens."

19.     An ICO is a capital raising event in which an entity offers investors unique coins or tokens in exchange for consideration – most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency. But, as is at issue here, a token or coin may entitle its holders to certain rights related to an underlying venture, or to be able to use that coin or token as a "utility" in order to buy a particular good or to use a particular service.

## II.     The CashBet Coin ICO

20.     In January 2018, Mobile Gaming announced that it would be issuing millions of CashBet Coins through an ICO. Mobile Gaming described the CashBet Coins as a kind of casino chip for on-line gaming. It announced that the CashBet Coins "may be used on multiple operator's sites, and not only for online gaming, but also for social gaming and skill-based gaming." White Paper, Ex. C, at 14. The White Paper stated that CashBet Coins would be distributed to buyers promptly – within two weeks of the conclusion of the CashBet Coin ICO on April 27, 2018. Id. at 37.

21.     In March 2018, defendant Reaves made public statements supporting the notion that CashBet Coins had great value because they could be used immediately for a superior online gaming experience. Reeves said that "the utility of the coin that we're producing right now is perfect for casino, is perfect for iGaming and social gaming" (emphasis added). Moreover, he claimed that the CashBet Coins were "a great value proposition for players who can come in and bet and wager using our token." The value, according to Reaves, was driven by the fact that CashBet Coin users would experience a better online gaming experience than anywhere else: "It's a good experience for the player

1  – it's not clunky – it's smooth . . . it's good looking stuff and you want to be there so that's the real

2  advantage that you have is that you've got a world class entertainment experience."

3      22.    In the White Paper offering document, Mobile Gaming claimed that it had "hundreds of

4  thousands of registered players . . . from around the world."  Ex. C at 3.  Mobile Gaming also claimed

5  that "millions and millions" of non-Mobile Gaming players could use the CashBet Coin through

6  partnerships that Mobile Gaming was building with other gaming companies. In March 2018, Mike

7  Reaves, for example, publicly announced the following about a supposed partnership between Mobile

8  Gaming and the casino company Novomatic:

> That's right, Novomatic is . . . one of the largest privately-held casino
> companies in the world.  They're a huge manufacturer in Europe . . .we
> just announced a partnership with them yesterday where they're going to
> be taking the CashBet Coin and allowing their players to go ahead and
> deposit into their Game Twist social casino sites using CashBet Coin and
> in doing so we're going to go ahead provide some VIP operation for them.
> And it will allow players to not only enjoy playing on CashBet powered
> sites, but also to play on [Novomatic] social casino sites.   And there are
> millions and millions of players out there on the . . . Game Twist sites
> throughout the world . . . CashBet will be able to be spent on that property
> inside the United States as well as for real money gaming.

(emphasis added).

    23.    Mobile Gaming did not register the CashBet Coin offering pursuant to the federal

securities laws. Instead, Mobile Gaming filed a "Registration D" form (the "Reg D Form") with the

SEC, where it identified itself as the issuer of the securities offering, but erroneously claimed that no

registration was required.  See Reg Form D, Ex. D.

    24.    In the Reg D Form, Mobile Gaming identified the control persons for the ICO securities

offering as Director Hsu, Executive Officer and Director Reaves, and Executive Officer Weinberg.  Id.

at 3.

    25.    Mobile Gaming directed ICO investors to make payments directly into its bank account

in Oakland, California.  See Ex. A at 2; Ex. B at 2.

26.     Mobile Gaming structured its ICO to consist of two "pre-sale" stages and a "public sale" period.  In the White Paper, Mobile Gaming represented that the offering price for the CashBet Coins generally would be increasing over time:

- $0.40 USD between January 24 and February 20;
- $0.42 USD between March 27 and April 3;
- $0.40 USD from April 10 at 5pm until April 11 at 5pm;
- $0.47 USD from April 11 at 5pm until April 12 at 5pm;
- $0.60 USD from April 17 at 5pm until April 22 at 5pm; and
- $0.75 USD from April 22 at 5pm until April 27.

Ex. C at 35-37.

27.     The White Paper offering document also stated that there would be no further discounts on CashBet Coin purchases, and that all unsold coins would be destroyed.  Id. at 36-37.

**III.    Mobile Gaming Extends Its ICO and Makes New Misrepresentations to Nirvana and Winslow Strong to Persuade Them to Buy CashBet Coins**

28.     By May 14, 2018, the CashBet Coin ICO had officially been completed and Mobile Gaming was obligated to distribute the coins to purchasers imminently.  At that time, Director Hsu and others from Mobile Gaming nevertheless attended Consensus 2018, a notable blockchain technology summit in New York City, in the hope of selling more CashBet Coins to prospective buyers.

29.     On May 15, Hsu met separately with Alfred Jiang of Nirvana and Winslow Strong at the midtown Hilton Hotel in New York (the "Consensus Meetings") to try to persuade them to purchase CashBet Coins.

30.     At the Consensus Meetings, and subsequently, Hsu urged Jiang and Strong to purchase CashBet Coins.   Towards that end, Hsu presented Plaintiffs with the ICO offering documents, including the White Paper, as well as newer updated marketing materials.

31.     One of the new Mobile Gaming marketing pieces, "Infrastructure for iGaming," (the "May iGaming Presentation"), which is attached as Ex. E, made new claims about purported uses for the CashBet Coin.  The May iGaming Presentation stated that the on-line casino Novomatic "will accept CashBet Coin on all Game Twist games." Ex. E at 11.  It also cited a purported partnership with

Lottery.com, and asserted that CashBet Coins were accepted for use in lotteries run worldwide by Lottery.com, including its $5 billion "lottery for social good." Id. at 12.

32.    Mobile Gaming provided a separate marketing piece to Nirvana and Strong making another claim about use of the CashBet Coins. This one asserted that Imperial Play's on-line gaming application "Steam Palace" was accepting CashBet Coins. See Ex. F.

33.    Based on these alleged partnerships, Mobile Gaming claimed player numbers dwarfing the "hundreds of thousands" that it had cited in the White Paper just two months earlier. Mobile Gaming now maintained that it had 4,250,000 "monthly active players" across more than 200 countries playing more than 750 games. Ex. E at 7.

34.    Despite the White Paper's representations that no further discounts would be offered for the CashBet Coin, Hsu claimed to be offering substantial price discounts to both Nirvana and Strong in the Consensus Meetings.

35.    Hsu told Jiang that Nirvana could serve as an "advisor" to Mobile Gaming and buy CashBet Coins through an "advisor sale" at $0.35 USD – which represented a whopping 53% discount over the "public price" of $0.75 offered to investors at the close of the public sale period.

36.    Separately, Hsu told Strong that he could buy CashBet Coins at $0.375 USD – which was a 50% discount over the "public price" offered to investors at the close of the public sale period.

37.    In exchange for this attractive pricing opportunity, Hsu told Jiang and Strong that they had to act quickly or they would lose this opportunity. Hsu said that the CashBet ICO supposedly would be closing the following Monday, May 21, and their purchases would need to be completed by that deadline.

38.    Furthermore, Mobile Gaming required that Nirvana and Strong each agree to a "lock-up" period prior to selling CashBet Coins. For Nirvana, half of its CashBet Coins would be subject to a 45-day lockup period and the second half would be subject to a 90-day lockup period. Strong was prohibited from selling his CashBet Coins for 90 days.

39.    Based on Mobile Gaming's written and verbal representations, Nirvana and Strong each signed a Token Purchase Agreement and paid millions of dollars to purchase CashBet Coins on May 21, 2018. Ex. A; Ex. B.

**IV.    The Falsity of Mobile Gaming's Representations Is Revealed and the CashBet Coin Plummets to a Negligible Value**

40.    Within weeks after taking millions of dollars from Nirvana and Strong, it became apparent that Mobile Gaming had made one misrepresentation after another as part of its scheme to sell them useless CashBet Coins.

41.    Once the truth about Mobile Gaming's representations came to light, the trading price of CashBet Coins promptly cratered.  By the time that the 90-day lockup period had ended and Nirvana and Strong were permitted to sell all of their CashBet Coins, the coins were trading at 5.2 cents.  As of November 30, 2018, the value of CashBet Coins had further declined to 1.2 cents.[2]



42.    In its offering documents and marketing materials provided to Nirvana and Strong, Mobile Gaming claimed that CashBet Coin had great value because it could be used by gamers for a superior on-line gaming experience.  This claim was false, as the CashBet Coins had no utility whatsoever for users when they were distributed in June 2018 and they continue to have no utility today.  CashBet Coins still cannot be used to access a single online gaming site.  In response to an

---

[2] Chart was pulled from Coin Market Cap on November 30, 2018; *see, generally*, https://coincodex.com/crypto/cashbet-coin/.

inquiry on November 19, 2018, Mobile Gaming stated that its efforts were concentrated on building relationships with online game operators rather than allowing players to use CashBet Coins for online gaming.

43.     Mobile Gaming falsely represented to Nirvana and Strong in the May Management Presentation that it had 4,250,000 "monthly active players." Ex. E at 7.  Far from having millions of active players, Mobile Gaming in fact never even had the "hundreds of thousands" of players claimed in the White Paper.  On December 4, 2018, Mobile Gaming acknowledged through its website that in actuality it had less than 25,000 active players.[3]

44.     Nor was there any validity to Mobile Gaming's various offering documents and public statements by Defendant Reaves stating that CashBet Coins would be acceptable currency on other online gaming sites.

45.     Defendant Reaves falsely asserted in March 2018 that Novomatic games including Game Twist would accept CashBet Coins.  But none of Novomatic games has ever taken CashBet Coins, and a Mobile Gaming Telegram Community Manager admitted on November 12, 2018 that Mobile Gaming has never finalized a partnership agreement with Novomatic.

46.     Mobile Gaming's representations about being able to use CashBet Coins in connection with Lottery.com were false.  Lottery.com has never accepted CashBet Coin, as the only tokens that can be used on its sites are Lottery's own tokens.[4]

47.     Contrary to the representations in the marketing materials given by Mobile Gaming to Nirvana and Strong, Imperial Play has never accepted CashBet Coin for any of its sites.

48.     Mobile Gaming falsely represented to Nirvana and Strong that the ICO was closing and they had to finalize their purchases of CashBet Coins by May 21, 2018.  After signing their Token Purchase Agreements on May 21, Nirvana and Strong each communicated with multiple other buyers who finalized CashBet Coin purchases after May 21.

---

[3] *See*, https://www.cashbet.com/about_us, last accessed on December 4, 2018.

[4]*See, e.g.,* https://sto.lottery.com/; and https://www.youtube.com/watch?v=Nx9HYKNaDhA both last accessed on December 4, 2018.

49.    At the time of his purchase of CashBet Coins on May 21, 2018, Strong saw reports noting that approximately 100 million CashBet Coins had been sold.  Mobile Gaming later disclosed that it ultimately sold 143 million CashBet Coins, which was all of the available tokens.

50.    Similarly, Hsu falsely represented to Nirvana and Strong that they would be receiving a discounted price well below the standard offering price.  Nirvana and Strong subsequently learned that Mobile Gaming offered similar discounts to other purchasers – making the same false representations about the supposed "discount pricing."

51.    Based on the funds raised by the CashBet Coin ICO and number of coins sold, the average sale price for a CashBet Coin was <u>27 cents</u> which is 64% percent lower than the last public sale price.  After the ICO had been completed, Mobile Gaming was questioned several times about how the average actual CashBet Coin price could be less than the lowest-disclosed officially offered price of 40 cents.  Mobile Gaming declined to respond to these questions.

## **FIRST CAUSE OF ACTION**

## **(VIOLATION OF SECTION 12(a)(1) OF THE SECURITIES ACT)**

52.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

53.    Section 12(a)(1) of the Securities act provides plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, stating that defendants:

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

54.    From January 2018 through May 2018, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act when Defendants, among other things, used the internet for these purposes.

55.    The ICO was a sale of unregistered securities under controlling federal law.  CashBet Coins satisfy the *Howey* test as follows: (a) in order to receive any CashBet Coins, Plaintiffs had to make an investment of money, in the form of US currency, ETH, BTC or other virtual currencies; (b)

the investment of money was made into the common enterprise that is Mobile Gaming and its potential future "business lines"; and (c) the success of the investment and any potential returns stemming from the potential future increase in CashBet Coin's value was entirely reliant upon the Mobile Gaming platform and its supposed online gambling casinos.

56.     Accordingly, Defendants participated in an unregistered sale of securities in violation of the Securities Act, and are thereby liable to Plaintiffs for rescission and/or compensatory damages.

## SECOND CAUSE OF ACTION

## (VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT)

57.     Plaintiffs Nirvana and Strong repeat and re-allege the preceding allegations as if fully set forth herein.

58.     Through the CashBet Coin ICO, Defendants solicited the purchase of securities by Plaintiffs Nirvana and Strong for their own financial gain.

59.     The offering documents issued by Defendants for the CashBet Coin ICO, including but not limited to the White Paper and the May iGaming Presentation, contained misstatements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

60.     Defendant Reaves and Director Hsu orally misstated material facts to Plaintiffs Nirvana and Strong in connection with their purchase of CashBet Coins, omitted to state facts necessary to make their oral statements not misleading, and concealed and failed to orally disclose material facts.

61.     Plaintiffs Nirvana and Strong did not know, and in the exercise of due diligence could not have known, of the untruths and omissions contained in the oral communications from Defendant Reaves and Hsu.

62.     Plaintiffs Nirvana and Strong suffered damages based on Defendants' misstatements and omissions of material fact.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRD CAUSE OF ACTION**

**(VIOLATION OF SECTION 15(a) OF THE SECURITIES ACT)**

63.     Plaintiffs Nirvana and Strong repeat and re-allege the preceding allegations as if fully set forth herein.

64.     In light of their ownership interest in and/or role in managing Mobile Gaming and conducting its functions, the individual Defendants acted as controlling persons of Cashbet within the meaning of Section 15(a) of the Securities Act.

65.     By virtue of their positions as officers and/or directors and participation in and/or awareness of Mobile Gaming's operations, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the CashBet Coin ICO, including the decision to engage in the sale of unregistered securities via that ICO.

66.     Accordingly, the individually named Defendants are liable as control persons of Mobile Gaming under Section 15(a) of the Securities Act.

**FOURTH CAUSE OF ACTION**

**(VIOLATION OF SECTION 11 OF THE SECURITIES ACT)**

67.     Plaintiffs Nirvana and Strong repeat and re-allege the preceding allegations as if fully set forth herein.

68.     The offering documents issued by Defendants for the CashBet Coin ICO, including but not limited to the White Paper and the May iGaming Presentation, contained misstatements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

69.     The misstatements and omissions in the offering documents issued by Defendants for the CashBet Coin ICO were material and misled Plaintiffs Nirvana and Strong about the nature of their investments in the CashBet Coins.

70.     Plaintiffs Nirvana and Strong have suffered damages based on their reasonable reliance on the misstatements and omissions in the offering documents issued by Defendants for the CashBet Coin ICO.

1
2

## FIFTH CAUSE OF ACTION

## (FRAUD)

3
4

71.     Plaintiffs Nirvana and Strong repeat and re-allege the preceding allegations as if fully set forth herein.

5
6
7
8
9
10
11
12

72.     Defendants made various misrepresentations to Plaintiffs Nirvana and Strong, including the following: (a) CashBet Coins were utility tokens that gamblers supposedly would be able to use in virtual casinos, which was false; (b) they had 4.25 million active players per month, which was false; (c) investors would be able to use CashBet Coins to buy goods or services through Defendants' gambling "ecosystem" and that the tokens would rise in value given the way the ecosystem was created, which was false; (d) Plaintiffs Nirvana and Strong had an opportunity to purchase CashBet Coins at a steep discount of 50% or more, which was false; and (e) that the ICO was closing imminently and their purchases had to be finalized in less than a week's time, which was false.

13
14
15

73.     Plaintiffs Nirvana and Strong did not know that Defendants' misrepresentations were false when they were made, and Plaintiffs Nirvana and Strong reasonably relied on them in making their decision to purchase CashBet Coins in the ICO.

16

74.     Defendants' misrepresentations have caused Plaintiffs to suffer damages.

17
18

75.     As a result of Defendants' fraud, plaintiffs Nirvana and Strong are entitled to an award of compensatory and punitive damages.

19

## PRAYER FOR RELIEF

20

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

21
22

a.     Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

23
24

b.     Declaring that Defendants are liable to Plaintiffs pursuant to Sections 11, 12(a)(1), 12(a)(2) and 15(a) of the Securities Act and for fraud;

25

c.     Awarding rescission of the investments made by Plaintiffs in the CashBet Coin ICO;

26
27

d.     Awarding compensatory and punitive damages against Defendants and in favor of Plaintiffs;

28

1         e.       Awarding Plaintiffs the costs of this action, including pre-judgment and post-judgment

2  interest, reasonable attorneys' and experts' fees; and

3         f.       Granting such further relief as this Court deems just and proper.

4

5  Dated: December 12, 2018                     HORIZONS LAW & CONSULTING GROUP

6

7                                         By: _/s/ Ryón Nixon_____

8                                                 Ryón Nixon
                                                 Attorneys for Plaintiffs

9

10  *Of Counsel:*
    Aaron M. Zeisler (to be admitted *pro hac vice*)

11  Brian A. Burns (to be admitted *pro hac vice*)
    **ZEISLER PLLC**

12  800 Third Avenue, Suite 2800
    New York, NY 10022

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>JURY DEMAND</u>

Plaintiffs respectfully request a jury trial on all issues triable thereby.

Dated: December 12, 2018                    HORIZONS LAW & CONSULTING GROUP


                                            By:   _/s/ Ryón Nixon_____
                                                  Ryón Nixon
                                                  Attorneys for Plaintiffs

# EXHIBIT A

# CASHBET ALDERNEY LIMITED

## TOKEN PURCHASE AGREEMENT

THIS CERTIFIES THAT in exchange for the payment by the undersigned purchaser (the "**Purchaser**") of the amount set forth below (the "**Purchase Amount**") on or about the date set forth below, CashBet Alderney Limited (the "**Company**"), will issue to the Purchaser, following the completion of the CashBet Coin Public Token Sale, that number of CashBet Coin tokens set forth below (the "**Purchased Tokens**").

The purchase and sale of the Purchased Tokens pursuant to this Token Purchase Agreement are subject to the TERMS & CONDITIONS attached as Exhibit A hereto (the "**Terms**"), which are incorporated herein by reference, in all respects. By executing this Token Purchase Agreement, the Purchaser acknowledges and agrees to the Terms. Purchaser acknowledges and agrees that the Terms may be modified from time to time in the Company's sole discretion with the amended Terms posted at https://ico.cashbet.com/cashbet/legal/MGT_Cashbet_Token_Sale_Terms_and_Conditions.pdf.

The Purchaser hereby agrees that, without the prior written consent of the Company, the Purchaser will not, during the period commencing upon issuance of the Purchased Tokens and continuing for the number of days set forth below: (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, this Token Purchase Agreement or any Purchased Tokens, or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of this Token Purchase Agreement or the Purchased Tokens.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

| CASHBET ALDERNEY LIMITED: | PURCHASER: Nirvana Capital Limited. |
|---|---|
| By:_____ Name: Michael P. Reaves Title: Director Email: mreaves@cashbet.com | By: _Pufan Jiang_ Name: Pufan Jiang Title: General Partner. Address: 1002, Unit 1, Junhuiyaju, No.3 |
| By: _Fred Hsu_ Name: Fred Hsu Title: Director Email: fhsu@cashbet.com | Baijiazhuang Beili, Chaoyang, Beijing, China Email: Alfred @ nirvana.capital |
| Address: Inchalla Le Val Alderney GY9 3UL | |

### PURCHASE DETAILS

Purchase Amount: $ 400 0000

Purchase Date: 5/21, 2018

Purchased Tokens: 11428571.4

Lockup Period: 45 days with respect to first 50% of the Purchased Tokens; 90 days with respect to second 50%

# CASHBET ALDERNEY LIMITED

## TOKEN PURCHASE AGREEMENT

THIS CERTIFIES THAT in exchange for the payment by the undersigned purchaser (the "**Purchaser**") of the amount set forth below (the "**Purchase Amount**") on or about the date set forth below, CashBet Alderney Limited (the "**Company**"), will issue to the Purchaser, following the completion of the CashBet Coin Public Token Sale, that number of CashBet Coin tokens set forth below (the "**Purchased Tokens**").

The purchase and sale of the Purchased Tokens pursuant to this Token Purchase Agreement are subject to the TERMS & CONDITIONS attached as Exhibit A hereto (the "**Terms**"), which are incorporated herein by reference, in all respects. By executing this Token Purchase Agreement, the Purchaser acknowledges and agrees to the Terms. Purchaser acknowledges and agrees that the Terms may be modified from time to time in the Company's sole discretion with the amended Terms posted at https://ico.cashbet.com/cashbet/legal/MGT_Cashbet_Token_Sale_Terms_and_Conditions.pdf.

The Purchaser hereby agrees that, without the prior written consent of the Company, the Purchaser will not, during the period commencing upon issuance of the Purchased Tokens and continuing for the number of days set forth below: (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, this Token Purchase Agreement or any Purchased Tokens, or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of this Token Purchase Agreement or the Purchased Tokens.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

| CASHBET ALDERNEY LIMITED: | PURCHASER: |
|---|---|
| By:_____<br>Name: Michael P. Reaves<br>Title: Director<br>Email: mreaves@cashbet.com<br><br>By:_____<br>Name: Fred Hsu<br>Title: Director<br>Email: fhsu@cashbet.com<br><br>Address:<br>Inchalla<br>Le Val<br>Alderney<br>GY9 3UL | By:_____<br><br>Name:<br><br>Title:<br><br>Address:<br><br>Email: |

| PURCHASE DETAILS | |
|---|---|
| Purchase Amount: $_____ | Purchase Date: _____ |
| Purchased Tokens: _____ | Lockup Period: 45 days with respect to first 50% of the Purchased Tokens;  90 days with respect to second 50% |

**PAYMENT INFORMATION**

| USD | Please provide the following information to your financial institution:<br><br>Wire Routing Transit Number: 121000248<br>SWIFT Code (Non-US transfers): WFBIUS6S<br>Bank Name: Wells Fargo Bank<br>City, State: San Francisco, CA<br>Account Number: 1881191785<br>Title of Account: MOBILE GAMING TECHNOLOGIES, INC. |
|---|---|
| BTC | 3KLstz9Jz2ZaHKdUjUtkw9zCiUKdW61zsA |
| ETH | 0x2E824F459c70d801e683cD2D566aE1571d8b468D |
| Please send remittance confirmation to: ico@cashbet.com | |

4837-1022-3456, v. 1

**EXHIBIT A**

**TERMS & CONDITIONS**

4837-1022-3456, v. 1

THERE IS CURRENTLY SUBSTANTIAL UNCERTAINTY IN VARIOUS JURISDICTIONS AS TO THE APPLICATION OF SECURITIES, COMMODITY, FINANCIAL, TAX AND OTHER LAWS AND REGULATIONS RELATING TO THE ISSUANCE OF CRYPTOGRAPHIC TOKENS, AND THE APPLICATION OF OTHER LAWS AND REGULATIONS MAY BE FACT-SPECIFIC AND SUBJECT TO CHANGE. THIS TOKEN IS NOT INTENDED TO BE OFFERED WHERE NOT PERMITTED BY APPLICABLE LAW. BECAUSE OF SUCH UNCERTAINTY, YOU SHOULD NOT PURCHASE THIS TOKEN IF YOU BELIEVE SUCH PURCHASE IS NOT PERMITTED IN YOUR JURISDICTION OF RESIDENCE, ORGANIZATION OR PRINCIPAL PLACE OF BUSINESS. THE OFFER AND SALE OF THIS TOKEN HAS NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE OR ANY OTHER AUTHORITY IN ANY OTHER COUNTRY OR JURISDICTION. THIS TOKEN IS SOLELY INTENDED TO BE SOLD FOR USE ON OUR PLATFORM, BUT BECAUSE OF THE RISK THAT THE OFFER AND SALE OF THIS TOKEN COULD CONSTITUTE THE OFFER AND SALE OF A SECURITY, THE TOKEN MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED TO THE EXTENT THE SECURITIES ACT OR STATE SECURITIES LAWS ARE APPLICABLE, EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION.

## CashBet Initial Coin Offering

PLEASE READ THESE TERMS OF SALE CAREFULLY. BY ATTEMPTING TO PURCHASE OR PURCHASING CASHBET COIN, YOU AGREE TO BE LEGALLY BOUND BY THESE TERMS & CONDITIONS AND ALL TERMS INCORPORATED HEREIN BY REFERENCE.

BY ACCEPTING THESE TERMS & CONDITIONS, YOU WILL BE ENTERING INTO A BINDING AGREEMENT WITH CASHBET. THESE TERMS & CONDITIONS CONTAIN PROVISIONS WHICH AFFECT YOUR LEGAL RIGHTS. NOTE THAT SECTION 15 CONTAINS A BINDING ARBITRATION SECTION. IF YOU DO NOT AGREE TO THESE TERMS & CONDITIONS, DO NOT MAKE A CONTRIBUTION FOR THE PURCHASE OF CASHBET COIN AND NAVIGATE AWAY FROM THE CASHBET WEBSITE.

These Terms & Conditions and any terms expressly incorporated herein (collectively, the "**Agreement**") govern the purchase (the "**Purchase**") by you ("**Purchaser**" or "**you**") of the tokens distributed (the "**CashBet Coin**") from Cashbet Alderney Limited, an Alderney Limited Company ("**CashBet**", "**Company**", "**us**", "**our**" or "**we**") during the token sale period (the "**Sale Period**"), and your use of the related CashBet token contract (the "**CashBet Token Smart Contract**"). Purchaser and CashBet are herein referred to individually as a "**Party**" and, collectively, as the "**Parties**". There may be other entities within the CashBet group of companies from time-to-time ("**CashBet Companies**") that will develop, manage and/or operate the CashBet Platform (as defined in Section 1.2 below) (or parts thereof) and references in the Agreement to CashBet shall be to CashBet, the CashBet Companies and their respective successors and assigns.

FOR RESIDENTS OF THE UNITED STATES: TOKENS ARE ONLY BEING OFFERED AND SOLD TO RESIDENTS OF THE UNITED STATES WHO QUALIFY AS "ACCREDITED INVESTORS" UNDER REGULATIONS ISSUED PURSUANT TO THE SECURITIES ACT.

FOR RESIDENTS OF NEW YORK: CASHBET COIN ARE NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF, OR ANY PERSON LOCATED IN, THE STATE OF NEW YORK OR ANY ENTITY, INCLUDING, WITHOUT LIMITATION, ANY CORPORATION OR PARTNERSHIP CREATED OR ORGANIZED IN OR UNDER THE LAWS OF THE STATE OF NEW YORK ("**NEW YORK PERSONS**"). CASHBET IS NOT SOLICITING PURCHASES BY NEW YORK PERSONS IN ANY WAY.

FOR RESIDENTS OF THE PEOPLE'S REPUBLIC OF CHINA (WHICH, FOR THE PURPOSES OF THIS AGREEMENT, DOES NOT INCLUDE HONG KONG, MACAU AND TAIWAN) ONLY: IF YOU ARE CITIZEN OR RESIDENT OF, OR A PERSON LOCATED OR DOMICILED IN, THE PEOPLE'S REPUBLIC OF CHINA OR ANY ENTITY, INCLUDING, WITHOUT LIMITATION, ANY CORPORATION OR PARTNERSHIP CREATED OR ORGANIZED IN OR UNDER THE LAWS OF THE PEOPLE'S REPUBLIC OF CHINA (COLLECTIVELY, "**PRC PERSONS**"), DO NOT PURCHASE OR ATTEMPT TO PURCHASE CASHBET COIN OR USE THE CASHBET TOKEN SMART CONTRACT OR THE CASHBET SMART SALE CONTRACT. PRC PERSONS ARE STRICTLY PROHIBITED AND RESTRICTED FROM USING THE CASHBET TOKEN SMART CONTRACTS. CASHBET COIN MAY NOT BE MARKETED, OFFERED OR SOLD DIRECTLY OR INDIRECTLY TO PRC PERSONS, AND NEITHER THIS SITE NOR THIS AGREEMENT, NOR ANY MATERIAL OR INFORMATION CONTAINED HEREIN PERTAINING TO CASHBET COIN, MAY BE SUPPLIED TO PRC PERSONS OR USED IN CONNECTION WITH ANY OFFER FOR THE SALE OF CASHBET COIN TO PRC PERSONS.

FOR RESIDENTS OF CUBA, IRAN, NORTH KOREA, SYRIA AND THE CRIMEA REGION: CASHBET COIN ARE NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF OR ANY PERSON LOCATED OR DOMICILED IN CUBA, IRAN, NORTH KOREA, SYRIA, THE CRIMEA REGION OR ANY OTHER COUNTRY OR TERRITORY THAT IS SUBJECT OF COUNTRY-WIDE OR TERRITORY-WIDE SANCTIONS.

THE INFORMATION CONTAINED IN THIS SITE AND THIS AGREEMENT DO NOT CONSTITUTE A PROSPECTUS OR OFFERING DOCUMENT, OR AN OFFER TO SELL OR AN INVITATION, ADVERTISEMENT OR SOLICITATION OF AN OFFER TO BUY SECURITIES. CASHBET COIN IS NOT AN INVESTMENT. CASHBET COIN IS NOT AN INVESTMENT PRODUCT BUT WILL BE REQUIRED TO USE THE CASHBET PLATFORM WHEN IT IS COMPLETED. THERE SHOULD BE NO EXPECTATION OF FUTURE PROFIT OR GAIN FROM THE PURCHASE OF CASHBET COIN.

THE SITE IS NOT INTENDED FOR USE BY ANYONE UNDER THE AGE OF 18. CASHBET COIN MAY NOT BE PURCHASED THROUGH THE SITE BY ANYONE UNDER THE AGE OF 18. BY USING THE SITE AND/OR PURCHASING CASHBET COIN THROUGH THIS SITE, YOU REPRESENT AND WARRANT THAT YOU ARE 18 YEARS OF AGE OR OLDER.

If you have any questions relating to the Agreement, please contact us at ico@cashbet.com.

1.    **SCOPE OF TERMS**

    1.1    **Scope.** Unless otherwise stated herein, this Agreement governs only your Purchase of CashBet Coin from us during the Sale Period, and your corresponding use of the CashBet Token Smart Contract.

    1.2    **Platform Terms of Use.** Any use of CashBet Coin in connection with providing or receiving services on the CashBet platform (the "**CashBet Platform**") will be governed by other applicable terms and policies (collectively, the "**Platform Terms and Policies**"), which will be made available on the CashBet Platform website when the CashBet services are operational. The planned services to be offered through the CashBet Platform, which is subject to change, is set forth in the White Paper (see Section 1.4, below). We may add new terms or policies to the Platform Terms and Policies in our sole discretion and may update each of the Platform Terms and Policies from time to time according to modification procedures set forth therein. To the extent of any conflict between this Agreement and the Platform Terms and Policies, this

Agreement shall govern your Purchase, and the Platform Terms and Policies shall govern your use of the CashBet Platform.

1.3    **Website Terms of Use**. Use of this website (https://www.cashbet.com/, https://coin.cashbet.com, and https://ico.cashbet.com) (collectively, our "**Site**") is governed by terms of use, as may be amended from time to time (the "**Terms of Use**"), which can be found through the "Terms" link (https://coin.cashbet.com/terms/). Those Terms of Use are hereby incorporated by reference. Purchaser has read, understands and agrees to those Terms of Use.

1.4    **White Paper**. CashBet has prepared a white paper, available on our Site, which describes the proposed uses of the CashBet Coin (the "**White Paper**"). The White Paper is of a descriptive nature only, and is not binding and does not form part of these Terms and Conditions.

2.    **CASHBET COIN SALE PROCEDURES AND SPECIFICATIONS**

2.1    **General**. CashBet intends to allocate and distribute a limited number of CashBet Coin (the "**CashBet Token Sale**"). Important information about the procedures and specifications of our CashBet Token Sale is provided in **Exhibit A**, including, but not limited to, details regarding the timing and pricing of the CashBet Token Sale, the amount of CashBet Coin we will sell and our anticipated use of the CashBet Token Sale proceeds. BY PURCHASING CASHBET COIN, YOU ACKNOWLEDGE THAT YOU UNDERSTAND AND HAVE NO OBJECTION TO THESE PROCEDURES AND SPECIFICATIONS.

2.2    **Final Sale**. Your Purchase of CashBet Coin from us during the Sale Period is final, and there are no refunds or cancellations except as may be required by applicable law or regulation. We reserve the right to refuse or cancel CashBet Coin purchase requests at any time in our sole discretion.

2.3    **Not an Offering of Securities**. Purchaser acknowledges and agrees that the sale of CashBet Coin and the CashBet Coin themselves are not an investment, security, share or equity interest, debt or loan nor a derivative instrument of any of the foregoing. This Agreement and all other documents referred to in this Agreement, do not constitute a prospectus or offering document and are not an offer to sell nor the solicitation of an offer to buy an investment, security, share, equity interest or debt nor a derivative interest of any of the foregoing.

2.4    **Not an Investment**. Purchaser should not participate in the CashBet Token Sale or Purchase CashBet Coin for investment purposes. The Purchase of CashBet Coin pursuant to this Agreement is not designed for investment purposes and should not be considered as a type of investment. CashBet Coin may not be transferred until the end of the Sale Period. Purchaser agrees not to sell or transfer CashBet Coin unless such sale or transfer is made pursuant to an exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), if applicable. Purchaser acknowledges, understands and agrees that Purchaser should not expect, and there is no guarantee or representation or warranty by CashBet, that (a) CashBet Coin will be listed for trading on any exchange, or (b) the CashBet Platform will be adopted as described in the White Paper and not in a different or modified form.

3

**2.5** **Not for Speculation.** Purchaser acknowledges and agrees that Purchaser is not purchasing CashBet Coin for purposes of investment or speculation or for immediate resale or other financial purposes. Purchaser acknowledges and agrees that Purchaser has no expectation of economic benefit or profit from purchasing CashBet Coin. Purchaser agrees that it has no present intention of selling or otherwise distributing CashBet Coin. Purchaser agrees that if Purchaser determines to transfer CashBet Coin, Purchaser will not portray CashBet Coin to prospective transferees as an investment opportunity to obtain an economic benefit or profit. Purchaser acknowledges it is Purchaser's sole responsibility to determine if such transfer is permissible at such time under applicable laws.

## 3. NO OTHER RIGHTS CREATED

**3.1** **No Claim, Loan or Ownership Interest.** The Purchase of CashBet Coin (a) does not provide Purchaser with rights of any type with respect to CashBet or its revenues or assets, including, but not limited to, any voting, distribution, redemption, liquidation, proprietary or other financial or legal rights, (b) is not a loan to CashBet and (c) does not provide Purchaser with any ownership or other interest in CashBet.

**3.2** **Intellectual Property.** CashBet retains all right, title and interest in all of CashBet's intellectual property, including, without limitation, inventions, ideas, discoveries, software, processes, marks, methods, information and data, whether or not protectable by patent, copyright or trademark. Purchaser may not use any of CashBet's intellectual property for any reason without CashBet's prior written consent.

## 4. RISKS

**4.1** **Acknowledgement.** You expressly acknowledge that you have carefully reviewed and understand and assume the risks associated with purchasing, holding and using CashBet Coin and using the corresponding CashBet Token Smart Contract, as disclosed and explained in **Exhibit B.** BY PURCHASING CASHBET COIN USING THE CASHBET TOKEN SMART CONTRACTS, YOU EXPRESSLY ACKNOWLEDGE AND ASSUME THESE RISKS, INCLUDING THAT CASHBET COIN MAY HAVE NO VALUE.

## 5. AUDIT OF THE SMART CONTRACT SYSTEM

**5.1** Smart contract technology is still in an early stage of development and its application is currently of an experimental nature, which carries significant operational, technological, financial, regulatory and reputational risks. Accordingly, while any audit conducted shall raise the level of security and accuracy of CashBet's smart contract system, you acknowledge, understand and accept that any audit does not amount to any form of warranty, representation or assurance (in each case whether express or implied) that CashBet's smart contract system and CashBet Coin are fit for a particular purpose or that they are free from any defects, weaknesses, vulnerabilities, viruses or bugs which could cause, inter alia, the complete loss of your USD or cryptocurrency contribution and/or CashBet Coin.

## 6. SECURITY

**6.1** **Your Obligations.** You are responsible for implementing reasonable measures for secure access to the device, wallet, vault or other storage mechanism you use to Purchase, receive and hold CashBet Coin you Purchase from us, including any requisite private key(s), usernames, passwords or other login or credentials necessary to access such storage mechanism(s). If your private key(s) or other access credentials are lost, you may lose access to your CashBet Coin. We are not responsible for any such losses. You understand and agree that all Purchases of CashBet Coin are non-refundable and you will not receive money or other compensation for any CashBet Coin purchased.

**6.2** **KYC process.** You accept that you will receive your CashBet Coin ONLY after having successfully passed through our "Know-Your-Customer" ("**KYC**") process and/or the KYC process of Cynopsis (https://cynopsis-solutions.com) (the "**KYC Provider**"). This includes a basic KYC review prior to purchase and an enhanced KYC review upon purchase. This means that CashBet Coin will not be distributed until you have passed through this screening successfully. If you fail to pass the KYC screening you will not receive your CashBet Coin. In the case that you do not successfully pass the KYC screening, you agree that the Company and/or the KYC Provider will hold your funds until the CashBet Coin are fully distributed. You agree that the Company and/or the KYC Provider may use your submitted information in any way required by law or deemed necessary and that your funds used to purchase CashBet Coin will not be automatically refunded to you without first submitting a refund request and that a refund request MUST be submitted within 6 weeks of the CashBet Token Sale end date. A valid user account and ERC-20 wallet address on https://ico.cashbet.com are required to receive your Tokens because your Tokens will be delivered to the ERC-20 wallet address linked to your user account.

## 7. PERSONAL INFORMATION

**7.1** **Privacy Policy.** Please refer to our Privacy Policy (https://coin.cashbet.com/privacy/) for information about how we collect, use and share your information.

## 8. TAXES

**8.1** **Tax Treatment.** The purchase price that you pay for CashBet Coin is exclusive of all applicable taxes. You are responsible for determining what, if any, taxes apply to your Purchase of CashBet Coin, including, for example, sales, use, value added and similar taxes. It is also your responsibility to withhold, collect, report and remit the correct taxes to the appropriate tax authorities. We are not responsible for withholding, collecting, reporting or remitting any sales, use, value added or similar tax arising from your Purchase of CashBet Coin.

**8.2** **Acknowledgement.** You acknowledge, understand and agree that (a) the Purchase and receipt of CashBet Coin may have tax consequences for you, (b) you are solely responsible for compliance with your tax obligations, and (c) CashBet bears no liability or responsibility with respect to any tax consequences to you associated with or arising from the creation, ownership, use or liquidation of CashBet Coin or any other action or transaction related to the CashBet Platform or the CashBet Token Sale.

9.      **REPRESENTATIONS AND WARRANTIES**

9.1     **Representations by Purchaser.** By purchasing CashBet Coin, you represent and warrant that:

9.1.1.  You have read and understand this Agreement (including all Exhibits) and the White Paper;

9.1.2.  You have the necessary authority and consent to accept the Agreement, to enter into a binding agreement with CashBet and to perform the obligations set out herein;

9.1.3.  The acceptance of the Agreement and the entry into a binding agreement with CashBet shall not result in any breach of, be in conflict with, or constitute a material default under: (i) any provision of the Purchaser's constitutional or organizational documents (in the case of a corporate entity including, without limitation. any company or partnership); (ii) any provision of any judgment, decree or order imposed on the Purchaser by any court or governmental or regulatory authority; and/or (iii) any material agreement, obligation, duty or commitment to which the Purchaser is a party or by which the Purchaser is bound;

9.1.4.  You have sufficient knowledge and experience in business and financial matters, including a sufficient understanding of blockchain or cryptographic tokens and other digital assets, smart contracts, token storage mechanisms (such as digital or token wallets), blockchain-based software systems and blockchain technology, to be able to evaluate the risks and merits of your Purchase of CashBet Coin, including, but not limited to, the matters set forth in this Agreement and to appreciate the risks and implications of purchasing CashBet Coin, and you are able to bear the risks thereof, including loss of all amounts paid, loss of CashBet Coin and liability to the CashBet Parties (as defined in Section 11.1) and others for your acts and omissions, including, without limitation, those constituting breach of this Agreement, negligence, fraud or willful misconduct;

9.1.5.  You have obtained sufficient information about CashBet Coin to make an informed decision to Purchase CashBet Coin;

9.1.6.  You understand that CashBet Coin confer only the right to provide and receive services on the CashBet Platform, and confer no other rights of any form with respect to CashBet, including, but not limited to, any voting, distribution, redemption, liquidation or other financial and legal rights;

9.1.7.  You are not purchasing CashBet Coin for any uses or purposes other than to provide or receive services on the CashBet Platform, including, but not limited to, any investment, speculative or other financial purposes;

9.1.8.  You are not a PRC Person, a New York Person or a person located, organized or resident in Cuba, Iran, North Korea, Syria or the Crimea

Region or any other country or territory that is subject of world-wide or territory wide sanctions; nor are you making a contribution for the purchase of CashBet Coin for or on behalf of any such person or entity;

**9.1.9.** You have all requisite power and authority to execute and deliver this Agreement, to use the CashBet Token Smart Contract, to Purchase CashBet Coin and to carry out and perform your obligations under this Agreement;

**9.1.10.** If you are an individual, you are at least 18 years old and of sufficient legal age and capacity to Purchase CashBet Coin;

**9.1.11.** If you are an entity, Purchaser is duly organized, validly existing and in good standing under the laws of its domiciliary jurisdiction and each jurisdiction where it conducts business;

**9.1.12.** Your Purchase of CashBet Coin complies with applicable law and regulation in your jurisdiction, including, but not limited to, (a) legal capacity and any other threshold requirements in your jurisdiction for the Purchase of CashBet Coin and entering into this Agreement with us, (b) any foreign exchange or regulatory restrictions applicable to such Purchase, and (c) any governmental or other consents that may need to be obtained;

**9.1.13.** You will comply with any tax obligations applicable to you arising from your Purchase of CashBet Coin;

**9.1.14.** The funds, including any fiat, virtual currency or cryptocurrency you use to Purchase CashBet Coin, are not derived from or related to any unlawful activities, including, but not limited to, money laundering or terrorist financing, and you will not use the CashBet Coin to finance, engage in or otherwise support any unlawful activities;

**9.1.15.** All payments by you under this Agreement will be made only in your name, from a digital wallet or bank account not located in a country or territory that has been designated as a "non-cooperative country or territory" by the Financial Action Task Force and is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.) as amended, and the regulations promulgated thereunder by the Financial Crimes Enforcement Network, as such regulations may be amended from time to time;

**9.1.16.** The execution, delivery and performance of this Agreement will not result in any violation of, be in conflict with or constitute a default under, with or without the passage of time or the giving of notice (a) any provision of Purchaser's organizational documents, if applicable, (b) any provision of any judgment, decree or order to which you are a party, by which you are bound, or to which any of your assets are subject, (c) any agreement, obligation, duty or commitment to which you are a party or by which you are bound or (d) any laws, regulations or rules applicable to you;

**9.1.17.** The execution and delivery of, and performance under, this Agreement requires no approval or other action from any governmental authority or person other than you;

**9.1.18.** To the extent required by applicable law, you comply with all anti-money laundering ("**AML**") and counter the financing of terrorism ("**CFT**") requirements, including, but not limited to, (a) the applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, as amended (i.e., the Bank Secrecy Act), (b) any applicable money laundering statutes of all jurisdictions in which you are located, resident, organized or operate, and the rules and regulations thereunder, and/or (c) any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental authority to which you are subject ((a) through (c) collectively, the "**AML/CFT Laws**");

**9.1.19.** Neither you, nor any person having a direct or indirect beneficial interest in you or CashBet Coin being acquired by you, or any person for whom you are acting as agent or nominee in connection the purchase of CashBet Coin, (a) is the subject of economic or financial sanctions or trade embargoes administered or enforced by any country or government, including, but not limited to, those administered by the U.S. government through the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom or any other applicable jurisdictions (collectively, "**Sanctions**"), (b) is located, organized or resident in Cuba, Iran, North Korea, Syria, the Crimea Region or any other country or territory that is the subject of country-wide or territory-wide Sanctions, (c) is listed in any Sanctions-related list of sanctioned persons, including, but not limited to, those maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom and/or (d) is directly or indirectly owned or controlled by any person or persons described in the foregoing clauses (a) through (c);

**9.1.20.** Any contribution to be made by you for the purchase of CashBet Coin is not derived from or related to any unlawful activities, including but not limited to money laundering or terrorist financing activities;

**9.1.21.** You shall not use CashBet Coin to finance, engage in, or otherwise support any unlawful activities;

**9.1.22.** If you are purchasing CashBet Coin on behalf of any entity, you are authorized to accept this Agreement on such entity's behalf and such entity will be responsible for breach of this Agreement by you or any other employee or agent of such entity (references to "you" in this Agreement refer to you and such entity jointly);

**9.1.23.** You shall provide an accurate digital wallet address to CashBet for receipt of any CashBet Coin distributed to you by CashBet;

**9.1.24.** You understand and accept the risks of contributing to early stage blockchain start-up business and acknowledge that these risks are substantial. You further warrant and represent that your contribution does not represent a meaningful or substantial proportion of your wealth or net worth, and that you are willing to accept the risk of loss associated with the contribution made under the Agreement; and

**9.1.25.** In connection with the purchase of the CashBet Coin, you represent to the Company the following: You will provide to the Company, the KYC Vendor or to our nominee, immediately upon request, information that any of the three of us, in any of our sole discretion, deem necessary or appropriate in order to maintain compliance with any federal, state, local, domestic or foreign law, regulation or policy, including any "Know Your Customer" requirements and policies or any judicial process. Such information or documents may include but are not limited to, passports, driver's licenses, utility bills, photographs, government identification cards or sworn statements, or, if you are an entity, proof of legal existence such as a government-issued certificate of incorporation or notarized formation documents, and we, the KYC Vendor or our nominee, may keep a copy of such information and disclose such information and documents in order to comply with applicable laws, regulations, rules or agreements. You acknowledge that CashBet may refuse to distribute CashBet Coin to you until such requested information is provided.

## 10. ICOBOX AS PLATFORM FOR SALE OF CASHBET COIN

**10.1** Sale of the CashBet Coin is conducted through the platform ICOBox Ltd. ("**ICOBox**"). The information about purchased CashBet Coin will be reflected in your account at https://ico.cashbet.com ("**ICOBox Account**"). The purchased CashBet Coin would be available for use upon distribution by Company as set forth in **Exhibit A** of this Agreement.

**10.2** Any use of CashBet Coin will be governed primarily by other applicable terms and policies, which will be available at https://coin.cashbet.com/ upon the distribution of CashBet Coin (collectively, "**CashBet Terms and Conditions**"). CashBet Terms and Conditions may change from time to time at the provider's sole discretion with the amended CashBet Terms and Conditions posted instead of the previous version.

**10.3** **Purchase Procedure.** Sale of CashBet Coin is conducted through the ICOBox platform ("**ICOBox Platform**"). The information about purchased CashBet Coin will be reflected in your ICOBox Account. The purchased CashBet Coin would be available for use upon distribution by CashBet as set forth in **Exhibit A** of this Agreement.

## 11. INDEMNIFICATION

**11.1** **Scope of Indemnity.** To the fullest extent permitted by applicable law, Purchaser will indemnify, defend and hold harmless CashBet and its past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns (the

"**CashBet Parties**") from and against all claims, demands, actions, damages, losses, costs and expenses of any kind (including attorneys' fees) arising from or relating to (a) Purchaser's purchase or use of the CashBet Coin, (b) Purchaser's use of the CashBet Token Smart Contract, (c) Purchaser's responsibilities or obligations under this Agreement, (d) Purchaser's breach or violation of this Agreement, (e) any inaccuracy in any representation or warranty of Purchaser, (f) Purchaser's violation of any rights of any other person or entity and/or (g) any act or omission of Purchaser that is negligent or unlawful, or constitutes willful misconduct.

**11.2    CashBet Rights.** CashBet reserves the right, at its option, to exercise sole control over the defense, at your expense, of any claim subject to indemnification under Section 11.1. This indemnity is in addition to, and not in lieu of, any other indemnities set forth in any other written agreement between you and CashBet.

## 12.   DISCLAIMERS

**12.1    Disclaimer by CashBet.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS OTHERWISE SPECIFIED IN A WRITING BY US, (A) CASHBET COIN ARE SOLD ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, AND WE EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES AS TO THE CASHBET COIN, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, UTILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR AS TO THE WORKMANSHIP OR TECHNICAL CODING THEREOF, OR TITLE AND NON-INFRINGEMENT; (B) CASHBET DOES NOT REPRESENT OR WARRANT THAT THE CASHBET COIN OR THE CASHBET TOKEN SMART CONTRACTS ARE RELIABLE, CURRENT OR ERROR-FREE OR MEET PURCHASER'S REQUIREMENTS, OR THAT DEFECTS IN THE CASHBET COIN OR CASHBET TOKEN SMART CONTRACTS WILL BE CORRECTED; (C) CASHBET CANNOT AND DOES NOT REPRESENT OR WARRANT (i) THAT THE CASHBET COIN, THE DELIVERY MECHANISM FOR CASHBET COIN OR THE CASHBET TOKEN SMART CONTRACTS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS, (ii) THE ABILITY OF ANYONE TO PURCHASE OR USE THE CASHBET COIN, AND (iii) THAT THE PROCESS OF PURCHASING THE CASHBET COIN, RECEIVING THE CASHBET COIN OR USING THE CASHBET TOKEN SMART CONTRACTS WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT THE CASHBET COIN OR CASHBET TOKEN SMART CONTRACTS ARE RELIABLE AND ERROR-FREE. AS A RESULT, PURCHASER ACKNOWLEDGES AND UNDERSTANDS THAT PURCHASER MAY NEVER RECEIVE CASHBET COIN AND MAY LOSE THE ENTIRE AMOUNT PURCHASER PAID TO CASHBET.

**12.2    Exclusions.** Some jurisdictions do not allow for the exclusion of certain warranties or disclaimer of implied terms in contracts with consumers. If these laws apply to you, some or all of the limitations or exclusions may not apply to you, and you may have additional rights.

## 13.   LIMITATION OF LIABILITY

**13.1    No Consequential Damages.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NEITHER CASHBET NOR THE CASHBET PARTIES ARE RESPONSIBLE OR LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL,

SPECIAL, EXEMPLARY, PUNITIVE OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS, LOSS OF DATA OR LOST PROFITS), UNDER ANY LEGAL THEORY ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR YOUR PURCHASE OF CASHBET COIN, OR YOUR USE OF THE CASHBET TOKEN SMART CONTRACTS. YOUR SOLE REMEDY FOR DISSATISFACTION WITH THE PURCHASE PROCESS IS TO NOT MAKE A PURCHASE. THE SOLE AND EXCLUSIVE MAXIMUM LIABILITY OF CASHBET FOR ALL DAMAGES, LOSSES AND CAUSES OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE) OR OTHERWISE, SHALL BE THE TOTAL AMOUNT PAID BY YOU TO US FOR THE CASHBET COIN. THE FOREGOING LIMITATIONS WILL NOT LIMIT OR EXCLUDE LIABILITY FOR ANY LOSSES FOR WHICH, AS A MATTER OF APPLICABLE LAW, IT WOULD BE UNLAWFUL TO LIMIT OR EXCLUDE LIABILITY.

**13.2** **Exclusions.** Some jurisdictions may not allow the limitation or exclusion of liability for incidental or consequential damages. If these laws apply to you, some or all of the limitations or exclusions may not apply to you, and you may have additional rights.

## 14. DATA PROTECTION

**14.1** If we make an information request in accordance with Section 9.1.25, we may require you to provide information and documents relating to (without limitation):

- your identity;

- your address;

- the source of funds used for the purposes of purchasing CashBet Coin; and/or

- any other documents or data from which you can be identified (together your "**Personal Data**").

**14.2** We will not disclose your Personal Data except as expressly permitted under the Agreement and otherwise only with your prior consent. However, we may be required to disclose your Personal Data and/or certain other information about you to the extent required by applicable law or by an order of a court or competent governmental or regulatory authority. By accepting the Agreement, you expressly agree and consent to your Personal Data being disclosed to third parties to any extent required for the purposes of compliance with applicable law.

**14.3** We shall process your Personal Data in accordance with the Data Protection (Bailiwick of Guernsey) Law, 2001 as may be amended ("**Data Protection Law**"), and you agree that we, as the data controller, may directly or through our service providers or agents process your Personal Data for any one or more of the following purposes:

- the purchase of CashBet Coin and the processing of transactions related to the CashBet Token Sale pursuant to the Agreement;

11

- providing you with information about us and our range of services;

- compliance with any requirement imposed by applicable law or by an order of a court or competent governmental or regulatory authority;

- management of enquiries and complaints;

- opening, maintaining or operating a bank account in the Company's name;

- subject to Section 15, resolving any Disputes with you;

- producing summary information for statistical, regulatory and audit purposes; and/or

- any other reasonable purposes in accordance with applicable law.

**14.4**    Under the Data Protection Law you have a right to access your Personal Data held by us, and it is your responsibility to inform us of any changes to your Personal Data to ensure such data remains accurate. You also have a right to object to your Personal Data being processed for the purposes of direct marketing. You agree to provide a written request to us should you wish to enforce these rights.

**14.5**    You agree that we may, for the purposes set out in Section 14.3, permit the transfer of your Personal Data to any jurisdiction, whether or not inside the European Economic Area, and that by accepting the Agreement you authorize and expressly consent to the processing of your Personal Data by us, our agents and/or our service providers, provided that where your Personal Data is processed by entities other than us, our agents or our service providers, we shall seek your prior written consent in respect of such processing.

**14.6**    You acknowledge, accept and understand that the Agreement, insofar as they relate to the controlling and processing of your Personal Data by CashBet, our agents and/or service providers, are only relevant to the processing of your Personal Data for the purposes set out in Section 14.3, In order to access the CashBet Platform and provide or receive services therein or otherwise use and interact with the CashBet Platform, you will be required to accept the Platform Terms and Policies which shall also set out the terms and conditions under which your Personal Data is collected, stored and processed (as well as your individual rights under applicable data protection laws) in connection with your use of the CashBet Platform.

## 15.   DISPUTE RESOLUTION; ARBITRATION

PLEASE READ THE FOLLOWING SECTION CAREFULLY BECAUSE IT CONTAINS CERTAIN PROVISIONS, SUCH AS A BINDING ARBITRATION SECTION AND CLASS ACTION WAIVER, WHICH AFFECT YOUR LEGAL RIGHTS. THIS CLAUSE REQUIRES YOU TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH THE COMPANY AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM US.

**15.1**    **Binding Arbitration**: Except for any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "**Disputes**") in which either Party

seeks injunctive or other equitable relief for the alleged unlawful use of intellectual property, including, without limitation, copyrights, trademarks, trade names, logos, trade secrets or patents, you and the Company (i) waive your and the Company's respective rights to have any and all Disputes arising from or related to the Agreement resolved in a court, and (ii) waive your and the Company's respective rights to a jury trial. Instead, you and the Company agree to arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).

**15.2    No Class Arbitrations, Class or Representatives Actions**: Any Dispute arising out of or related to the Agreement is personal to you and the Company and will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

**15.3    Arbitration Rules**: Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the rules of the Arbitration (Guernsey) Law, 2016 (the "**Rules**") and are deemed to be incorporated by reference in this Section 15. By agreeing to be bound by the Agreement, you either (i) acknowledge and agree that you have read and understood the Rules, or (ii) waive your opportunity to read the Rules and any claim that the Rules are unfair or should not apply for any reason.

**15.4    Notice; Informal Dispute Resolution.** Each Party will notify the other Party in writing of any Dispute within thirty (30) days of the date it arises, so that the Parties can attempt in good faith to resolve the Dispute informally. Notice to the Company shall be sent by e-mail to the Company at ico-support@cashbet.com. Notice to you shall be sent to any address you provide to us in writing in a notice. Your notice must include (i) your name, postal address, email address and telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that you are seeking. If you and the Company cannot agree how to resolve the Dispute within thirty (30) days after the date that the notice is received by the applicable Party, then either you or the Company may, as appropriate and in accordance with this Section 15, commence an arbitration proceeding or, to the extent specifically provided for in Section 15.1, file a claim in court.

**15.5    Process.** Any arbitration will occur in Alderney. The arbitration will be conducted confidentially by a single arbitrator appointed in accordance with the Rules. The language to be used in the arbitral proceedings shall be English. The governing law of the Agreement shall be the substantive law of Alderney and the Alderney court will have exclusive jurisdiction over any appeals and the enforcement of an arbitration decision.

**15.6    Authority of Arbitrator.** These Terms & Conditions, the applicable Rules and the arbitrator will have (i) the exclusive authority and jurisdiction to make all

13

procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court, provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative or class action, which is prohibited by the Agreement. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding or preside over any proceeding involving more than one individual.

**15.7    Severability of Dispute Resolution and Arbitration Provisions.** If any term, clause or provision of this Section 15 is held invalid or unenforceable, it will be so held to the minimum extent applicable and required by law, and all other terms, clauses and provisions of this Section 15 will remain valid and enforceable. Further, the waivers set forth in Section 15.2 above are severable from the other provisions of the Agreement and will remain valid and enforceable, except as prohibited by applicable law.

## 16.    ELECTRONIC NOTICES

**16.1    Consent to Electronic Delivery.** You agree and consent to receive electronically all communications, agreements, documents, receipts, notices and disclosures (collectively "**Communications**") that CashBet provides in connection with your Purchase of CashBet Coin or use of the CashBet Token Smart Contract. You agree that CashBet may provide these Communications to you by posting them on the Site, by emailing them to you at the email address you provide and/or by sending an SMS or text message to a mobile phone number that you provide. Your carrier's normal, messaging, data and other rates and fees may apply to any mobile Communications. You should maintain copies of electronic Communications by printing a paper copy or saving an electronic copy.

**16.2    Withdrawal of Consent.** You may withdraw your consent to receive electronic Communications by sending a withdrawal notice to ico-support@cashbet.com. If you decline or withdraw consent to receive electronic Communications, CashBet may suspend or terminate your ability to purchase CashBet Coin.

## 17.    MISCELLANEOUS

**17.1    Governing Law and Venue.** Subject to Section 15, the Agreement and any dispute or claim arising out of or in connection with their subject matter or formation (including non-contractual disputes and claims) shall be governed by and construed in accordance with Guernsey law.

**17.2    Severability.** If any term, clause or provision of this Agreement is held unlawful, void or unenforceable, then that term, clause or provision will be severable from this Agreement and will not affect the validity or enforceability of any remaining part of that term, clause or provision, or any other term, clause or provision of this Agreement.

**17.3    Entire Agreement.** This Agreement, including the exhibits attached hereto and the materials incorporated herein by reference, constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous

agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, including, without limitation, any public or other statements or presentations made by any CashBet Party about the CashBet Coin or the CashBet Platform. Headings are for information purposes only.

**17.4    Assignment.** You may not assign or transfer any of your rights or obligations under this Agreement without prior written consent from CashBet, including by operation of law or in connection with any change of control. CashBet may assign or transfer any or all of its rights under this Agreement, in whole or in part, without obtaining your consent or approval.

**17.5    Waiver.** Our failure or delay in exercising any right, power or privilege under this Agreement shall not operate as a waiver thereof. All waivers by CashBet must be unequivocal and in writing to be effective.

**17.6    Force Majeure.** You understand and agree that CashBet shall not be liable and disclaims all liability to you in connection with any force majeure event, including acts of God, labor disputes or other industrial disturbances; electrical, telecommunications, hardware, software or other utility failures; software or smart contract bugs or weaknesses; earthquakes, storms, or other nature-related events; blockages, embargoes, riots, acts or orders of government; acts of terrorism or war; technological change; changes in interest rates or other monetary conditions; or other matters beyond the reasonable control of CashBet, including changes to any blockchain-related protocol.

**17.7    No Partnership; No Agency; No Third-Party Beneficiaries.** Nothing in this Agreement and no action taken by the Parties shall constitute, or be deemed to constitute, a partnership, association, joint venture or other co-operative entity between the Parties. Nothing in this Agreement and no action taken by the Parties pursuant to this Agreement shall constitute, or be deemed to constitute, either Party as the agent of the other Party for any purpose. No Party has, pursuant to this Agreement, any authority or power to bind or to contract in the name of the other Party. This Agreement does not create any third-party beneficiary rights in any person.

**17.8    Modifications.** We reserve the right to make changes or modifications to this Agreement from time to time, in our sole discretion. If we make changes to this Agreement, we will provide notice of such changes, which may include sending you an email, providing notice on the homepage of the Site, and/or posting an amended Agreement, and updating the "Last Updated" date above. The modified Agreement will become effective upon posting and will apply to any Purchase or use of CashBet Coin made after the modified Agreement becomes effective.

**17.9    Termination.** Notwithstanding anything contained in this Agreement, we reserve the right, without notice and in our sole discretion, to terminate your right to Purchase CashBet Coin, at any time and for any reason, and you acknowledge and agree that CashBet shall have no liability or obligation to you in such event to the fullest extent permitted by applicable law.

**Exhibit A**

**CashBet Token Sale Procedures and Specifications**

## Token Sale

1. *Total Token Supply*

   - 430,000,000 ERC20 CashBet Coin Tokens
   - No additional tokens will be created beyond this amount

2. *Token Distribution*

For every one token which is sold, three tokens will be distributed according to the following plan:



| 33.25% | 35.00% | 16.75% | 8.00% | 7.00% |
|---|---|---|---|---|
| Token Sale | Casino Bank Reserve | Team Retention | Referral | Advisors |

*Figure 1 - Token Distribution Plan*

3. *Token Sale Structure*

The Token sale event allows you to contribute to CashBet to receive CBC ERC20 Tokens.

CashBet's token sale will consist of two pre-sales and a public sale as defined below. A soft cap of $5 million equivalent value will be enforced (the "**Soft Cap**"). The Token Sale will end early if the hard cap is reached prior to the end of the public sale.

   a.   *First Pre-Sale*

| Start Date | Wednesday, January 24 2018, 5:00 p.m. GMT |
|---|---|
| End Date | Tuesday, February 20 2018, 5:00 p.m. GMT |
| Minimum Purchase | $25,000 USD equivalent |
| Discount | 20% discount on the initial token price of $0.50 USD |
| Participation | Open to all participants meeting the Participation Eligibility Rules |
| Contract Type | Future tokens will be offered through the sale and issuance of Simple Agreements for Future Equity (SAFTs) to certain (i) accredited Investors, as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended, and (ii) other parties who are |

| | not deemed to be U.S. persons within the meaning of Rule 902 of Regulation S of the Securities Act of 1933, as amended. |
|---|---|

### b. Second Pre-Sale

| Start Date | Tuesday, March 27 2018, 5:00 p.m. GMT |
|---|---|
| End Date | Tuesday, April 3 2018, 5:00 p.m. GMT |
| Minimum Purchase | $10,000 USD equivalent |
| Discount | 16% discount on the initial token price of $0.50 USD |
| Participation | Open to all participants meeting the Participation Eligibility Rules |
| Contract Type | Future tokens will be offered through a Token Purchase Agreement to certain (i) accredited Investors, as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended, and (ii) other parties who are not deemed to be U.S. persons within the meaning of Rule 902 of Regulation S of the Securities Act of 1933, as amended. |

### c.      Public Sale

| Start Date | Tuesday, April 10 2018, 5:00 p.m. GMT |
|---|---|
| End Date | Friday, April 27 2018, 5:00 p.m. GMT |
| Discount | <ul><li>10% discount during first 24 hours</li><li>6% discount during second 24 hours</li><li>No further discounts will be offered after this</li></ul> |
| Participation | Open to all participants meeting the Participation Eligibility Rules |

### d.      Modifications

CashBet reserves the right in its sole discretion, to change the date and/or time when the Pre-Sales and Public Sale will begin and further reserves the right in its sole discretion, to extend the duration of the CashBet Token Sale (the "**Extension Period**"), for any reason, including

17

unforeseen security or procedural issues. During the Extension Period, CashBet reserves the right to implement and/or change CashBet Token Sale Terms.

4.  *Participation Eligibility Rules*

- We will accept token purchases worldwide except where forbidden by law.
- Token purchases by US citizens may only be made by accredited investors who do not reside in the state of New York (due to Bitlicense law). Automated accredited investor checks will be performed and the purchaser will be required to input the necessary data.
- "Know-Your-Customer" (KYC) and Anti-Money Laundering (AML) processes will be performed during the purchase process to ensure we meet the criteria of our regulators.
- Unused value on account will be automatically converted into CBC tokens.

5.  *Token Price Rate & Increase Schedule*
CashBet Coin will be initially priced at $0.50 USD per token. During the Pre-Sale, the price will stay fixed at this initial rate. During the Public Sale, the price per token will increase to $0.60 USD on April 17 at 5:00pm GMT, and to $0.75 USD on April 22 at 5:00pm GMT.

6.  *Currencies Accepted*

- Bitcoin
- Bitcoin Cash
- Ethereum
- Ethereum Classic
- Litecoin
- US Dollars (USD)

7.  *Method of Contribution*

- Contributions into the token sale are accepted at https://ico.cashbet.com

- Contributions to be made in fiat currency must be sent in USD via wire transfer to a bank account designated by CashBet, details of which are specified on the CashBet Token Sale website.

- Contributions in the accepted cryptocurrencies listed in paragraph 6 must be sent from a cryptocurrency wallet in respect of which you can identify your private key. Your private key shall be required to verify your contribution to CashBet.

- Your ERC-20 (Ethereum-compatible) wallet address is required to enable CashBet to issue CashBet Coin to you through CashBet's smart contract system.

- Contributions shall be sent exclusively to the CashBet bank account or wallet address specified on the CashBet Website. To the extent that any third-party website, service or smart-contract offers to receive contributions and issue CashBet Coin or facilitates the allocation or transfer of CashBet Coin in any way during the

CashBet Token Sale, such third-party websites or services are, unless expressly set out in the Agreement or mentioned on the CashBet website, not authorized by CashBet nor do they have any legal or commercial relationship in any way with CashBet, the CashBet Platform or CashBet Coin.

- For the purposes of this paragraph 7, ICOBox is authorized by CashBet to receive contributions and issue CashBet Coin on behalf of CashBet.

- Purchasers that send contributions in a manner that does not conform with the methods of contribution described in the Agreement; or to any third-party website, wallet address, service or smart contract that offers CashBet Coins in a manner set out in this paragraph 7, risk losing their entire contribution and CashBet shall not be responsible or liable for recovering or returning any such contributions to the Purchaser not shall CashBet be responsible or liable for any losses incurred by the Purchaser in this respect.

8. *Token Issuance*
   - Within two weeks of the conclusion of the token sale, CashBet Coin will be distributed proportionately to purchasers on a pro-rata basis.
   - CashBet Coin tokens will be physically transferred to purchasers' ERC20-compatible Ethereum wallets, which will have been specified in the purchasers' profiles at coin.cashbet.com.
   - Tokens distributed to team members through CashBet's retention program will be released gradually, over an 18-month period, in order to avoid flooding the market with tokens.
   - Any unsold tokens will be destroyed.

9. *Use of Token Sale Proceeds*

The use of proceeds from the coin sale will depend on the total value of tokens sold, as detailed in the scenarios below.



*Figure 2 - Use of ICO proceeds if company raises $5 million to $29 million*



*Figure 3 - Use of ICO proceeds if company raises $30 million or more*

Please note that on April 13, 2018, the Company used $5 million of the token sale proceeds to purchase CashBet Coin at a price of $0.25 per token. This purchase was made in anticipation of the tokens potentially not selling out, so that the Company could further increase its token reserves and avoid destruction of these tokens. Please also note that $533,269 of the sale proceeds as of April 13, 2018 have resulted from the conversion of

previously sold convertible notes into CashBet Coin. Additional convertible notes may be converted into CashBet Coin in the future.

*10. Returns and Refund Policy*

- CashBet has imposed a minimum aggregate target equivalent to the Soft Cap. If on conclusion of the CashBet Token Sale, the aggregate sum of all contributions received by CashBet is less than the Soft Cap, CashBet shall, within a reasonable period of time, exercise reasonable endeavors to procure that contributions are returned to the Purchaser.

- CashBet reserves the right to refuse or reject any contribution made at any time in its sole and absolute discretion. To the extent that we refuse or reject a contribution, we will exercise reasonable endeavors to procure that the contribution is returned to the Purchaser, however, CashBet does not warrant, represent or offer any assurances that CashBet will successfully be able to recover and/or return any such contribution.

- Subject to the foregoing paragraphs and except to the extent required by applicable law, all contributions received by CashBet under the Agreement are final and purchasers shall not be entitled to claim any refund or reimbursement of contributions from CashBet.

- During any period of suspension or in the event that the CashBet Token Sale is aborted, CashBet's smart contract system will no longer be able to receive and accept contributions, create CashBet Coin and/or issue CashBet Coin to purchasers. Purchasers who send us contributions (after we publish a notice that the CashBet Token Sale has been suspended or aborted in accordance with this paragraph) risk losing their entire contribution and we shall not be responsible or liable for recovering or returning any such contributions to the Purchaser nor shall we be responsible or liable for any losses incurred by such Purchasers in this respect. Purchasers are therefore strongly advised to check our website before sending a contribution to CashBet's smart contract system.

*11. Distribution of CashBet Coin and Trading*

Purchasers will receive access to their CashBet Coin after their Purchase of CashBet Coin. CashBet Coin tokens are expected to be distributed to token purchasers within two weeks of the token sale conclusion, pending purchaser clearance of any additional enhanced KYC review required.

*12. Insufficient Funds*

If you have an insufficient amount of funds in your wallet to complete an order for CashBet Coin, we may cancel the entire order.

*13. Failure to Follow Procedures*

- Failure to follow the procedures set forth in this Agreement and otherwise in connection with the CashBet Token Sale may result in Purchaser not receiving any CashBet Coin.

- During the CashBet Token Sale, receipt or purchase of CashBet Coin through any other means other than through the Site are not sanctioned or agreed to in any way by CashBet. Purchaser should take great care that the website used to purchase CashBet Coin has the following universal resource locator (URL): https://ico.cashbet.com.

## 14. Token Functionality

- Ownership of CashBet Coin carries no rights, whether express or implied, other than a limited potential future right or expectation to use and interact with the CashBet Platform as may be made available from time to time, (as further described in this **Exhibit A**), if and to the extent the CashBet Platform is successfully developed and deployed. Any potential future right or expectation relating to the provision and receipt of services on the CashBet Platform shall be subject to any restrictions and limitations set out in the Agreement and/or the Platform Terms and Policies (as applicable).

- You acknowledge and accept that CashBet Coin do not represent or constitute:

  o any ownership right or stake, share, equity, security, commodity, bond, debt instrument or any other financial instrument or investment carrying equivalent rights;

  o any right to receive future revenues, shares or any other form of participation or governance right from, in or relating to the Company and/or the CashBet Platform;

  o any form of money or legal tender in any jurisdiction, nor do they constitute any representation of money (including electronic money); or

  o the provision of any goods and/or services as at the date that the Agreement form a binding agreement between the Parties.

- Protections offered by applicable law in relation to the acquisition, storage, sale and/or transfer of the instruments and/or investments of the types referred to in this **Exhibit A** shall not apply to any contribution made under the Agreement for the acquisition of CashBet Coin or to your storage, sale and/or transfer of CashBet Coin.

- The Company makes no warranties or representations and offers no assurances (in each case whether express or implied) that CashBet Coin shall confer any actual and/or exercisable rights of use, functionality, features, purpose or attributes in connection with the CashBet Platform.

## 15. Intended functionality of CashBet Coin

CashBet Coin will be an essential utility for users of the CashBet Platform as they will enable interaction within the CashBet Platform and will act as the main driver of the CashBet ecosystem. CashBet Coin will effectively operate as an "in-app currency", the sole purpose of which is to allow users to participate on the CashBet Platform. It is envisaged

that users of the Platform will be able to undertake the tasks set forth in the White Paper using CashBet Coins.

CashBet Coin do not have any functionality or utility outside the CashBet Platform. The functionality and utility of CashBet Coin will therefore be limited to interacting with users/content within the confines of a single platform. CashBet Coin will not have any functionality or utility outside the CashBet Platform. It is therefore intended that CashBet Coin will continuously circulate within the CashBet Platform ecosystem. The CashBet Platform will therefore be structured as a "closed system" insofar as the use of CashBet Coin is concerned. While it is possible that a secondary market could develop for trading CashBet Coin, the Company will not create such secondary markets nor will it act as an exchange for CashBet Coin. To the extent a secondary market or exchange for trading CashBet Coin does develop, it would be run and operated wholly independently of the Company, the CashBet Token Sale and the CashBet Platform.

16. *Possibility of change to the intended functionality of CashBet Coin*

PLEASE NOTE THAT WE MAY DECIDE TO AMEND THE INTENDED FUNCTIONALITY OF CASHBET COIN IN ORDER TO ENSURE COMPLIANCE WITH ANY LEGAL OR REGULATORY REQUIREMENTS TO WHICH WE ARE SUBJECT. WE SHALL PUBLISH A NOTICE ON OUR WEBSITE OF ANY CHANGES THAT WE DECIDE TO MAKE TO THE FUNCTIONALITY OF CASHBET COIN AND IT IS YOUR RESPONSIBILITY TO REGULARLY CHECK OUR WEBSITE FOR ANY SUCH NOTICES. ON THE CONCLUSION OF THIS ANALYSIS, WE WILL DECIDE WHETHER OR NOT TO CHANGE THE FUNCTIONALITY OF CASHBET COIN.

**Exhibit B**

**Certain Risks Associated with the Purchase, Sale and Use of CashBet Coin and Use of the CashBet Token Smart Contract**

**IMPORTANT NOTE: CashBet Coin are not being structured or sold as securities or as any other form of investment product. Accordingly, none of the information presented in this Exhibit B is intended to form the basis for any investment decision, and no specific recommendations are intended.**

**By purchasing, holding and using CashBet Coin, you expressly acknowledge and assume the following risks:**

*1.   Risk of Losing Access to CashBet Coin Due to Loss of Private Key(s).*

CashBet Coin purchased by you may be held in a digital wallet or vault, which requires a private key or a combination of private keys for access. Accordingly, loss of requisite private key(s) associated with your digital wallet or vault storing CashBet Coin will result in loss of such CashBet Coin, as well as access to your CashBet Coin balance. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet or vault service you use, may be able to misappropriate your CashBet Coin. CashBet is not responsible for any such losses.

*2.   Risks Associated with the Ethereum Protocol.*

Because CashBet Coin are based on the Ethereum protocol, any malfunction, breakdown or abandonment of, or attack on, the Ethereum protocol may have a material adverse effect on the CashBet Coin. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to the CashBet Coin by rendering ineffective the cryptographic consensus mechanism that underpins the Ethereum protocol. Upgrades by Ethereum to the Ethereum platform, a hard fork in the Ethereum platform or a change in how transactions are confirmed on the Ethereum platform may have unintended adverse effects on all blockchains using the ERC-20 or ERC-223 standards, including CashBet. The Ethereum blockchain is at an early stage of development, and it is not fully known whether the Ethereum blockchain will be able to sustain long-term operation of large-scale D-apps such as the CashBet Coin. As recently as October 2017, the Ethereum blockchain experienced significant delays in processing block transactions due to extremely high volumes associated with similar token sales around that time. It is not certain whether the Ethereum development community will resolve these technical issues in the future.

*3.   Unknown Impact of Proposed Changes to Ethereum.*

The Ethereum Foundation has laid out a road map for the improvement and development of Ethereum. While some of the future proposals offer promises to known technical issues, it is uncertain when these new improvements will be introduced and whether they will be successful. In particular, proposals to greatly increase blockchain speeds is, at the time of the CashBet Token Sale, not imminent. A proposal to change the mining process from the current Proof-of-Work algorithm to a Proof-of-Stake algorithm will have a yet-to-be-seen impact for the Ethereum network.

24

4.  *Prohibitively High Gas Prices for Transactions.*

All transactions over the Ethereum blockchain, including the transfer of CashBet Coin, have a real- world cost in ETH ("Gas"). While at this point in time, Gas prices for basic transactions over the Ethereum network are nominal, there is no certainty that Gas prices will not increase, and thereby make the trading of CashBet Coin over the Ethereum network commercially unfeasible. In addition, high volumes could lead to very high Gas prices for processing transactions, which would make using the blockchain prohibitively expensive.

5.  *Ethereum May be Superseded.*

While today, in our view, the Ethereum blockchain technology presents the most promising advances in blockchain technology, there is no guarantee that Ethereum will not be supplanted by competing protocols that improve upon the Ethereum technology. The Ethereum technology is open-source, meaning that anyone can copy and disseminate the same code with modifications. It is not known whether the Ethereum platform will become the predominant protocol adopted globally by the industry. If Ethereum is surpassed or superseded, then this could impact the CashBet Coin program as usage and adoption declines.

6.  *Blockchain Risk.*

On the Ethereum blockchain, timing of block production is determined by proof of work so block production can occur at random times. For example, ETH that is contributed to the CashBet Token Smart Contract in the final seconds of a distribution period may not get included for that period. Purchaser acknowledges and understands that the Ethereum blockchain may not include Purchaser's transaction at the time Purchaser expects, and Purchaser may not receive CashBet Coin the same day Purchaser sends ETH. The Ethereum blockchain is prone to periodic congestion during which transactions can be delayed or lost. Purchaser acknowledges and understands that Ethereum block producers may not include Purchaser's transaction when Purchaser wants or Purchaser's transaction may not be included at all.

7.  *Risk of Hacking and Security Weakness.*

CashBet Coin may be subject to expropriation and/or theft. Hackers or other malicious groups or organizations may attempt to interfere with the CashBet Token Smart Contract or the CashBet Coin in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. In the event of such a software bug or weakness, there may be no remedy and holders of CashBet Coin are not guaranteed any remedy, refund, or compensation.

8.  *Uncertain Regulatory Framework.*

The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether governmental authorities will regulate such technologies. It is likewise difficult to predict how or whether any governmental authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology, and its applications. Such changes could negatively impact CashBet Coin in various ways, including, for example, through a determination that CashBet Coin are regulated financial instruments that require registration or through the imposition of onerous liquidity requirements. CashBet may cease the distribution of CashBet Coin, the development of the CashBet Platform, or cease operations in

a jurisdiction in the event that governmental actions make it unlawful or commercially undesirable to continue to do so.

9.  *Legal and Regulatory Factors Relating to Our Business Model Might Present Barriers to Success.*

CashBet operates in a new and developing legal and regulatory environment concerning initial token sales, blockchain and smart contracts. There is no established body of law or court decisions in any country concerning blockchain and smart contracts, and the law regarding initial token sales is developing. As a result, it is possible that there could be legal disputes over the interpretation of smart contracts between members of the CashBet community, thus undermining the attractiveness of smart contracts to CashBet users. Further, aspects of the platform could face regulatory scrutiny or could be determined by regulators to be subject to currently existing or future licensing and/or registration requirements in one or more jurisdictions. To the extent licenses or other authorizations are required in one or more jurisdictions in which CashBet operates or will operate, there is no guarantee we will be granted such licenses or authorizations. We may also need to change our business model to comply with these licensing and/or registration requirements. Uncertainty in how the legal and regulatory environment will develop could negatively impact CashBet's business operations and revenue streams, thus posing a risk to the usefulness of the CashBet Coin you purchased in the CashBet Token Sale.

10. *Risk of Government Action.*

The use of blockchain technology in the online gaming market is new, and may be subject to heightened oversight and scrutiny, including investigations or enforcement actions. There can be no assurance that governmental authorities will not examine the operations of CashBet and/or pursue enforcement actions against CashBet. Such governmental activities may or may not be the result of targeting CashBet in particular. All of this may subject CashBet to judgments, settlements, fines or penalties, or cause CashBet to restructure its operations and activities or to cease offering certain products or services, all of which could harm CashBet's reputation or lead to higher operational costs, which may in turn have a material adverse effect on the CashBet Coin and/or the CashBet Platform.

11. *Risk of Fluctuation of Ether or other Currency.*

Proceeds of the sale of CashBet Coin will be denominated in ETH and may be converted into other cryptographic or fiat currencies. If the value of ETH or other currencies fluctuates unfavorably during or after the Sale Period, CashBet may not be able to fund development in the manner that it intended.

*12. Lack of Interest.*

A lack of use or public interest in the CashBet Platform could negatively impact the potential utility of CashBet Coin.

*13. CashBet is Unable to Implement its Future Business Model.*

CashBet's current business model has a solid track record and has assembled a quality team to grow the Company. However, it is possible that the Company will not be able to successfully implement future components of the business model. If CashBet is unable to operationalize these features, or the market does not respond positively to them, some or all of the usefulness of the CashBet Coin you purchased in the CashBet Token Sale may be at risk, despite any corrective actions CashBet may take.

*14. Ability to Transact or Resell.*

You may be unable to sell or otherwise transact in CashBet Coin at any time, or for the price you paid. By using the CashBet Token Smart Contract, or by purchasing CashBet Coin, you acknowledge, understand and agree that: (a) CashBet Coin may have no value; (b) there is no guarantee or representation of liquidity for CashBet Coin; and (c) CashBet is not responsible for the market value of CashBet Coin, the transferability and/or liquidity of CashBet Coin and/or the availability of any market or exchange for CashBet Coin through third parties or otherwise.

*15. CashBet Coin are Non-Transferable Until Completion of Sale.*

You acknowledge and understand that CashBet Coin are not transferable until after the end of the Sale Period and you may not transfer CashBet Coin to the extent the Securities Act restricts such transfer, unless such transfer is made pursuant to an exemption from the registration requirements of the Securities Act. You further acknowledge and understand that CashBet Coin reserves the right to terminate the sale process at any time and withdraw any unsold CashBet Coin from the CashBet Token Sale. Even when CashBet Coins become transferable, there may not be a market through which you can transfer them.

*16. CashBet May Modify or Stop the Sale at Any Time.*

Purchaser acknowledges and understands that CashBet may modify the timing, sale price, and number of CashBet Coin available for sale at any time during the Sale Period. Purchaser further acknowledges and understands that CashBet reserves the right to terminate the sale process at any time and withdraw any unsold CashBet Coin from the sale process. If the sale process has been stopped prematurely, CashBet Coin purchased by Purchaser may not be transferable.

*17. Exchange and Counterparty Risks.*

CashBet Coin will be distributed to the ERC-20 wallet address you have linked to your account. If you link your account to an exchange address account that you do not control, pursuant to the CashBet Token Smart Contract, you may never receive or be able to recover your CashBet Coin. By using the CashBet Token Smart Contract, and/or by purchasing CashBet Coin, you acknowledge and agree that your tokens will be distributed to the address you have linked on your account.

*18. Risks Associated With The CashBet Token Sale.*

27

CashBet Coin serve a specific function within the CashBet Platform, which is as a medium of exchange integral to the goods and services being or to be provided by CashBet and via the CashBet Platform. CashBet Coin are not investment products. There should be no expectation of future profit or gain from the Purchase of CashBet Coin. CashBet Coin do not represent (i) any equity or other ownership interest in CashBet, (ii) any rights to dividends or other distribution rights from CashBet, or (iii) any voting or other governance rights in CashBet. While we do not believe the sale of CashBet Coin constitutes a public offering of securities in those jurisdictions where the offering is being made, this conclusion is not free from doubt. In addition, public policy towards token sales is evolving, and it is conceivable that regulators may in the future seek to broaden the scope of regulation of token sales. If the CashBet Token Sale becomes subject to registration, prospectus or licensing requirements in a particular jurisdiction, we may be found liable if we have not complied with the applicable registration, prospectus or licensing requirements, and this would delay or potentially postpone the proposed CashBet Token Sale indefinitely. There are also other risks of participating in any token sale. Risks include turnover in a company's management team, volatility in cryptocurrency markets, the possibility of increasing regulation of cryptocurrency exchanges, the potential for a post facto government investigation of a token sale, suboptimal ability of participants to conduct due diligence on a company undertaking a token sale, and other risks. Potential token buyers should weigh these risks against the possible future benefits before deciding to participate in the CashBet Token Sale.

*19. Taxation Risks.*

The use of CashBet Coin as a form of settlement currency may or may not be subject to local income tax, capital gain taxes, VAT, or other forms of taxes. This uncertainty in tax legislation may expose merchants and customers alike to unforeseen future tax consequences associated with the use of CashBet Coin as a settlement currency, and/or the trading of CashBet Coin for capital gains.

*20. Capital Control Risks.*

Many jurisdictions, such as China, impose strict controls on the cross-border flow of capital. Holders of CashBet Coin may be subject to these regulations and/or arbitrary enforcement of such regulations at any time. This would make the transfer of CashBet Coin out of the local jurisdiction to overseas exchanges an unlawful activity exposing the user of CashBet Coin to government fines or other regulatory sanction.

*21. Countering the Financing of Terrorism ("CFT") and Anti-Money Laundering ("AML") Regulations.*

The United States has issued a series of regulations to combat terrorist financing and money-laundering activities. Many other countries have enacted similar legislation to control the flow of capital for such illicit activities. In the event that licenses, registrations, or other authorizations are required under applicable CFT and/or AML regulations to operate the CashBet Platform, there is no guarantee that CashBet will be able to successfully obtain such authorizations. In addition, any illicit use of the CashBet Coin by bad actors could breach such regulations and seriously impact the global reputation of the CashBet Platform. In such event, it is conceivable that this could trigger scrutiny by CFT and AML regulators and potentially cause significant disruption to the distribution and circulation of CashBet Coin.

*22. Changes to the CashBet Platform.*

Although CashBet intends for the CashBet Platform to have the features and specifications set forth in the White Paper, CashBet may make changes to such features and specifications for any number of reasons.

*23. Reliance on Third Parties.*

CashBet anticipates relying on third parties to develop and build out the Platform. CashBet may be unable to retain third parties with the requisite expertise, and those it does retain may not adequately perform their obligations under an agreement with CashBet.

*24. Risks Associated with CashBet's Business.*

CashBet's success depends on its continued innovation to provide new, and improve upon existing, products and services that make its Platform useful for users. As a result, CashBet must continually invest significant resources in research and development to improve the attractiveness and comprehensiveness of its products and services and effectively incorporate new mobile, internet, blockchain and other technologies into them. If CashBet is unable to continue offering high-quality, innovative products and services, it may be unable to attract additional users or retain current users, which could harm CashBet's business, results of operations and financial condition.

In addition, CashBet's success depends on its ability to continue to attract users to its Platform and enhance their engagement with CashBet's products and services. CashBet's existing and potential competitors include, but are not limited to, companies that operate, or could develop, international, national and local gaming, rental mobile applications and websites. These companies could devote greater technical and other resources than CashBet has available, have a more accelerated timeframe for deployment and leverage their existing user bases and proprietary technologies to provide products and services that users might view as superior to CashBet's offerings. Any of CashBet's future or existing competitors may introduce different solutions that attract users or provide solutions similar to CashBet's but with better branding or marketing resources. If CashBet is not able to continue to attract users to its Platform, CashBet's business, results of operations and financial condition would be harmed.

Further, the online gaming market, especially using blockchain technology, is in early stages of development, and significant shifts in the online gaming market occur constantly and rapidly. CashBet continues to learn a great deal about the market participants as the industry evolves. CashBet may not successfully anticipate or keep pace with industry changes, and CashBet may invest considerable financial, personnel and other resources to pursue strategies that do not, ultimately, prove effective such that its business, results of operations and financial condition may be harmed.

*25. Unanticipated Risks.*

Cryptographic tokens such as CashBet Coin are a new and untested technology. In addition to the risks included in this **Exhibit B**, there are other risks associated with your Purchase, holding and use of CashBet Coin, including those that CashBet cannot anticipate.

*26. Sale of business Risks.*

In the event of a sale, transfer or other disposal of the shares or assets of (i) the Company; or (ii) the CashBet Companies, the CashBet Platform may not be developed or operated and CashBet Coin may not have the functionality or utility intended or otherwise described in the Agreement or in the White Paper. A prospective buyer of the Company or the CashBet

Companies may decide not to develop or operate the CashBet Platform or assign a functionality to CashBet Coin in a manner not otherwise envisaged by the existing management team of the Company or the CashBet Companies.

# EXHIBIT B

# CASHBET ALDERNEY LIMITED

## TOKEN PURCHASE AGREEMENT

THIS CERTIFIES THAT in exchange for the payment by the undersigned purchaser (the "**Purchaser**") of the amount set forth below (the "**Purchase Amount**") on or about the date set forth below, CashBet Alderney Limited (the "**Company**"), will issue to the Purchaser, following the completion of the CashBet Coin Public Token Sale, that number of CashBet Coin tokens set forth below (the "**Purchased Tokens**").

The purchase and sale of the Purchased Tokens pursuant to this Token Purchase Agreement are subject to the TERMS & CONDITIONS attached as Exhibit A hereto (the "**Terms**"), which are incorporated herein by reference, in all respects. By executing this Token Purchase Agreement, the Purchaser acknowledges and agrees to the Terms. Purchaser acknowledges and agrees that the Terms may be modified from time to time in the Company's sole discretion with the amended Terms posted at https://ico.cashbet.com/cashbet/legal/MGT_Cashbet_Token_Sale_Terms_and_Conditions.pdf.

The Purchaser hereby agrees that, without the prior written consent of the Company, the Purchaser will not, during the period commencing upon issuance of the Purchased Tokens and continuing for the number of days set forth below: (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, this Token Purchase Agreement or any Purchased Tokens, or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of this Token Purchase Agreement or the Purchased Tokens.

IN WITNESS WHEREOF, the undersigned have caused this instrument to be duly executed and delivered.

| CASHBET ALDERNEY LIMITED: | PURCHASER: |
|---|---|
| By: *Michael P. Reaves* <br> 670DF0AAF07D452 <br> Name: Michael P. Reaves <br> Title: Director <br> Email: mreaves@cashbet.com <br><br> By: *Fred Hsu* <br> 05251EFACDEE432... <br> Name: Fred Hsu <br> Title: Director <br> Email: fhsu@cashbet.com <br><br> Address: <br> Inchalla <br> Le Val <br> Alderney <br> GY9 3UL | By: *Winslow Carter Strong* <br><br> Name: Winslow Carter Strong <br><br> Title: Mr. <br><br> Address: 100 Carr 115 <br> Unit 778 <br> Rincon PR 00677 <br> US <br><br> Email: winslow.strong@gmail.com |

## PURCHASE DETAILS

Purchase Amount: $ 600 ETH ($419,532)    Purchase Date: May 21, 2018

Purchased Tokens: 1,118,752    Lockup Period: 90 days

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

**PAYMENT INFORMATION**

| | |
|---|---|
| USD | Please provide the following information to your financial institution:<br><br>Wire Routing Transit Number: 121000248<br>SWIFT Code (Non-US transfers): WFBIUS6S<br>Bank Name: Wells Fargo Bank<br>City, State: San Francisco, CA<br>Account Number: 1881191785<br>Title of Account: MOBILE GAMING TECHNOLOGIES, INC. |
| BTC | 3KLstz9Jz2ZaHKdUjUtkw9zCiUKdW61zsA |
| ETH | 0x2E824F459c70d801e683cD2D566aE1571d8b468D |
| Please send remittance confirmation to: ico@cashbet.com | |

4837-1022-3456, v. 1

**EXHIBIT A**

**TERMS & CONDITIONS**

THERE IS CURRENTLY SUBSTANTIAL UNCERTAINTY IN VARIOUS JURISDICTIONS AS TO THE APPLICATION OF SECURITIES, COMMODITY, FINANCIAL, TAX AND OTHER LAWS AND REGULATIONS RELATING TO THE ISSUANCE OF CRYPTOGRAPHIC TOKENS, AND THE APPLICATION OF OTHER LAWS AND REGULATIONS MAY BE FACT-SPECIFIC AND SUBJECT TO CHANGE. THIS TOKEN IS NOT INTENDED TO BE OFFERED WHERE NOT PERMITTED BY APPLICABLE LAW. BECAUSE OF SUCH UNCERTAINTY, YOU SHOULD NOT PURCHASE THIS TOKEN IF YOU BELIEVE SUCH PURCHASE IS NOT PERMITTED IN YOUR JURISDICTION OF RESIDENCE, ORGANIZATION OR PRINCIPAL PLACE OF BUSINESS. THE OFFER AND SALE OF THIS TOKEN HAS NOT BEEN REGISTERED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE OR ANY OTHER AUTHORITY IN ANY OTHER COUNTRY OR JURISDICTION. THIS TOKEN IS SOLELY INTENDED TO BE SOLD FOR USE ON OUR PLATFORM, BUT BECAUSE OF THE RISK THAT THE OFFER AND SALE OF THIS TOKEN COULD CONSTITUTE THE OFFER AND SALE OF A SECURITY, THE TOKEN MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED TO THE EXTENT THE SECURITIES ACT OR STATE SECURITIES LAWS ARE APPLICABLE, EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OR APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION.

## CashBet Initial Coin Offering

PLEASE READ THESE TERMS OF SALE CAREFULLY. BY ATTEMPTING TO PURCHASE OR PURCHASING CASHBET COIN, YOU AGREE TO BE LEGALLY BOUND BY THESE TERMS & CONDITIONS AND ALL TERMS INCORPORATED HEREIN BY REFERENCE.

BY ACCEPTING THESE TERMS & CONDITIONS, YOU WILL BE ENTERING INTO A BINDING AGREEMENT WITH CASHBET. THESE TERMS & CONDITIONS CONTAIN PROVISIONS WHICH AFFECT YOUR LEGAL RIGHTS. NOTE THAT SECTION 15 CONTAINS A BINDING ARBITRATION SECTION. IF YOU DO NOT AGREE TO THESE TERMS & CONDITIONS, DO NOT MAKE A CONTRIBUTION FOR THE PURCHASE OF CASHBET COIN AND NAVIGATE AWAY FROM THE CASHBET WEBSITE.

These Terms & Conditions and any terms expressly incorporated herein (collectively, the "**Agreement**") govern the purchase (the "**Purchase**") by you ("**Purchaser**" or "**you**") of the tokens distributed (the "**CashBet Coin**") from Cashbet Alderney Limited, an Alderney Limited Company ("**CashBet**", "**Company**", "**us**", "**our**" or "**we**") during the token sale period (the "**Sale Period**"), and your use of the related CashBet token contract (the "**CashBet Token Smart Contract**"). Purchaser and CashBet are herein referred to individually as a "**Party**" and, collectively, as the "**Parties**". There may be other entities within the CashBet group of companies from time-to-time ("**CashBet Companies**") that will develop, manage and/or operate the CashBet Platform (as defined in Section 1.2 below) (or parts thereof) and references in the Agreement to CashBet shall be to CashBet, the CashBet Companies and their respective successors and assigns.

FOR RESIDENTS OF THE UNITED STATES: TOKENS ARE ONLY BEING OFFERED AND SOLD TO RESIDENTS OF THE UNITED STATES WHO QUALIFY AS "ACCREDITED INVESTORS" UNDER REGULATIONS ISSUED PURSUANT TO THE SECURITIES ACT.

FOR RESIDENTS OF NEW YORK: CASHBET COIN ARE NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF, OR ANY PERSON LOCATED IN, THE STATE OF NEW YORK OR ANY ENTITY, INCLUDING, WITHOUT LIMITATION, ANY CORPORATION OR PARTNERSHIP CREATED OR ORGANIZED IN OR UNDER THE LAWS OF THE STATE OF NEW YORK ("**NEW YORK PERSONS**"). CASHBET IS NOT SOLICITING PURCHASES BY NEW YORK PERSONS IN ANY WAY.

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

FOR RESIDENTS OF THE PEOPLE'S REPUBLIC OF CHINA (WHICH, FOR THE PURPOSES OF THIS AGREEMENT, DOES NOT INCLUDE HONG KONG, MACAU AND TAIWAN) ONLY: IF YOU ARE CITIZEN OR RESIDENT OF, OR A PERSON LOCATED OR DOMICILED IN, THE PEOPLE'S REPUBLIC OF CHINA OR ANY ENTITY, INCLUDING, WITHOUT LIMITATION, ANY CORPORATION OR PARTNERSHIP CREATED OR ORGANIZED IN OR UNDER THE LAWS OF THE PEOPLE'S REPUBLIC OF CHINA (COLLECTIVELY, "**PRC PERSONS**"), DO NOT PURCHASE OR ATTEMPT TO PURCHASE CASHBET COIN OR USE THE CASHBET TOKEN SMART CONTRACT OR THE CASHBET SMART SALE CONTRACT. PRC PERSONS ARE STRICTLY PROHIBITED AND RESTRICTED FROM USING THE CASHBET TOKEN SMART CONTRACTS. CASHBET COIN MAY NOT BE MARKETED, OFFERED OR SOLD DIRECTLY OR INDIRECTLY TO PRC PERSONS, AND NEITHER THIS SITE NOR THIS AGREEMENT, NOR ANY MATERIAL OR INFORMATION CONTAINED HEREIN PERTAINING TO CASHBET COIN, MAY BE SUPPLIED TO PRC PERSONS OR USED IN CONNECTION WITH ANY OFFER FOR THE SALE OF CASHBET COIN TO PRC PERSONS.

FOR RESIDENTS OF CUBA, IRAN, NORTH KOREA, SYRIA AND THE CRIMEA REGION: CASHBET COIN ARE NOT BEING OFFERED OR DISTRIBUTED TO ANY RESIDENT OF OR ANY PERSON LOCATED OR DOMICILED IN CUBA, IRAN, NORTH KOREA, SYRIA, THE CRIMEA REGION OR ANY OTHER COUNTRY OR TERRITORY THAT IS SUBJECT OF COUNTRY-WIDE OR TERRITORY-WIDE SANCTIONS.

THE INFORMATION CONTAINED IN THIS SITE AND THIS AGREEMENT DO NOT CONSTITUTE A PROSPECTUS OR OFFERING DOCUMENT, OR AN OFFER TO SELL OR AN INVITATION, ADVERTISEMENT OR SOLICITATION OF AN OFFER TO BUY SECURITIES. CASHBET COIN IS NOT AN INVESTMENT. CASHBET COIN IS NOT AN INVESTMENT PRODUCT BUT WILL BE REQUIRED TO USE THE CASHBET PLATFORM WHEN IT IS COMPLETED. THERE SHOULD BE NO EXPECTATION OF FUTURE PROFIT OR GAIN FROM THE PURCHASE OF CASHBET COIN.

THE SITE IS NOT INTENDED FOR USE BY ANYONE UNDER THE AGE OF 18. CASHBET COIN MAY NOT BE PURCHASED THROUGH THE SITE BY ANYONE UNDER THE AGE OF 18. BY USING THE SITE AND/OR PURCHASING CASHBET COIN THROUGH THIS SITE, YOU REPRESENT AND WARRANT THAT YOU ARE 18 YEARS OF AGE OR OLDER.

If you have any questions relating to the Agreement, please contact us at ico@cashbet.com.

1.    **SCOPE OF TERMS**

1.1    **Scope**. Unless otherwise stated herein, this Agreement governs only your Purchase of CashBet Coin from us during the Sale Period, and your corresponding use of the CashBet Token Smart Contract.

1.2    **Platform Terms of Use**. Any use of CashBet Coin in connection with providing or receiving services on the CashBet platform (the "**CashBet Platform**") will be governed by other applicable terms and policies (collectively, the "**Platform Terms and Policies**"), which will be made available on the CashBet Platform website when the CashBet services are operational. The planned services to be offered through the CashBet Platform, which is subject to change, is set forth in the White Paper (see Section 1.4, below). We may add new terms or policies to the Platform Terms and Policies in our sole discretion and may update each of the Platform Terms and Policies from time to time according to modification procedures set forth therein. To the extent of any conflict between this Agreement and the Platform Terms and Policies, this

2

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

Agreement shall govern your Purchase, and the Platform Terms and Policies shall govern your use of the CashBet Platform.

1.3     **Website Terms of Use**. Use of this website (https://www.cashbet.com/, https://coin.cashbet.com, and https://ico.cashbet.com) (collectively, our "**Site**") is governed by terms of use, as may be amended from time to time (the "**Terms of Use**"), which can be found through the "Terms" link (https://coin.cashbet.com/terms/). Those Terms of Use are hereby incorporated by reference. Purchaser has read, understands and agrees to those Terms of Use.

1.4     **White Paper**. CashBet has prepared a white paper, available on our Site, which describes the proposed uses of the CashBet Coin (the "**White Paper**"). The White Paper is of a descriptive nature only, and is not binding and does not form part of these Terms and Conditions.

2.     **CASHBET COIN SALE PROCEDURES AND SPECIFICATIONS**

2.1     **General**. CashBet intends to allocate and distribute a limited number of CashBet Coin (the "**CashBet Token Sale**"). Important information about the procedures and specifications of our CashBet Token Sale is provided in **Exhibit A**, including, but not limited to, details regarding the timing and pricing of the CashBet Token Sale, the amount of CashBet Coin we will sell and our anticipated use of the CashBet Token Sale proceeds. BY PURCHASING CASHBET COIN, YOU ACKNOWLEDGE THAT YOU UNDERSTAND AND HAVE NO OBJECTION TO THESE PROCEDURES AND SPECIFICATIONS.

2.2     **Final Sale**. Your Purchase of CashBet Coin from us during the Sale Period is final, and there are no refunds or cancellations except as may be required by applicable law or regulation. We reserve the right to refuse or cancel CashBet Coin purchase requests at any time in our sole discretion.

2.3     **Not an Offering of Securities**. Purchaser acknowledges and agrees that the sale of CashBet Coin and the CashBet Coin themselves are not an investment, security, share or equity interest, debt or loan nor a derivative instrument of any of the foregoing. This Agreement and all other documents referred to in this Agreement, do not constitute a prospectus or offering document and are not an offer to sell nor the solicitation of an offer to buy an investment, security, share, equity interest or debt nor a derivative interest of any of the foregoing.

2.4     **Not an Investment**. Purchaser should not participate in the CashBet Token Sale or Purchase CashBet Coin for investment purposes. The Purchase of CashBet Coin pursuant to this Agreement is not designed for investment purposes and should not be considered as a type of investment. CashBet Coin may not be transferred until the end of the Sale Period. Purchaser agrees not to sell or transfer CashBet Coin unless such sale or transfer is made pursuant to an exemption from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), if applicable. Purchaser acknowledges, understands and agrees that Purchaser should not expect, and there is no guarantee or representation or warranty by CashBet, that (a) CashBet Coin will be listed for trading on any exchange, or (b) the CashBet Platform will be adopted as described in the White Paper and not in a different or modified form.

3

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

**2.5** **Not for Speculation.** Purchaser acknowledges and agrees that Purchaser is not purchasing CashBet Coin for purposes of investment or speculation or for immediate resale or other financial purposes. Purchaser acknowledges and agrees that Purchaser has no expectation of economic benefit or profit from purchasing CashBet Coin. Purchaser agrees that it has no present intention of selling or otherwise distributing CashBet Coin. Purchaser agrees that if Purchaser determines to transfer CashBet Coin, Purchaser will not portray CashBet Coin to prospective transferees as an investment opportunity to obtain an economic benefit or profit. Purchaser acknowledges it is Purchaser's sole responsibility to determine if such transfer is permissible at such time under applicable laws.

**3.** **NO OTHER RIGHTS CREATED**

**3.1** **No Claim, Loan or Ownership Interest.** The Purchase of CashBet Coin (a) does not provide Purchaser with rights of any type with respect to CashBet or its revenues or assets, including, but not limited to, any voting, distribution, redemption, liquidation, proprietary or other financial or legal rights, (b) is not a loan to CashBet and (c) does not provide Purchaser with any ownership or other interest in CashBet.

**3.2** **Intellectual Property.** CashBet retains all right, title and interest in all of CashBet's intellectual property, including, without limitation, inventions, ideas, discoveries, software, processes, marks, methods, information and data, whether or not protectable by patent, copyright or trademark. Purchaser may not use any of CashBet's intellectual property for any reason without CashBet's prior written consent.

**4.** **RISKS**

**4.1** **Acknowledgement.** You expressly acknowledge that you have carefully reviewed and understand and assume the risks associated with purchasing, holding and using CashBet Coin and using the corresponding CashBet Token Smart Contract, as disclosed and explained in **Exhibit B.** BY PURCHASING CASHBET COIN USING THE CASHBET TOKEN SMART CONTRACTS, YOU EXPRESSLY ACKNOWLEDGE AND ASSUME THESE RISKS, INCLUDING THAT CASHBET COIN MAY HAVE NO VALUE.

**5.** **AUDIT OF THE SMART CONTRACT SYSTEM**

**5.1** Smart contract technology is still in an early stage of development and its application is currently of an experimental nature, which carries significant operational, technological, financial, regulatory and reputational risks. Accordingly, while any audit conducted shall raise the level of security and accuracy of CashBet's smart contract system, you acknowledge, understand and accept that any audit does not amount to any form of warranty, representation or assurance (in each case whether express or implied) that CashBet's smart contract system and CashBet Coin are fit for a particular purpose or that they are free from any defects, weaknesses, vulnerabilities, viruses or bugs which could cause, inter alia, the complete loss of your USD or cryptocurrency contribution and/or CashBet Coin.

**6.** **SECURITY**

4

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

**6.1**  **Your Obligations.** You are responsible for implementing reasonable measures for secure access to the device, wallet, vault or other storage mechanism you use to Purchase, receive and hold CashBet Coin you Purchase from us, including any requisite private key(s), usernames, passwords or other login or credentials necessary to access such storage mechanism(s). If your private key(s) or other access credentials are lost, you may lose access to your CashBet Coin. We are not responsible for any such losses. You understand and agree that all Purchases of CashBet Coin are non-refundable and you will not receive money or other compensation for any CashBet Coin purchased.

**6.2**  **KYC process.** You accept that you will receive your CashBet Coin ONLY after having successfully passed through our "Know-Your-Customer" ("**KYC**") process and/or the KYC process of Cynopsis (https://cynopsis-solutions.com) (the "**KYC Provider**"). This includes a basic KYC review prior to purchase and an enhanced KYC review upon purchase. This means that CashBet Coin will not be distributed until you have passed through this screening successfully. If you fail to pass the KYC screening you will not receive your CashBet Coin. In the case that you do not successfully pass the KYC screening, you agree that the Company and/or the KYC Provider will hold your funds until the CashBet Coin are fully distributed. You agree that the Company and/or the KYC Provider may use your submitted information in any way required by law or deemed necessary and that your funds used to purchase CashBet Coin will not be automatically refunded to you without first submitting a refund request and that a refund request MUST be submitted within 6 weeks of the CashBet Token Sale end date. A valid user account and ERC-20 wallet address on https://ico.cashbet.com are required to receive your Tokens because your Tokens will be delivered to the ERC-20 wallet address linked to your user account.

## 7.  PERSONAL INFORMATION

**7.1**  **Privacy Policy.** Please refer to our Privacy Policy (https://coin.cashbet.com/privacy/) for information about how we collect, use and share your information.

## 8.  TAXES

**8.1**  **Tax Treatment.** The purchase price that you pay for CashBet Coin is exclusive of all applicable taxes. You are responsible for determining what, if any, taxes apply to your Purchase of CashBet Coin, including, for example, sales, use, value added and similar taxes. It is also your responsibility to withhold, collect, report and remit the correct taxes to the appropriate tax authorities. We are not responsible for withholding, collecting, reporting or remitting any sales, use, value added or similar tax arising from your Purchase of CashBet Coin.

**8.2**  **Acknowledgement.** You acknowledge, understand and agree that (a) the Purchase and receipt of CashBet Coin may have tax consequences for you, (b) you are solely responsible for compliance with your tax obligations, and (c) CashBet bears no liability or responsibility with respect to any tax consequences to you associated with or arising from the creation, ownership, use or liquidation of CashBet Coin or any other action or transaction related to the CashBet Platform or the CashBet Token Sale.

## 9.    REPRESENTATIONS AND WARRANTIES

**9.1    Representations by Purchaser.** By purchasing CashBet Coin, you represent and warrant that:

**9.1.1.**  You have read and understand this Agreement (including all Exhibits) and the White Paper;

**9.1.2.**  You have the necessary authority and consent to accept the Agreement, to enter into a binding agreement with CashBet and to perform the obligations set out herein;

**9.1.3.**  The acceptance of the Agreement and the entry into a binding agreement with CashBet shall not result in any breach of, be in conflict with, or constitute a material default under: (i) any provision of the Purchaser's constitutional or organizational documents (in the case of a corporate entity including, without limitation. any company or partnership); (ii) any provision of any judgment, decree or order imposed on the Purchaser by any court or governmental or regulatory authority; and/or (iii) any material agreement, obligation, duty or commitment to which the Purchaser is a party or by which the Purchaser is bound;

**9.1.4.**  You have sufficient knowledge and experience in business and financial matters, including a sufficient understanding of blockchain or cryptographic tokens and other digital assets, smart contracts, token storage mechanisms (such as digital or token wallets), blockchain-based software systems and blockchain technology, to be able to evaluate the risks and merits of your Purchase of CashBet Coin, including, but not limited to, the matters set forth in this Agreement and to appreciate the risks and implications of purchasing CashBet Coin, and you are able to bear the risks thereof, including loss of all amounts paid, loss of CashBet Coin and liability to the CashBet Parties (as defined in Section 11.1) and others for your acts and omissions, including, without limitation, those constituting breach of this Agreement, negligence, fraud or willful misconduct;

**9.1.5.**  You have obtained sufficient information about CashBet Coin to make an informed decision to Purchase CashBet Coin;

**9.1.6.**  You understand that CashBet Coin confer only the right to provide and receive services on the CashBet Platform, and confer no other rights of any form with respect to CashBet, including, but not limited to, any voting, distribution, redemption, liquidation or other financial and legal rights;

**9.1.7.**  You are not purchasing CashBet Coin for any uses or purposes other than to provide or receive services on the CashBet Platform, including, but not limited to, any investment, speculative or other financial purposes;

**9.1.8.**  You are not a PRC Person, a New York Person or a person located, organized or resident in Cuba, Iran, North Korea, Syria or the Crimea

Region or any other country or territory that is subject of world-wide or territory wide sanctions; nor are you making a contribution for the purchase of CashBet Coin for or on behalf of any such person or entity;

**9.1.9.** You have all requisite power and authority to execute and deliver this Agreement, to use the CashBet Token Smart Contract, to Purchase CashBet Coin and to carry out and perform your obligations under this Agreement;

**9.1.10.** If you are an individual, you are at least 18 years old and of sufficient legal age and capacity to Purchase CashBet Coin;

**9.1.11.** If you are an entity, Purchaser is duly organized, validly existing and in good standing under the laws of its domiciliary jurisdiction and each jurisdiction where it conducts business;

**9.1.12.** Your Purchase of CashBet Coin complies with applicable law and regulation in your jurisdiction, including, but not limited to, (a) legal capacity and any other threshold requirements in your jurisdiction for the Purchase of CashBet Coin and entering into this Agreement with us, (b) any foreign exchange or regulatory restrictions applicable to such Purchase, and (c) any governmental or other consents that may need to be obtained;

**9.1.13.** You will comply with any tax obligations applicable to you arising from your Purchase of CashBet Coin;

**9.1.14.** The funds, including any fiat, virtual currency or cryptocurrency you use to Purchase CashBet Coin, are not derived from or related to any unlawful activities, including, but not limited to, money laundering or terrorist financing, and you will not use the CashBet Coin to finance, engage in or otherwise support any unlawful activities;

**9.1.15.** All payments by you under this Agreement will be made only in your name, from a digital wallet or bank account not located in a country or territory that has been designated as a "non-cooperative country or territory" by the Financial Action Task Force and is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.) as amended, and the regulations promulgated thereunder by the Financial Crimes Enforcement Network, as such regulations may be amended from time to time;

**9.1.16.** The execution, delivery and performance of this Agreement will not result in any violation of, be in conflict with or constitute a default under, with or without the passage of time or the giving of notice (a) any provision of Purchaser's organizational documents, if applicable, (b) any provision of any judgment, decree or order to which you are a party, by which you are bound, or to which any of your assets are subject, (c) any agreement, obligation, duty or commitment to which you are a party or by which you are bound or (d) any laws, regulations or rules applicable to you;

**9.1.17.** The execution and delivery of, and performance under, this Agreement requires no approval or other action from any governmental authority or person other than you;

**9.1.18.** To the extent required by applicable law, you comply with all anti-money laundering ("**AML**") and counter the financing of terrorism ("**CFT**") requirements, including, but not limited to, (a) the applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, as amended (i.e., the Bank Secrecy Act), (b) any applicable money laundering statutes of all jurisdictions in which you are located, resident, organized or operate, and the rules and regulations thereunder, and/or (c) any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental authority to which you are subject ((a) through (c) collectively, the "**AML/CFT Laws**");

**9.1.19.** Neither you, nor any person having a direct or indirect beneficial interest in you or CashBet Coin being acquired by you, or any person for whom you are acting as agent or nominee in connection the purchase of CashBet Coin, (a) is the subject of economic or financial sanctions or trade embargoes administered or enforced by any country or government, including, but not limited to, those administered by the U.S. government through the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom or any other applicable jurisdictions (collectively, "**Sanctions**"), (b) is located, organized or resident in Cuba, Iran, North Korea, Syria, the Crimea Region or any other country or territory that is the subject of country-wide or territory-wide Sanctions, (c) is listed in any Sanctions-related list of sanctioned persons, including, but not limited to, those maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom and/or (d) is directly or indirectly owned or controlled by any person or persons described in the foregoing clauses (a) through (c);

**9.1.20.** Any contribution to be made by you for the purchase of CashBet Coin is not derived from or related to any unlawful activities, including but not limited to money laundering or terrorist financing activities;

**9.1.21.** You shall not use CashBet Coin to finance, engage in, or otherwise support any unlawful activities;

**9.1.22.** If you are purchasing CashBet Coin on behalf of any entity, you are authorized to accept this Agreement on such entity's behalf and such entity will be responsible for breach of this Agreement by you or any other employee or agent of such entity (references to "you" in this Agreement refer to you and such entity jointly);

**9.1.23.** You shall provide an accurate digital wallet address to CashBet for receipt of any CashBet Coin distributed to you by CashBet;

9.1.24. You understand and accept the risks of contributing to early stage blockchain start-up business and acknowledge that these risks are substantial. You further warrant and represent that your contribution does not represent a meaningful or substantial proportion of your wealth or net worth, and that you are willing to accept the risk of loss associated with the contribution made under the Agreement; and

9.1.25. In connection with the purchase of the CashBet Coin, you represent to the Company the following: You will provide to the Company, the KYC Vendor or to our nominee, immediately upon request, information that any of the three of us, in any of our sole discretion, deem necessary or appropriate in order to maintain compliance with any federal, state, local, domestic or foreign law, regulation or policy, including any "Know Your Customer" requirements and policies or any judicial process. Such information or documents may include but are not limited to, passports, driver's licenses, utility bills, photographs, government identification cards or sworn statements, or, if you are an entity, proof of legal existence such as a government-issued certificate of incorporation or notarized formation documents, and we, the KYC Vendor or our nominee, may keep a copy of such information and disclose such information and documents in order to comply with applicable laws, regulations, rules or agreements. You acknowledge that CashBet may refuse to distribute CashBet Coin to you until such requested information is provided.

## 10. ICOBOX AS PLATFORM FOR SALE OF CASHBET COIN

10.1 Sale of the CashBet Coin is conducted through the platform ICOBox Ltd. ("**ICOBox**"). The information about purchased CashBet Coin will be reflected in your account at https://ico.cashbet.com ("**ICOBox Account**"). The purchased CashBet Coin would be available for use upon distribution by Company as set forth in **Exhibit A** of this Agreement.

10.2 Any use of CashBet Coin will be governed primarily by other applicable terms and policies, which will be available at https://coin.cashbet.com/ upon the distribution of CashBet Coin (collectively, "**CashBet Terms and Conditions**"). CashBet Terms and Conditions may change from time to time at the provider's sole discretion with the amended CashBet Terms and Conditions posted instead of the previous version.

10.3 **Purchase Procedure**. Sale of CashBet Coin is conducted through the ICOBox platform ("**ICOBox Platform**"). The information about purchased CashBet Coin will be reflected in your ICOBox Account. The purchased CashBet Coin would be available for use upon distribution by CashBet as set forth in **Exhibit A** of this Agreement.

## 11. INDEMNIFICATION

11.1 **Scope of Indemnity**. To the fullest extent permitted by applicable law, Purchaser will indemnify, defend and hold harmless CashBet and its past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns (the

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24E7401A

"**CashBet Parties**") from and against all claims, demands, actions, damages, losses, costs and expenses of any kind (including attorneys' fees) arising from or relating to (a) Purchaser's purchase or use of the CashBet Coin, (b) Purchaser's use of the CashBet Token Smart Contract, (c) Purchaser's responsibilities or obligations under this Agreement, (d) Purchaser's breach or violation of this Agreement, (e) any inaccuracy in any representation or warranty of Purchaser, (f) Purchaser's violation of any rights of any other person or entity and/or (g) any act or omission of Purchaser that is negligent or unlawful, or constitutes willful misconduct.

11.2    **CashBet Rights**. CashBet reserves the right, at its option, to exercise sole control over the defense, at your expense, of any claim subject to indemnification under Section 11.1. This indemnity is in addition to, and not in lieu of, any other indemnities set forth in any other written agreement between you and CashBet.

## 12.    DISCLAIMERS

12.1    **Disclaimer by CashBet**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS OTHERWISE SPECIFIED IN A WRITING BY US, (A) CASHBET COIN ARE SOLD ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT WARRANTIES OF ANY KIND, AND WE EXPRESSLY DISCLAIM ALL IMPLIED WARRANTIES AS TO THE CASHBET COIN, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, UTILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR AS TO THE WORKMANSHIP OR TECHNICAL CODING THEREOF, OR TITLE AND NON-INFRINGEMENT; (B) CASHBET DOES NOT REPRESENT OR WARRANT THAT THE CASHBET COIN OR THE CASHBET TOKEN SMART CONTRACTS ARE RELIABLE, CURRENT OR ERROR-FREE OR MEET PURCHASER'S REQUIREMENTS, OR THAT DEFECTS IN THE CASHBET COIN OR CASHBET TOKEN SMART CONTRACTS WILL BE CORRECTED; (C) CASHBET CANNOT AND DOES NOT REPRESENT OR WARRANT (i) THAT THE CASHBET COIN, THE DELIVERY MECHANISM FOR CASHBET COIN OR THE CASHBET TOKEN SMART CONTRACTS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS, (ii) THE ABILITY OF ANYONE TO PURCHASE OR USE THE CASHBET COIN, AND (iii) THAT THE PROCESS OF PURCHASING THE CASHBET COIN, RECEIVING THE CASHBET COIN OR USING THE CASHBET TOKEN SMART CONTRACTS WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT THE CASHBET COIN OR CASHBET TOKEN SMART CONTRACTS ARE RELIABLE AND ERROR-FREE. AS A RESULT, PURCHASER ACKNOWLEDGES AND UNDERSTANDS THAT PURCHASER MAY NEVER RECEIVE CASHBET COIN AND MAY LOSE THE ENTIRE AMOUNT PURCHASER PAID TO CASHBET.

12.2    **Exclusions**. Some jurisdictions do not allow for the exclusion of certain warranties or disclaimer of implied terms in contracts with consumers. If these laws apply to you, some or all of the limitations or exclusions may not apply to you, and you may have additional rights.

## 13.    LIMITATION OF LIABILITY

13.1    **No Consequential Damages**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NEITHER CASHBET NOR THE CASHBET PARTIES ARE RESPONSIBLE OR LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL,

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24E7401A

SPECIAL, EXEMPLARY, PUNITIVE OR OTHER DAMAGES (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS, LOSS OF DATA OR LOST PROFITS), UNDER ANY LEGAL THEORY ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR YOUR PURCHASE OF CASHBET COIN, OR YOUR USE OF THE CASHBET TOKEN SMART CONTRACTS. YOUR SOLE REMEDY FOR DISSATISFACTION WITH THE PURCHASE PROCESS IS TO NOT MAKE A PURCHASE. THE SOLE AND EXCLUSIVE MAXIMUM LIABILITY OF CASHBET FOR ALL DAMAGES, LOSSES AND CAUSES OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE) OR OTHERWISE, SHALL BE THE TOTAL AMOUNT PAID BY YOU TO US FOR THE CASHBET COIN. THE FOREGOING LIMITATIONS WILL NOT LIMIT OR EXCLUDE LIABILITY FOR ANY LOSSES FOR WHICH, AS A MATTER OF APPLICABLE LAW, IT WOULD BE UNLAWFUL TO LIMIT OR EXCLUDE LIABILITY.

**13.2**   **Exclusions**. Some jurisdictions may not allow the limitation or exclusion of liability for incidental or consequential damages. If these laws apply to you, some or all of the limitations or exclusions may not apply to you, and you may have additional rights.

## 14.   DATA PROTECTION

**14.1**   If we make an information request in accordance with Section 9.1.25, we may require you to provide information and documents relating to (without limitation):

- your identity;

- your address;

- the source of funds used for the purposes of purchasing CashBet Coin; and/or

- any other documents or data from which you can be identified (together your "**Personal Data**").

**14.2**   We will not disclose your Personal Data except as expressly permitted under the Agreement and otherwise only with your prior consent. However, we may be required to disclose your Personal Data and/or certain other information about you to the extent required by applicable law or by an order of a court or competent governmental or regulatory authority. By accepting the Agreement, you expressly agree and consent to your Personal Data being disclosed to third parties to any extent required for the purposes of compliance with applicable law.

**14.3**   We shall process your Personal Data in accordance with the Data Protection (Bailiwick of Guernsey) Law, 2001 as may be amended ("**Data Protection Law**"), and you agree that we, as the data controller, may directly or through our service providers or agents process your Personal Data for any one or more of the following purposes:

- the purchase of CashBet Coin and the processing of transactions related to the CashBet Token Sale pursuant to the Agreement;

11

- providing you with information about us and our range of services;

- compliance with any requirement imposed by applicable law or by an order of a court or competent governmental or regulatory authority;

- management of enquiries and complaints;

- opening, maintaining or operating a bank account in the Company's name;

- subject to Section 15, resolving any Disputes with you;

- producing summary information for statistical, regulatory and audit purposes; and/or

- any other reasonable purposes in accordance with applicable law.

14.4     Under the Data Protection Law you have a right to access your Personal Data held by us, and it is your responsibility to inform us of any changes to your Personal Data to ensure such data remains accurate. You also have a right to object to your Personal Data being processed for the purposes of direct marketing. You agree to provide a written request to us should you wish to enforce these rights.

14.5     You agree that we may, for the purposes set out in Section 14.3, permit the transfer of your Personal Data to any jurisdiction, whether or not inside the European Economic Area, and that by accepting the Agreement you authorize and expressly consent to the processing of your Personal Data by us, our agents and/or our service providers, provided that where your Personal Data is processed by entities other than us, our agents or our service providers, we shall seek your prior written consent in respect of such processing.

14.6     You acknowledge, accept and understand that the Agreement, insofar as they relate to the controlling and processing of your Personal Data by CashBet, our agents and/or our service providers, are only relevant to the processing of your Personal Data for the purposes set out in Section 14.3, In order to access the CashBet Platform and provide or receive services therein or otherwise use and interact with the CashBet Platform, you will be required to accept the Platform Terms and Policies which shall also set out the terms and conditions under which your Personal Data is collected, stored and processed (as well as your individual rights under applicable data protection laws) in connection with your use of the CashBet Platform.

## 15.     DISPUTE RESOLUTION; ARBITRATION

PLEASE READ THE FOLLOWING SECTION CAREFULLY BECAUSE IT CONTAINS CERTAIN PROVISIONS, SUCH AS A BINDING ARBITRATION SECTION AND CLASS ACTION WAIVER, WHICH AFFECT YOUR LEGAL RIGHTS. THIS CLAUSE REQUIRES YOU TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH THE COMPANY AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM US.

15.1     **Binding Arbitration**: Except for any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "**Disputes**") in which either Party

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

seeks injunctive or other equitable relief for the alleged unlawful use of intellectual property, including, without limitation, copyrights, trademarks, trade names, logos, trade secrets or patents, you and the Company (i) waive your and the Company's respective rights to have any and all Disputes arising from or related to the Agreement resolved in a court, and (ii) waive your and the Company's respective rights to a jury trial. Instead, you and the Company agree to arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).

**15.2    No Class Arbitrations, Class or Representatives Actions:** Any Dispute arising out of or related to the Agreement is personal to you and the Company and will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

**15.3    Arbitration Rules:** Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the rules of the Arbitration (Guernsey) Law, 2016 (the "**Rules**") and are deemed to be incorporated by reference in this Section 15. By agreeing to be bound by the Agreement, you either (i) acknowledge and agree that you have read and understood the Rules, or (ii) waive your opportunity to read the Rules and any claim that the Rules are unfair or should not apply for any reason.

**15.4    Notice; Informal Dispute Resolution.** Each Party will notify the other Party in writing of any Dispute within thirty (30) days of the date it arises, so that the Parties can attempt in good faith to resolve the Dispute informally. Notice to the Company shall be sent by e-mail to the Company at ico-support@cashbet.com. Notice to you shall be sent to any address you provide to us in writing in a notice. Your notice must include (i) your name, postal address, email address and telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that you are seeking. If you and the Company cannot agree how to resolve the Dispute within thirty (30) days after the date that the notice is received by the applicable Party, then either you or the Company may, as appropriate and in accordance with this Section 15, commence an arbitration proceeding or, to the extent specifically provided for in Section 15.1, file a claim in court.

**15.5    Process.** Any arbitration will occur in Alderney. The arbitration will be conducted confidentially by a single arbitrator appointed in accordance with the Rules. The language to be used in the arbitral proceedings shall be English. The governing law of the Agreement shall be the substantive law of Alderney and the Alderney court will have exclusive jurisdiction over any appeals and the enforcement of an arbitration decision.

**15.6    Authority of Arbitrator.** These Terms & Conditions, the applicable Rules and the arbitrator will have (i) the exclusive authority and jurisdiction to make all

procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court, provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative or class action, which is prohibited by the Agreement. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding or preside over any proceeding involving more than one individual.

15.7 **Severability of Dispute Resolution and Arbitration Provisions.** If any term, clause or provision of this Section 15 is held invalid or unenforceable, it will be so held to the minimum extent applicable and required by law, and all other terms, clauses and provisions of this Section 15 will remain valid and enforceable. Further, the waivers set forth in Section 15.2 above are severable from the other provisions of the Agreement and will remain valid and enforceable, except as prohibited by applicable law.

# 16. ELECTRONIC NOTICES

16.1 **Consent to Electronic Delivery.** You agree and consent to receive electronically all communications, agreements, documents, receipts, notices and disclosures (collectively "**Communications**") that CashBet provides in connection with your Purchase of CashBet Coin or use of the CashBet Token Smart Contract. You agree that CashBet may provide these Communications to you by posting them on the Site, by emailing them to you at the email address you provide and/or by sending an SMS or text message to a mobile phone number that you provide. Your carrier's normal, messaging, data and other rates and fees may apply to any mobile Communications. You should maintain copies of electronic Communications by printing a paper copy or saving an electronic copy.

16.2 **Withdrawal of Consent.** You may withdraw your consent to receive electronic Communications by sending a withdrawal notice to ico-support@cashbet.com. If you decline or withdraw consent to receive electronic Communications, CashBet may suspend or terminate your ability to purchase CashBet Coin.

# 17. MISCELLANEOUS

17.1 **Governing Law and Venue.** Subject to Section 15, the Agreement and any dispute or claim arising out of or in connection with their subject matter or formation (including non-contractual disputes and claims) shall be governed by and construed in accordance with Guernsey law.

17.2 **Severability.** If any term, clause or provision of this Agreement is held unlawful, void or unenforceable, then that term, clause or provision will be severable from this Agreement and will not affect the validity or enforceability of any remaining part of that term, clause or provision, or any other term, clause or provision of this Agreement.

17.3 **Entire Agreement.** This Agreement, including the exhibits attached hereto and the materials incorporated herein by reference, constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, including, without limitation, any public or other statements or presentations made by any CashBet Party about the CashBet Coin or the CashBet Platform. Headings are for information purposes only.

**17.4**   **Assignment**. You may not assign or transfer any of your rights or obligations under this Agreement without prior written consent from CashBet, including by operation of law or in connection with any change of control. CashBet may assign or transfer any or all of its rights under this Agreement, in whole or in part, without obtaining your consent or approval.

**17.5**   **Waiver**. Our failure or delay in exercising any right, power or privilege under this Agreement shall not operate as a waiver thereof. All waivers by CashBet must be unequivocal and in writing to be effective.

**17.6**   **Force Majeure**. You understand and agree that CashBet shall not be liable and disclaims all liability to you in connection with any force majeure event, including acts of God, labor disputes or other industrial disturbances; electrical, telecommunications, hardware, software or other utility failures; software or smart contract bugs or weaknesses; earthquakes, storms, or other nature-related events; blockages, embargoes, riots, acts or orders of government; acts of terrorism or war; technological change; changes in interest rates or other monetary conditions; or other matters beyond the reasonable control of CashBet, including changes to any blockchain-related protocol.

**17.7**   **No Partnership; No Agency; No Third-Party Beneficiaries**. Nothing in this Agreement and no action taken by the Parties shall constitute, or be deemed to constitute, a partnership, association, joint venture or other co-operative entity between the Parties. Nothing in this Agreement and no action taken by the Parties pursuant to this Agreement shall constitute, or be deemed to constitute, either Party as the agent of the other Party for any purpose. No Party has, pursuant to this Agreement, any authority or power to bind or to contract in the name of the other Party. This Agreement does not create any third-party beneficiary rights in any person.

**17.8**   **Modifications**. We reserve the right to make changes or modifications to this Agreement from time to time, in our sole discretion. If we make changes to this Agreement, we will provide notice of such changes, which may include sending you an email, providing notice on the homepage of the Site, and/or posting an amended Agreement, and updating the "Last Updated" date above. The modified Agreement will become effective upon posting and will apply to any Purchase or use of CashBet Coin made after the modified Agreement becomes effective.

**17.9**   **Termination**. Notwithstanding anything contained in this Agreement, we reserve the right, without notice and in our sole discretion, to terminate your right to Purchase CashBet Coin, at any time and for any reason, and you acknowledge and agree that CashBet shall have no liability or obligation to you in such event to the fullest extent permitted by applicable law.

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

**Exhibit A**

**CashBet Token Sale Procedures and Specifications**

**Token Sale**

1. *Total Token Supply*

   - 430,000,000 ERC20 CashBet Coin Tokens
   - No additional tokens will be created beyond this amount

2. *Token Distribution*

For every one token which is sold, three tokens will be distributed according to the following plan:



| 33.25% | 35.00% | 16.75% | 8.00% | 7.00% |
| :---: | :---: | :---: | :---: | :---: |
| Token Sale | Casino Bank Reserve | Team Retention | Referral | Advisors |

*Figure 1 - Token Distribution Plan*

3. *Token Sale Structure*

The Token sale event allows you to contribute to CashBet to receive CBC ERC20 Tokens.

CashBet's token sale will consist of two pre-sales and a public sale as defined below. A soft cap of $5 million equivalent value will be enforced (the "**Soft Cap**"). The Token Sale will end early if the hard cap is reached prior to the end of the public sale.

   a.   *First Pre-Sale*

| Start Date | Wednesday, January 24 2018, 5:00 p.m. GMT |
| --- | --- |
| End Date | Tuesday, February 20 2018, 5:00 p.m. GMT |
| Minimum Purchase | $25,000 USD equivalent |
| Discount | 20% discount on the initial token price of $0.50 USD |
| Participation | Open to all participants meeting the Participation Eligibility Rules |
| Contract Type | Future tokens will be offered through the sale and issuance of Simple Agreements for Future Equity (SAFTs) to certain (i) accredited Investors, as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended, and (ii) other parties who are |

| | not deemed to be U.S. persons within the meaning of Rule 902 of Regulation S of the Securities Act of 1933, as amended. |
|---|---|

### b. Second Pre-Sale

| Start Date | Tuesday, March 27 2018, 5:00 p.m. GMT |
|---|---|
| End Date | Tuesday, April 3 2018, 5:00 p.m. GMT |
| Minimum Purchase | $10,000 USD equivalent |
| Discount | 16% discount on the initial token price of $0.50 USD |
| Participation | Open to all participants meeting the Participation Eligibility Rules |
| Contract Type | Future tokens will be offered through a Token Purchase Agreement to certain (i) accredited Investors, as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended, and (ii) other parties who are not deemed to be U.S. persons within the meaning of Rule 902 of Regulation S of the Securities Act of 1933, as amended. |

### c.   Public Sale

| Start Date | Tuesday, April 10 2018, 5:00 p.m. GMT |
|---|---|
| End Date | Friday, April 27 2018, 5:00 p.m. GMT |
| Discount | ● 10% discount during first 24 hours<br>● 6% discount during second 24 hours<br>● No further discounts will be offered after this |
| Participation | Open to all participants meeting the Participation Eligibility Rules |

### d.   Modifications

CashBet reserves the right in its sole discretion, to change the date and/or time when the Pre-Sales and Public Sale will begin and further reserves the right in its sole discretion, to extend the duration of the CashBet Token Sale (the "**Extension Period**"), for any reason, including

unforeseen security or procedural issues. During the Extension Period, CashBet reserves the right to implement and/or change CashBet Token Sale Terms.

4.  *Participation Eligibility Rules*

   ● We will accept token purchases worldwide except where forbidden by law.
   ● Token purchases by US citizens may only be made by accredited investors who do not reside in the state of New York (due to Bitlicense law). Automated accredited investor checks will be performed and the purchaser will be required to input the necessary data.
   ● "Know-Your-Customer" (KYC) and Anti-Money Laundering (AML) processes will be performed during the purchase process to ensure we meet the criteria of our regulators.
   ● Unused value on account will be automatically converted into CBC tokens.

5.  *Token Price Rate & Increase Schedule*
CashBet Coin will be initially priced at $0.50 USD per token. During the Pre-Sale, the price will stay fixed at this initial rate. During the Public Sale, the price per token will increase to $0.60 USD on April 17 at 5:00pm GMT, and to $0.75 USD on April 22 at 5:00pm GMT.

6.  *Currencies Accepted*

   ● Bitcoin
   ● Bitcoin Cash
   ● Ethereum
   ● Ethereum Classic
   ● Litecoin
   ● US Dollars (USD)

7.  *Method of Contribution*

   • Contributions into the token sale are accepted at https://ico.cashbet.com

   • Contributions to be made in fiat currency must be sent in USD via wire transfer to a bank account designated by CashBet, details of which are specified on the CashBet Token Sale website.

   • Contributions in the accepted cryptocurrencies listed in paragraph 6 must be sent from a cryptocurrency wallet in respect of which you can identify your private key. Your private key shall be required to verify your contribution to CashBet.

   • Your ERC-20 (Ethereum-compatible) wallet address is required to enable CashBet to issue CashBet Coin to you through CashBet's smart contract system.

   • Contributions shall be sent exclusively to the CashBet bank account or wallet address specified on the CashBet Website. To the extent that any third-party website, service or smart-contract offers to receive contributions and issue CashBet Coin or facilitates the allocation or transfer of CashBet Coin in any way during the

CashBet Token Sale, such third-party websites or services are, unless expressly set out in the Agreement or mentioned on the CashBet website, not authorized by CashBet nor do they have any legal or commercial relationship in any way with CashBet, the CashBet Platform or CashBet Coin.

- For the purposes of this paragraph 7, ICOBox is authorized by CashBet to receive contributions and issue CashBet Coin on behalf of CashBet.

- Purchasers that send contributions in a manner that does not conform with the methods of contribution described in the Agreement; or to any third-party website, wallet address, service or smart contract that offers CashBet Coins in a manner set out in this paragraph 7, risk losing their entire contribution and CashBet shall not be responsible or liable for recovering or returning any such contributions to the Purchaser not shall CashBet be responsible or liable for any losses incurred by the Purchaser in this respect.

8. *Token Issuance*
   - Within two weeks of the conclusion of the token sale, CashBet Coin will be distributed proportionately to purchasers on a pro-rata basis.
   - CashBet Coin tokens will be physically transferred to purchasers' ERC20-compatible Ethereum wallets, which will have been specified in the purchasers' profiles at coin.cashbet.com.
   - Tokens distributed to team members through CashBet's retention program will be released gradually, over an 18-month period, in order to avoid flooding the market with tokens.
   - Any unsold tokens will be destroyed.

9. *Use of Token Sale Proceeds*
The use of proceeds from the coin sale will depend on the total value of tokens sold, as detailed in the scenarios below.

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24F7401A

CashBet Token Sale Terms and Conditions



*Figure 2 - Use of ICO proceeds if company raises $5 million to $29 million*



*Figure 3 - Use of ICO proceeds if company raises $30 million or more*

Please note that on April 13, 2018, the Company used $5 million of the token sale proceeds to purchase CashBet Coin at a price of $0.25 per token. This purchase was made in anticipation of the tokens potentially not selling out, so that the Company could further increase its token reserves and avoid destruction of these tokens. Please also note that $533,269 of the sale proceeds as of April 13, 2018 have resulted from the conversion of

previously sold convertible notes into CashBet Coin. Additional convertible notes may be converted into CashBet Coin in the future.

*10. Returns and Refund Policy*

- CashBet has imposed a minimum aggregate target equivalent to the Soft Cap. If on conclusion of the CashBet Token Sale, the aggregate sum of all contributions received by CashBet is less than the Soft Cap, CashBet shall, within a reasonable period of time, exercise reasonable endeavors to procure that contributions are returned to the Purchaser.

- CashBet reserves the right to refuse or reject any contribution made at any time in its sole and absolute discretion. To the extent that we refuse or reject a contribution, we will exercise reasonable endeavors to procure that the contribution is returned to the Purchaser, however, CashBet does not warrant, represent or offer any assurances that CashBet will successfully be able to recover and/or return any such contribution.

- Subject to the foregoing paragraphs and except to the extent required by applicable law, all contributions received by CashBet under the Agreement are final and purchasers shall not be entitled to claim any refund or reimbursement of contributions from CashBet.

- During any period of suspension or in the event that the CashBet Token Sale is aborted, CashBet's smart contract system will no longer be able to receive and accept contributions, create CashBet Coin and/or issue CashBet Coin to purchasers. Purchasers who send us contributions (after we publish a notice that the CashBet Token Sale has been suspended or aborted in accordance with this paragraph) risk losing their entire contribution and we shall not be responsible or liable for recovering or returning any such contributions to the Purchaser nor shall we be responsible or liable for any losses incurred by such Purchasers in this respect. Purchasers are therefore strongly advised to check our website before sending a contribution to CashBet's smart contract system.

*11. Distribution of CashBet Coin and Trading*

Purchasers will receive access to their CashBet Coin after their Purchase of CashBet Coin. CashBet Coin tokens are expected to be distributed to token purchasers within two weeks of the token sale conclusion, pending purchaser clearance of any additional enhanced KYC review required.

*12. Insufficient Funds*

If you have an insufficient amount of funds in your wallet to complete an order for CashBet Coin, we may cancel the entire order.

*13. Failure to Follow Procedures*

- Failure to follow the procedures set forth in this Agreement and otherwise in connection with the CashBet Token Sale may result in Purchaser not receiving any CashBet Coin.

- During the CashBet Token Sale, receipt or purchase of CashBet Coin through any other means other than through the Site are not sanctioned or agreed to in any way by CashBet. Purchaser should take great care that the website used to purchase CashBet Coin has the following universal resource locator (URL): https://ico.cashbet.com.

14. *Token Functionality*

- Ownership of CashBet Coin carries no rights, whether express or implied, other than a limited potential future right or expectation to use and interact with the CashBet Platform as may be made available from time to time, (as further described in this **Exhibit A**), if and to the extent the CashBet Platform is successfully developed and deployed. Any potential future right or expectation relating to the provision and receipt of services on the CashBet Platform shall be subject to any restrictions and limitations set out in the Agreement and/or the Platform Terms and Policies (as applicable).

- You acknowledge and accept that CashBet Coin do not represent or constitute:

  o any ownership right or stake, share, equity, security, commodity, bond, debt instrument or any other financial instrument or investment carrying equivalent rights;

  o any right to receive future revenues, shares or any other form of participation or governance right from, in or relating to the Company and/or the CashBet Platform;

  o any form of money or legal tender in any jurisdiction, nor do they constitute any representation of money (including electronic money); or

  o the provision of any goods and/or services as at the date that the Agreement form a binding agreement between the Parties.

- Protections offered by applicable law in relation to the acquisition, storage, sale and/or transfer of the instruments and/or investments of the types referred to in this **Exhibit A** shall not apply to any contribution made under the Agreement for the acquisition of CashBet Coin or to your storage, sale and/or transfer of CashBet Coin.

- The Company makes no warranties or representations and offers no assurances (in each case whether express or implied) that CashBet Coin shall confer any actual and/or exercisable rights of use, functionality, features, purpose or attributes in connection with the CashBet Platform.

15. *Intended functionality of CashBet Coin*

CashBet Coin will be an essential utility for users of the CashBet Platform as they will enable interaction within the CashBet Platform and will act as the main driver of the CashBet ecosystem. CashBet Coin will effectively operate as an "in-app currency", the sole purpose of which is to allow users to participate on the CashBet Platform. It is envisaged

that users of the Platform will be able to undertake the tasks set forth in the White Paper using CashBet Coins.

CashBet Coin do not have any functionality or utility outside the CashBet Platform. The functionality and utility of CashBet Coin will therefore be limited to interacting with users/content within the confines of a single platform. CashBet Coin will not have any functionality or utility outside the CashBet Platform. It is therefore intended that CashBet Coin will continuously circulate within the CashBet Platform ecosystem. The CashBet Platform will therefore be structured as a "closed system" insofar as the use of CashBet Coin is concerned. While it is possible that a secondary market could develop for trading CashBet Coin, the Company will not create such secondary markets nor will it act as an exchange for CashBet Coin. To the extent a secondary market or exchange for trading CashBet Coin does develop, it would be run and operated wholly independently of the Company, the CashBet Token Sale and the CashBet Platform.

16. *Possibility of change to the intended functionality of CashBet Coin*

PLEASE NOTE THAT WE MAY DECIDE TO AMEND THE INTENDED FUNCTIONALITY OF CASHBET COIN IN ORDER TO ENSURE COMPLIANCE WITH ANY LEGAL OR REGULATORY REQUIREMENTS TO WHICH WE ARE SUBJECT. WE SHALL PUBLISH A NOTICE ON OUR WEBSITE OF ANY CHANGES THAT WE DECIDE TO MAKE TO THE FUNCTIONALITY OF CASHBET COIN AND IT IS YOUR RESPONSIBILITY TO REGULARLY CHECK OUR WEBSITE FOR ANY SUCH NOTICES. ON THE CONCLUSION OF THIS ANALYSIS, WE WILL DECIDE WHETHER OR NOT TO CHANGE THE FUNCTIONALITY OF CASHBET COIN.

**Exhibit B**

**Certain Risks Associated with the Purchase, Sale and Use of CashBet Coin and Use of the CashBet Token Smart Contract**

**IMPORTANT NOTE: CashBet Coin are not being structured or sold as securities or as any other form of investment product. Accordingly, none of the information presented in this Exhibit B is intended to form the basis for any investment decision, and no specific recommendations are intended.**

**By purchasing, holding and using CashBet Coin, you expressly acknowledge and assume the following risks:**

*1.   Risk of Losing Access to CashBet Coin Due to Loss of Private Key(s).*

CashBet Coin purchased by you may be held in a digital wallet or vault, which requires a private key or a combination of private keys for access. Accordingly, loss of requisite private key(s) associated with your digital wallet or vault storing CashBet Coin will result in loss of such CashBet Coin, as well as access to your CashBet Coin balance. Moreover, any third party that gains access to such private key(s), including by gaining access to login credentials of a hosted wallet or vault service you use, may be able to misappropriate your CashBet Coin. CashBet is not responsible for any such losses.

*2.   Risks Associated with the Ethereum Protocol.*

Because CashBet Coin are based on the Ethereum protocol, any malfunction, breakdown or abandonment of, or attack on, the Ethereum protocol may have a material adverse effect on the CashBet Coin. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to the CashBet Coin by rendering ineffective the cryptographic consensus mechanism that underpins the Ethereum protocol. Upgrades by Ethereum to the Ethereum platform, a hard fork in the Ethereum platform or a change in how transactions are confirmed on the Ethereum platform may have unintended adverse effects on all blockchains using the ERC-20 or ERC-223 standards, including CashBet. The Ethereum blockchain is at an early stage of development, and it is not fully known whether the Ethereum blockchain will be able to sustain long-term operation of large-scale D-apps such as the CashBet Coin. As recently as October 2017, the Ethereum blockchain experienced significant delays in processing block transactions due to extremely high volumes associated with similar token sales around that time. It is not certain whether the Ethereum development community will resolve these technical issues in the future.

*3.   Unknown Impact of Proposed Changes to Ethereum.*

The Ethereum Foundation has laid out a road map for the improvement and development of Ethereum. While some of the future proposals offer promises to known technical issues, it is uncertain when these new improvements will be introduced and whether they will be successful. In particular, proposals to greatly increase blockchain speeds is, at the time of the CashBet Token Sale, not imminent. A proposal to change the mining process from the current Proof-of-Work algorithm to a Proof-of-Stake algorithm will have a yet-to-be-seen impact for the Ethereum network.

4. *Prohibitively High Gas Prices for Transactions.*

All transactions over the Ethereum blockchain, including the transfer of CashBet Coin, have a real- world cost in ETH ("Gas"). While at this point in time, Gas prices for basic transactions over the Ethereum network are nominal, there is no certainty that Gas prices will not increase, and thereby make the trading of CashBet Coin over the Ethereum network commercially unfeasible. In addition, high volumes could lead to very high Gas prices for processing transactions, which would make using the blockchain prohibitively expensive.

5. *Ethereum May be Superseded.*

While today, in our view, the Ethereum blockchain technology presents the most promising advances in blockchain technology, there is no guarantee that Ethereum will not be supplanted by competing protocols that improve upon the Ethereum technology. The Ethereum technology is open-source, meaning that anyone can copy and disseminate the same code with modifications. It is not known whether the Ethereum platform will become the predominant protocol adopted globally by the industry. If Ethereum is surpassed or superseded, then this could impact the CashBet Coin program as usage and adoption declines.

6. *Blockchain Risk.*

On the Ethereum blockchain, timing of block production is determined by proof of work so block production can occur at random times. For example, ETH that is contributed to the CashBet Token Smart Contract in the final seconds of a distribution period may not get included for that period. Purchaser acknowledges and understands that the Ethereum blockchain may not include Purchaser's transaction at the time Purchaser expects, and Purchaser may not receive CashBet Coin the same day Purchaser sends ETH. The Ethereum blockchain is prone to periodic congestion during which transactions can be delayed or lost. Purchaser acknowledges and understands that Ethereum block producers may not include Purchaser's transaction when Purchaser wants or Purchaser's transaction may not be included at all.

7. *Risk of Hacking and Security Weakness.*

CashBet Coin may be subject to expropriation and/or theft. Hackers or other malicious groups or organizations may attempt to interfere with the CashBet Token Smart Contract or the CashBet Coin in a variety of ways, including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. In the event of such a software bug or weakness, there may be no remedy and holders of CashBet Coin are not guaranteed any remedy, refund, or compensation.

8. *Uncertain Regulatory Framework.*

The regulatory status of cryptographic tokens, digital assets and blockchain technology is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether governmental authorities will regulate such technologies. It is likewise difficult to predict how or whether any governmental authority may make changes to existing laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology, and its applications. Such changes could negatively impact CashBet Coin in various ways, including, for example, through a determination that CashBet Coin are regulated financial instruments that require registration or through the imposition of onerous liquidity requirements. CashBet may cease the distribution of CashBet Coin, the development of the CashBet Platform, or cease operations in

DocuSign Envelope ID: 5C5CD882-4A5B-4280-B7EC-482B24E7401A

a jurisdiction in the event that governmental actions make it unlawful or commercially undesirable to continue to do so.

9.  *Legal and Regulatory Factors Relating to Our Business Model Might Present Barriers to Success.*

CashBet operates in a new and developing legal and regulatory environment concerning initial token sales, blockchain and smart contracts. There is no established body of law or court decisions in any country concerning blockchain and smart contracts, and the law regarding initial token sales is developing. As a result, it is possible that there could be legal disputes over the interpretation of smart contracts between members of the CashBet community, thus undermining the attractiveness of smart contracts to CashBet users. Further, aspects of the platform could face regulatory scrutiny or could be determined by regulators to be subject to currently existing or future licensing and/or registration requirements in one or more jurisdictions. To the extent licenses or other authorizations are required in one or more jurisdictions in which CashBet operates or will operate, there is no guarantee we will be granted such licenses or authorizations. We may also need to change our business model to comply with these licensing and/or registration requirements. Uncertainty in how the legal and regulatory environment will develop could negatively impact CashBet's business operations and revenue streams, thus posing a risk to the usefulness of the CashBet Coin you purchased in the CashBet Token Sale.

10. *Risk of Government Action.*

The use of blockchain technology in the online gaming market is new, and may be subject to heightened oversight and scrutiny, including investigations or enforcement actions. There can be no assurance that governmental authorities will not examine the operations of CashBet and/or pursue enforcement actions against CashBet. Such governmental activities may or may not be the result of targeting CashBet in particular. All of this may subject CashBet to judgments, settlements, fines or penalties, or cause CashBet to restructure its operations and activities or to cease offering certain products or services, all of which could harm CashBet's reputation or lead to higher operational costs, which may in turn have a material adverse effect on the CashBet Coin and/or the CashBet Platform.

11. *Risk of Fluctuation of Ether or other Currency.*

Proceeds of the sale of CashBet Coin will be denominated in ETH and may be converted into other cryptographic or fiat currencies. If the value of ETH or other currencies fluctuates unfavorably during or after the Sale Period, CashBet may not be able to fund development in the manner that it intended.

*12. Lack of Interest.*

A lack of use or public interest in the CashBet Platform could negatively impact the potential utility of CashBet Coin.

*13. CashBet is Unable to Implement its Future Business Model.*

CashBet's current business model has a solid track record and has assembled a quality team to grow the Company. However, it is possible that the Company will not be able to successfully implement future components of the business model. If CashBet is unable to operationalize these features, or the market does not respond positively to them, some or all of the usefulness of the CashBet Coin you purchased in the CashBet Token Sale may be at risk, despite any corrective actions CashBet may take.

*14. Ability to Transact or Resell.*

You may be unable to sell or otherwise transact in CashBet Coin at any time, or for the price you paid. By using the CashBet Token Smart Contract, or by purchasing CashBet Coin, you acknowledge, understand and agree that: (a) CashBet Coin may have no value; (b) there is no guarantee or representation of liquidity for CashBet Coin; and (c) CashBet is not responsible for the market value of CashBet Coin, the transferability and/or liquidity of CashBet Coin and/or the availability of any market or exchange for CashBet Coin through third parties or otherwise.

*15. CashBet Coin are Non-Transferable Until Completion of Sale.*

You acknowledge and understand that CashBet Coin are not transferable until after the end of the Sale Period and you may not transfer CashBet Coin to the extent the Securities Act restricts such transfer, unless such transfer is made pursuant to an exemption from the registration requirements of the Securities Act. You further acknowledge and understand that CashBet Coin reserves the right to terminate the sale process at any time and withdraw any unsold CashBet Coin from the CashBet Token Sale. Even when CashBet Coins become transferable, there may not be a market through which you can transfer them.

*16. CashBet May Modify or Stop the Sale at Any Time.*

Purchaser acknowledges and understands that CashBet may modify the timing, sale price, and number of CashBet Coin available for sale at any time during the Sale Period. Purchaser further acknowledges and understands that CashBet reserves the right to terminate the sale process at any time and withdraw any unsold CashBet Coin from the sale process. If the sale process has been stopped prematurely, CashBet Coin purchased by Purchaser may not be transferable.

*17. Exchange and Counterparty Risks.*

CashBet Coin will be distributed to the ERC-20 wallet address you have linked to your account. If you link your account to an exchange address account that you do not control, pursuant to the CashBet Token Smart Contract, you may never receive or be able to recover your CashBet Coin. By using the CashBet Token Smart Contract, and/or by purchasing CashBet Coin, you acknowledge and agree that your tokens will be distributed to the address you have linked on your account.

*18. Risks Associated With The CashBet Token Sale.*

CashBet Coin serve a specific function within the CashBet Platform, which is as a medium of exchange integral to the goods and services being or to be provided by CashBet and via the CashBet Platform. CashBet Coin are not investment products. There should be no expectation of future profit or gain from the Purchase of CashBet Coin. CashBet Coin do not represent (i) any equity or other ownership interest in CashBet, (ii) any rights to dividends or other distribution rights from CashBet, or (iii) any voting or other governance rights in CashBet. While we do not believe the sale of CashBet Coin constitutes a public offering of securities in those jurisdictions where the offering is being made, this conclusion is not free from doubt. In addition, public policy towards token sales is evolving, and it is conceivable that regulators may in the future seek to broaden the scope of regulation of token sales. If the CashBet Token Sale becomes subject to registration, prospectus or licensing requirements in a particular jurisdiction, we may be found liable if we have not complied with the applicable registration, prospectus or licensing requirements, and this would delay or potentially postpone the proposed CashBet Token Sale indefinitely. There are also other risks of participating in any token sale. Risks include turnover in a company's management team, volatility in cryptocurrency markets, the possibility of increasing regulation of cryptocurrency exchanges, the potential for a post facto government investigation of a token sale, suboptimal ability of participants to conduct due diligence on a company undertaking a token sale, and other risks. Potential token buyers should weigh these risks against the possible future benefits before deciding to participate in the CashBet Token Sale.

*19. Taxation Risks.*

The use of CashBet Coin as a form of settlement currency may or may not be subject to local income tax, capital gain taxes, VAT, or other forms of taxes. This uncertainty in tax legislation may expose merchants and customers alike to unforeseen future tax consequences associated with the use of CashBet Coin as a settlement currency, and/or the trading of CashBet Coin for capital gains.

*20. Capital Control Risks.*

Many jurisdictions, such as China, impose strict controls on the cross-border flow of capital. Holders of CashBet Coin may be subject to these regulations and/or arbitrary enforcement of such regulations at any time. This would make the transfer of CashBet Coin out of the local jurisdiction to overseas exchanges an unlawful activity exposing the user of CashBet Coin to government fines or other regulatory sanction.

*21. Countering the Financing of Terrorism ("CFT") and Anti-Money Laundering ("AML") Regulations.*

The United States has issued a series of regulations to combat terrorist financing and money-laundering activities. Many other countries have enacted similar legislation to control the flow of capital for such illicit activities. In the event that licenses, registrations, or other authorizations are required under applicable CFT and/or AML regulations to operate the CashBet Platform, there is no guarantee that CashBet will be able to successfully obtain such authorizations. In addition, any illicit use of the CashBet Coin by bad actors could breach such regulations and seriously impact the global reputation of the CashBet Platform. In such event, it is conceivable that this could trigger scrutiny by CFT and AML regulators and potentially cause significant disruption to the distribution and circulation of CashBet Coin.

*22. Changes to the CashBet Platform.*

Although CashBet intends for the CashBet Platform to have the features and specifications set forth in the White Paper, CashBet may make changes to such features and specifications for any number of reasons.

23. *Reliance on Third Parties.*

CashBet anticipates relying on third parties to develop and build out the Platform. CashBet may be unable to retain third parties with the requisite expertise, and those it does retain may not adequately perform their obligations under an agreement with CashBet.

24. *Risks Associated with CashBet's Business.*

CashBet's success depends on its continued innovation to provide new, and improve upon existing, products and services that make its Platform useful for users. As a result, CashBet must continually invest significant resources in research and development to improve the attractiveness and comprehensiveness of its products and services and effectively incorporate new mobile, internet, blockchain and other technologies into them. If CashBet is unable to continue offering high-quality, innovative products and services, it may be unable to attract additional users or retain current users, which could harm CashBet's business, results of operations and financial condition.

In addition, CashBet's success depends on its ability to continue to attract users to its Platform and enhance their engagement with CashBet's products and services. CashBet's existing and potential competitors include, but are not limited to, companies that operate, or could develop, international, national and local gaming, rental mobile applications and websites. These companies could devote greater technical and other resources than CashBet has available, have a more accelerated timeframe for deployment and leverage their existing user bases and proprietary technologies to provide products and services that users might view as superior to CashBet's offerings. Any of CashBet's future or existing competitors may introduce different solutions that attract users or provide solutions similar to CashBet's but with better branding or marketing resources. If CashBet is not able to continue to attract users to its Platform, CashBet's business, results of operations and financial condition would be harmed.

Further, the online gaming market, especially using blockchain technology, is in early stages of development, and significant shifts in the online gaming market occur constantly and rapidly. CashBet continues to learn a great deal about the market participants as the industry evolves. CashBet may not successfully anticipate or keep pace with industry changes, and CashBet may invest considerable financial, personnel and other resources to pursue strategies that do not, ultimately, prove effective such that its business, results of operations and financial condition may be harmed.

25. *Unanticipated Risks.*

Cryptographic tokens such as CashBet Coin are a new and untested technology. In addition to the risks included in this **Exhibit B**, there are other risks associated with your Purchase, holding and use of CashBet Coin, including those that CashBet cannot anticipate.

26. *Sale of business Risks.*

In the event of a sale, transfer or other disposal of the shares or assets of (i) the Company; or (ii) the CashBet Companies, the CashBet Platform may not be developed or operated and CashBet Coin may not have the functionality or utility intended or otherwise described in the Agreement or in the White Paper. A prospective buyer of the Company or the CashBet

Companies may decide not to develop or operate the CashBet Platform or assign a functionality to CashBet Coin in a manner not otherwise envisaged by the existing management team of the Company or the CashBet Companies.

# EXHIBIT C



# The world's only complete, crypto-ready iGaming platform

WHITEPAPER

THE CASHBET TEAM

For the latest version of the full official ICO whitepaper, visit

**COIN.CASHBET.COM**

V3.5 April 10, 2018

CashBet Initial Coin Offering

## TABLE OF CONTENTS

**Executive Summary**                                                              **4**

**The iGaming & Cryptocurrency Opportunity**                                       **5**

    Today's Crypto Casino Challenges                           6

    Delivering on the Promise: Blockchain-enabled Processing for iGaming   8

**Operators: Launch a Complete iGaming Site**                                      **9**

    Operate an iGaming Site End-to-End                         9

    Access to Quality Content                                  9

    Elimination of Card Theft                                  9

    Increased Liquidity                                        9

**Players: A Better Gaming Experience**                                            **10**

    Greater Access to iGaming Content                          10

    Trust and Transparency                                     11

    Responsive Game Play                                       11

    Reduced Transaction Costs                                  11

**The CashBet Platform**                                                           **11**

**Competitive Landscape**                                                          **13**

    Content Providers                                          13

    Casino Operators                                           13

    Crypto Casinos                                             14

    Crypto-Casino Platforms                                    15

**The CashBet Coin Token: Utility**                                                **15**

    CashBet Coin Token Utility: Partners & Players             15

    Gambling Use Restrictions & Compliance                     16

**CashBet Coin Issuance and Management**                                           **16**

    Phase 1 - CBC VIP Program                                  17

    Phase 2 - CBC Deposit & Wagering                           17

© CashBet 2018

CashBet Initial Coin Offering

Phase 3 - CryptoRGSTM                                                                    19

Phase 4 - Pay-As-You-Go State Channel Technology - CryptoGoTM                            19

Inner Workings of Micropayment Channels                                                  20

Creating the Channel                                                                     22

**Methodology for Warm Wallet Depletion**                                                **24**

**About CashBet**                                                                        **26**

Company Highlights                                                                       26

CashBet Team                                                                             27

Customers and Partners                                                                   33

**CashBet Roadmap**                                                                      **34**

**Token Sale**                                                                           **34**

Total Token Supply                                                                       34

Token Distribution                                                                       34

Token Sale Structure                                                                     35

Participation Eligibility Rules                                                          36

Token Price Rate & Increase Schedule                                                     36

Currencies Accepted                                                                      37

Token Issuance                                                                           37

Use of ICO Proceeds                                                                      37

Financial Plan                                                                           39

**Disclaimer**                                                                           **39**

**Official Sites and Pages**                                                             **39**

**Document Revision History**                                                            **39**

**Bibliography**                                                                         **40**

© CashBet 2018

CashBet Initial Coin Offering

# Executive Summary

Mobile gaming and cryptocurrency are two of the fastest growing, demand-driven markets in the world today. CashBet is merging these technologies into an iGaming solution and issuing CashBet Coin to solve the problems facing crypto casino operators and players today: speed, trust, cost, content and access.

CashBet is the only complete, crypto-ready, mobile-first iGaming platform with an established, profitable presence in regulated gaming markets.  Launched in 2012, CashBet has hundreds of thousands of registered players, tens of millions of Pounds Sterling wagered, gaming licenses in multiple jurisdictions, and customers from all facets of iGaming (real-money, social, and skill-based) from around the world.

- **The CashBet platform is uniquely positioned to set the standard in the emerging cryptocurrency iGaming space.** Architected and implemented by iGaming veterans, its modular, end-to-end iGaming solution reflects years of both B2B and B2C iGaming experience. It is creating a proprietary off-chain payment technology that will significantly reduce costs and increase payout speeds, making CashBet Coin the most desirable cryptocurrency in the iGaming market.

- **The CashBet platform is the only crypto-casino platform licensed in multiple tier 1 gaming jurisdictions.**  The platform and all associated games - over 450 titles - have passed rigorous third-party compliance testing.  It features a player and content management system, content distribution tailored for the crypto casino market, a geo-verification system, and a responsible gaming module, all of which can be licensed to crypto casino operators. It includes full support for FATF-compliant Know Your Customer (KYC) and Anti-Money Laundering (AML) compliance.

- **CashBet is white-label capable.** CashBet empowers operators and developers to easily launch their own bespoke iGaming sites, content, and apps.

- **CashBet Coin ("CBC") tokens will be offered to token purchasers during a token sale that commenced in January 2018.** The acceptance of CBC will democratize access to world-class entertainment for those underserved by the centralized banking establishment.

- **The phases of the CashBet solution** are as follows:

  - **Phase 1 CashBet Coin VIP registration.** CashBet registers players who deposit 1,000 CBC attain instant VIP membership and substantial bonuses for gameplay unavailable to players not holding the 1,000 CBC balance.

  - **Phase 2 CashBet crypto gaming.** CashBet will convert CBC at the time of wager to a fiat currency and convert any winnings back to CBC at the same

© CashBet 2018

CashBet Initial Coin Offering

rate. This will make hundreds of games available to cryptocurrency players and operators.

- o **Phase 3 Direct CBC wagering.** CashBet enables wagering in CBC with no fiat currency conversion.  In addition, Phase 3 will include the rollout of CryptoRGS, CashBet's content distribution platform for crypto casino operators.

- o **Phase 4 CrytoGo Payment channel-based gaming.**  CashBet's proprietary implementation, CryptoGo, is an off-chain[1] state channel-based payment technology.  It will allow wagers and payouts made directly between players' ERC20 capable wallets and the CashBet platform without the need for a deposit account. This will allow immediate payouts and a significant reduction in fees.



*Figure 1 - CashBet's enterprise-grade software empowers operators to run mobile-first iGaming sites and apps*

## The iGaming & Cryptocurrency Opportunity

The convergence of mobile gaming and cryptocurrency offers a unique opportunity for operators and supporters to disrupt the crypto casino market.

The gambling market has changed considerably in the last decade with the rise of online gaming and the shift of online from desktop to mobile.  Mobile (mainly HTML5) content is now ubiquitous and accounts for the majority of CashBet's game play. Riding a still-rising surge in mobile gaming and growth in regulated jurisdictions, online gambling became a $43B (USD) market in 2016.  All types (social, mobile, real-money, crypto) of iGaming continue to grow rapidly.  Mobile real-money gaming is the fastest growing segment of the online gaming market.

© CashBet 2018

CashBet Initial Coin Offering



*Figure 2 - The global mobile gaming market is surging and will accelerate with the mainstreaming of cryptocurrency payment methods.*

At the same time, cryptocurrencies and their underlying blockchain technologies are white-hot and gaining acceptance on a growing list of reputable commodity markets worldwide.

## Today's Crypto Casino Challenges

Crypto-ready casinos are in their infancy. They face the following speed, trust, and cost challenges:

- ***Cryptocurrency transaction costs are high and growing.*** Ethereum transaction fees will continue to increase[2] as scaling issues with the Ethereum blockchain cause an increase in *gas prices* (the internal pricing for running a transaction or contract in Ethereum)

Page **5** of 39

© CashBet 2018

CashBet Initial Coin Offering

- ***Smaller transactions are slow.***  Because blockchain *miners* are paid partially with transaction fees, they prioritize larger transactions where the rewards are higher.  Small transactions on the public blockchain can be painfully slow. For iGaming, this makes posting each wager to the blockchain impractical.

- ***Crypto-casinos lack transparency.***  With the important exception of 'provably fair' auditable casino systems[3], scant transparency of fair play exists, eroding consumer trust in game outcomes.

- **Crypto-casinos lack regulation.**  Until recently, most Tier 1 gaming regulators have been unwilling to provide guidance that could bolster crypto-casinos in mainstream markets.  As of 2017, the only respected online gambling regulator to issue licenses for the use of digital currencies and skins has been the Isle of Man (although Malta is testing cryptocurrency as of mid-2017[4].)

In addition to these challenges, many fledgling crypto-casinos are repeating the flawed approaches of legacy iGaming companies. Among them:

- ***Not optimized for mobile.*** Most operators have not optimized their sites and apps for mobile and tablet devices. Those that have are building on existing legacy software platforms with "bolt-on" mobile features not optimized for the channel. These platforms  do not take advantage of the key benefits of mobile hardware. And they typically cobble together 3rd party services to perform basic functions such as marketing automation and player segmentation. The end result is a sub-par user experience for a rapidly growing mobile audience.

- ***Lack of compelling game content.***  Legacy platform providers currently have no solution for content distribution in the crypto-casino space. Crypto-casinos are either developing and offering their own games (a strategy that failed in online gaming many years ago) or are turning to existing content providers without their knowledge.

- ***No licensable iGaming platform exists for cryptocurrency-based iGaming.*** As of August 21, 2017 there have been 15 ICOs by gambling companies[5]. None is using an iGaming platform developed and licensed by a reputable company with the basic controls in place needed to run a fair, reliable, and safe cryptocurrency online casino.

© CashBet 2018

## Delivering on the Promise: Blockchain-enabled Processing for iGaming

Blockchain technology has the capability to disrupt the online casino industry by improving payment processing capabilities, increasing access to players underserved by traditional banking, and by providing a high degree of transparency and trust between casino and player.  By introducing CBC and our blockchain-enabled platform, CashBet will offer features to operators and players that no other iGaming platform company can currently provide.

CBC will be the currency of choice on CashBet-powered casinos, used by operators to pay licensing and content fees, and wagered by players on great games.

CashBet Coin allows:

- **Lower costs.**  Whether playing in fiat or cryptocurrency, fees for small transactions can approach an appreciable size of the transaction itself.  In Phase 4, the CashBet platform plans to roll out CryptoGo, its proprietary implementation of state channel (payment channel)[1] technology to eliminate the need for wallets or deposits by facilitating instant wagers and payouts, using off-chain transactions.  Normal gas fees for Ethereum blockchain transactions can therefore be greatly reduced.

- **Trust.**  All CashBet games are third-party tested and licensed. In addition, the CashBet platform will be enabled for provably fair operation.  Blackjack, roulette, and card game players will be able to independently challenge CBC wagered outcomes with a provably fair tool and review the game resolution source. For slot games, where the IP and mathematics of the game are proprietary, CashBet is considering alternative methods to engender anonymous trust.

- **Speed.** CryptoGo will enable faster payouts to players, shrinking the withdrawal processing time from days to seconds. Only the final state will be written to the root blockchain. By comparing the player's history, withdrawal amount, and other requirements, the player can be paid immediately in CBC.

- **Access.** CashBet Coin will democratize access to CashBet's world-class entertainment by enabling players in markets underserved by the payment card industry to wager in CashBet-powered casinos.

- **Empowered players**.  Players have access to all their CBC transactions. Changes to public blockchains are publicly viewable by all parties creating transparency, and all transactions are immutable, meaning they cannot be altered or deleted.

© CashBet 2018

CashBet Initial Coin Offering

# Operators: Launch a Complete iGaming Site

## Operate an iGaming Site End-to-End

The CashBet platform is modular, comprehensive, and fiat-and-cryptocurrency ready. Operators can brand their iGaming site, enable gaming content, and launch a crypto-casino within days. Operators also avoid the challenges and expense of integrating a back office accounting and player management system.

The CashBet platform provides everything operators need to run a licensed and profitable iGaming business: an integrated back office, game management, certifiably secure and transparent outcome determination, exclusive content availability, and deeply integrated know-your-player analytics. The platform comes with built in bonusing for player retention and currency management, as well as a geo-verification system which can be used to offer location-based bonusing or restrict play to a locality.

## Access to Quality Content

CashBet is already a leader in aggregating and delivering content from 3rd party RGS platforms, offering a large number of quality games to its operators. CashBet's blockchain-enabled casino will extend the content to include crypto-casino games.

CashBet's software and game development kits will extend the pipeline to new titles via CashBet's RGS and third-party content delivery platforms. And as CashBet deploys new content, it becomes available at no additional implementation cost to operators.

Thanks to CashBet native apps that manage and optimize HTML5 content for mobile devices, operators will be able to attract players with a superior gaming experience featuring stunning graphics and responsive, high-speed animations.

## Elimination of Card Theft

Operators accepting cryptocurrency payments on the CashBet iGaming platform will eliminate chargeback fraud, a pervasive type of fraud difficult to combat and typically accounting for a reversal of 1% - 3% of transactions on a monthly basis.

## Increased Liquidity

Liquidity is an issue for every operator but especially smaller ones. A small liquidity pool limits what operators can offer and what players can win - a critical mass of players is crucial to success. Operators using the CashBet iGaming platform can increase their liquidity by legally offering wagering and payout in CBC.

© CashBet 2018

## Players: A Better Gaming Experience

### Greater Access to iGaming Content

CashBet-licensed casinos will be able to offer more content to more players than other crypto casino operators. The CashBet RGS and CryptoRGS platforms will be leading content aggregators of fiat and cryptocurrency denominated games.



*Figure 3 - The CashBet platform will accept both fiat and cryptocurrency transactions using CashBet Coin.*

CBC will allow players in markets underserved by the payment card industry to play on CashBet-powered casinos.  Disintermediation of banking providers will greatly increase access for players in emerging markets. These considerable markets include areas in Latin America, the Caribbean, and Africa where players are challenged by access to electronic payment networks (and where wagering is often transacted via cash and bookies).

© CashBet 2018

## Trust and Transparency

CashBet-powered casinos will give players visibility to all their information and transactions. It will also empower players to challenge and prove the fairness of outcomes.

- **Transaction Transparency -** Changes to public blockchains are viewable by all parties.

- **Fairness -** CashBet will raise the bar for trusted outcome determination, meeting the strictest emerging certifications. CashBet will show players how to challenge discrete outcomes, using provably fair hash/seed calculators.

- **Regulatory Compliance** - CashBet is licensed by the world's most reputable online gaming jurisdictions: the Alderney Gambling Control Commission (AGCC license numbers 116c1 & 116c2) and the UK Gambling Commission (UKGC license number 39620). CashBet is in the process of obtaining licenses from the Isle of Man Gambling Supervision Commission (GSV) - the only whitelisted regulatory body currently (October 2017) providing detailed guidance and a regulatory framework for crypto casinos.

## Responsive Game Play

CBC gaming on CashBet powered sites will be more responsive than the crypto-casino competition. CashBet's mobile-first operation is streamlined for HTML5 operation and performs equally well on desktop, mobile, or tablet devices.

## Reduced Transaction Costs

CashBet platforms will eliminate fees for fiat currency deposits and payout transfers, so only the amount of the wager need be risked by players.  CBC game play will use off-chain transactions, enabling instant wagers and payouts. These are captured in fully transparent microtransactions without incremental calls to the public blockchain. This reduces gas costs by cutting back on calls to the blockchain.

## The CashBet Platform

CashBet will be the first to market with a fully licensed, reputable, and comprehensive crypto-gaming solution.

The CashBet mobile-first iGaming platform has been licensed for real-money, social, and skill-based gaming and operational in several jurisdictions for over 4 years. Native and integrated third party RGS systems host a diverse selection of exclusive, unique, crypto-ready content to empower any iGaming operation. Using our vertically-integrated platform, CashBet provides player segmentation, player management, bonusing, campaign management, eWallet and geo-verification features to enhance or enable a profitable operation from day one.

© CashBet 2018

CashBet Initial Coin Offering

The CashBet platform consists of these fully integrated, third-party tested, and licensed components:

- CashBet and affiliated third-party remote game servers (RGS) and databases

- eWallet management

- Player Account Management back office

- GeoVerify services

- Native software development kits (SDKs) for optimum HTML5  presentation on iOS, Android, devices

- API servers to enhance component integration and responsiveness

- Game development kit (GDK) for content creation.



*Figure 4 - The CashBet platform provides everything an operator needs to run an iGaming business*

© CashBet 2018

CashBet Initial Coin Offering

## Competitive Landscape

CashBet is optimally positioned in the market. CashBet supports crypto iGaming, is licensed by top tier regulators, and offers a complete platform solution. As shown in Figure 5, CashBet's competitors fall short. In fact, they could become customers of CashBet by licensing our software to fill the gaps in their offerings.



*Figure 5 - CashBet is optimally positioned vs. competitors*

### Content Providers

None of the top tier game content providers, including NetEnt and Microgaming, support crypto wagering. Facing a dearth of quality content, crypto casinos typically offer subpar content or build their own, which requires talent, time, and money.

CashBet will be the first game content provider to bring top tier game content - proven titles in regulated casinos -  to the crypto casino market. And the CashBet platform can integrate third party content, bringing the best of social, skill, and real-money gaming titles to its B2B partners.

### Casino Operators

Most top tier casinos such as Mr. Green and 32 Red don't allow crypto wagering. In part, this reflects the technology constraints of their player wallets and back-office systems, which are designed exclusively for fiat currency transactions. Their prohibition on crypto

© CashBet 2018

CashBet Initial Coin Offering

content also reflects assumptions about the fairness of blockchain-based gaming that are demonstrably archaic.

Top-tier fiat currency operators rely on random number generators (RNGs) for outcome determination. Their RNGs are approved by regulatory bodies but only periodically - perhaps every two-three years - tested and then certified by third party consultants. By licensing CashBet Coin content -  and educating and equipping players with provably fair tools to challenge outcomes, CashBet operators can credibly elevate their claims to fair play.

## Crypto Casinos

Most crypto casinos are not regulated at all. At best they assert that they are provably fair and therefore require no regulation. At worst they dismiss any regulations as barriers to market entry. Neither could be further from the truth.

Regulators are chartered to protect players, not casino operators. If a player has a gambling problem regulators encourage or require operators to limit or block wagers and provide access to problem gambling agencies. Operators must oblige or risk losing their licenses. Regulators also protect players with daily, monthly, and yearly audits of an operator's back office to assure player payments and wagers are aligned and on the up and up. Furthermore, online gambling growth generally accelerates once a market becomes regulated. The future of online gambling is regulated.  As a top tier regulated platform, CashBet holds to - and embraces - the highest ethical and transparency standards.



Growth in key online gambling markets (indexed to 100 at year 0 = the last year pre-regulation)

© CashBet 2018

CashBet Initial Coin Offering

*Figure 6 - Online gambling growth generally accelerates as a market becomes regulated (Source: H2 Gambling Capital, Morgan Stanley Data Research).*

## Crypto-Casino Platforms

Crypto-casino platforms currently available aren't complete platforms. They either lack or must implement discrete modules for accounting and back office processing, analytics, marketing and promotions, and more.  By contrast, CashBet is the only turnkey, enterprise solution that fully integrates casino capabilities and is optimized for crypto gameplay.

## The CashBet Coin Token: Utility

CBC is a cryptocurrency token that may be used on multiple operator's sites, and not only for online gambling, but also for social gaming and skill-based gaming.  CBC-based gaming and token ownership will be uniquely useful and rewarded.

CashBet is issuing CashBet Coin tokens to power both its B2C and B2B crypto casino offerings.  CashBet will deliver concrete advantages to CashBet Coin players, partners, and owners. In addition to using CBC for deposits and wagers on any crypto casino powered by the CashBet platform, the CBC token will reward loyalty by paying VIP holders a percentage of losses and allowing them to enjoy better bonuses.  Paying in CBC will entitle CashBet partners to receive reduced rates on services.

CashBet Coin is a utility token. It is not proposed to be a security or regulated product. CashBet Coin confers only the right to access and use the CashBet platform. The utility of CashBet Coin, and the ability to access certain CashBet platform functionality may vary depending on the customer's place of residence, and where the customer accesses the CashBet platform from. See the 'Gambling Use Restrictions & Compliance' section for further details.

CashBet Coin ownership does not confer any equity, interest, or related right of any form with respect to CashBet or its affiliates or any related securities. Explicitly excluded are voting rights or rights to dividends or other distributions.

### CashBet Coin Token Utility: Partners & Players

- White label platform partners will be encouraged, in the form rate reductions, to use CBC to pay licensing and maintenance fees to CashBet.

- Content distribution partners will likewise be incentivized (in the form of lower rates) to use CBC to pay licensing fees to CashBet.  Casinos incorporating games from CryptoRGS will be required to offer deposit and wagering in CBC.

- CBC tokens may be granted to players as a reward for referring friends.

© CashBet 2018

- CBC may be used by other iGaming operators (social or real-money) as a deposit, payment, and withdrawal mechanism. In this way, CBC has a similar (but enhanced) utility to any other payment mechanism.

- Players who hold a certain number of eligible CBC tokens will be offered CBC VIP status in exchange for executing a time-locked contract, sequestering the tokens in the players' wallet so that they may neither be spent nor otherwise traded. This VIP management feature will be licensed to other operators who may accept CBC for purchase or deposit, allowing them to manage their own CBC-based VIP programs.

## Gambling Use Restrictions & Compliance

CashBet does not allow real-money wagering (gambling) play to be done by players who reside in the following countries:

- Belgium
- Bulgaria
- China
- Denmark
- Estonia
- France and French Territories
- Greece
- Hong Kong
- Hungary
- Italy
- Philippines
- Romania
- Singapore
- South Africa
- Spain
- Turkey
- United States of America
- US Minor Outlying Areas
- US Virgin Islands
- Syria
- Iran
- North Korea

Residents in these countries may still be able to use CashBet Coin to make purchases on non-gambling social casinos.

CashBet prevents players in the above-mentioned countries from gambling on the platform by verifying player geolocation and blocking IPs from the restricted jurisdictions. All players on the CashBet platform are also required to go through FATF-compliant KYC diligence, which includes address verification. Any player residing in the restricted countries would not pass KYC, and therefore would be unable to gamble on the platform.

© CashBet 2018

CashBet Initial Coin Offering

# CashBet Coin Issuance and Management

CashBet is issuing CashBet Coin and will integrate to the Ethereum blockchain in four phases.

## Phase 1 - CBC VIP Program

- Launching in Q2 2018, the CashBet Coin VIP program will offer:

    - Access to higher value bonuses with a lower turnover requirement than non-CBC VIP bonuses.

    - VIP loss insurance – 5% of a CBC VIP player's losses will be credited back to the player at the end of the first calendar month in which he or she attains CBC VIP status.  Players maintaining CBC VIP status for 3 months or more will see this amount rise to 10%.  Players who maintain CBC VIP status for 6 months or more will be credited back 15% of their losses on a monthly basis.

    - The Cashbet Coin smart contracts allow this feature to be used by any operator, allowing operators other than CashBet to develop CBC-based VIP programs for their players.

## Phase 2 - CBC Deposit & Wagering

A summary of the Phase 2 CBC game flow is as follows:

- The platform will internally convert CBC at the time of wager to fiat (USD or Euro) and convert any winnings back to CBC at the same rate.

- The player's balance will be held in CBC and clearly displayed in the CashBet eWallet interface.

- The game console will display the balance in the system currency.

- To keep the wager denominations even as the value of CashBet Coin fluctuates, the exchange rate will be updated hourly from a reference exchange.

Figure7 illustrates the game session CBC flow,  which is in accord with the Isle of Man crypto casino guidelines.  This improved the gaming experience during times when CBC may be volatile.

© CashBet 2018

CashBet Initial Coin Offering



*Figure 7 - CBC flow in game session.CBC is wagered by the player.  Wagers are converted to fiat (USD).  Winnings are converted from fiat back to CBC at the same exchange rate used for the wager.  Players deposit and withdraw CBC, but wagering is denominated only in fiat.*

### Phase 2 CashBet Coin-in, Conversion, CashBet Coin-out

Players make deposits in CBC to the CashBet gaming platform (on blockchain), where a ledger (off blockchain) will store their balance of crypto.  Wagers are made in fiat currency denominations, for example 1c, 25c, $1.  At time of wager, a recent value from a third-party exchange is used to convert the CBC to fiat and that amount is debited from the player's account in CBC.  On a win, an appropriate amount of fiat for the bet will be transferred to the player's holding account, and then converted using the SAME conversion factor back into CBC.  This amount will be transferred to the player ledger and which will await the next transaction.

At cash out, an appropriate amount will be transferred on ledger to the Ethereum blockchain to settle the player's account.

### Phase 2 Conversion How and Why

CashBet currently boasts some 450+ games integrated into its platform.  The games are not denominated in cryptocurrency.  The games require a discrete denomination of allowed bet amounts, like 0.01, 0.05, 0.25, 1.00, 5.00, etc.  These will not be appropriate for cryptocurrencies because the value of cryptocurrencies currently fluctuate too much to be able to use these denominations at all times.  Nor will any of the major game manufacturers allow their games to be played in a cryptocurrency.  Instead, the CashBet

© CashBet 2018

CashBet Initial Coin Offering

platform will automatically convert wager and win amounts within the platform on a per-wager and per-win basis, as described above.

A Phase 2 CashBet Coin deposit and subsequent wagering involves three wallets:

- The player's personal crypto wallet which is drawn from to buy CBC from an exchange and sell it back for other currencies.

- CashBet's crypto wallet, which is used to receive CBC deposits and pay out CBC to players.

- The player's eWallet, which is a representation within the CashBet platform of the player's account balance in whatever currency he/she is currently using.

## Phase 3 - CryptoRGS™

The CashBet platform features a robust and uniquely designed remote game server (RGS) that allows for both the integration of games directly into the platform as well as the incorporation of games from other vendors.  CashBet is building an exclusive library of the most popular casino games, including slots, roulette, blackjack and other table games, video poker, and bingo.  This library, combined with our RGS, allows us to offer CryptoRGS, the first content aggregation platform built with crypto casino operation in mind.

CryptoRGS games will feature provably-fair operation and accept any cryptocurrency (or fiat) natively, without the need for currency conversion.  Operators offering CashBet games can complete a server-to-server integration with CryptoRGS.  All games will be certified by a rigorous third-party compliance testing house.  Our provably fair feature may be invoked directly from any CryptoRGS game.

## Phase 4 - Pay-As-You-Go State Channel Technology - CryptoGo™

Traditionally, Bitcoin micropayments are executed via transferring transactions to third-party custodians, where users are compelled to trust custodians to stock coins, allow deposits and withdrawals, and update balances. Such an operation generates counterparty risk, adverse outcomes of which are well studied in financial economics[6].

Utilizing a simpler network of micropayment channels resolves the counterparty risk problem. Such channels allow multiple payments, which allows a party to send large sums to another in a decentralized manner. Micropayment channels establish a relationship between two parties to seamlessly update balances. A transfer is activated by broadcasting the net total to the blockchain when agreed upon by both parties. Note that this allows multiple transactions to be signed by the two parties while holding off the broadcast resulting in reduced network costs.

Cashbet's proprietary technology, CryptoGo, is based on the underlying technology of the blockchain and on a network of local two-party agreements. Contingent on each party signing off on spending amounts, both parties create an off-chain ledger entry, called balance proofs, denoting the transfer refunding the entry along with each party's individual allocation. Each party can update the ledger adding multiple transfers (from the ledger

© CashBet 2018

CashBet Initial Coin Offering

output), where only the latest version is contractual as imposed by the blockchain smart-contract scripts. These transfers are digitally signed and hash-timelocked operations, allowing secure conveyance of tokens among participants via bidirectional micropayment channels without the need for global consensus.

Payment channels permit practically unlimited number of bidirectional transfers between two parties provided that the net sum of transfers does not exceed the deposited tokens. Transfers can be executed instantaneously without a broadcast to the blockchain except during a one-time on-chain channel creation and final closing of the channel. Digital signatures and hash-timelocks ensure neither party can back out of any transfers contained in a channel, provided at least one party decides to present it to the blockchain. A balance proof in this design is as binding as an on-chain transaction because only the two participants has access to the tokens deposited in the payment channel's smart contract.

Our platform's strength lies in its network protocol. A sample network is illustrated in Figure 8. Each node in the network represents a party and paths between parties represent micropayment channels. The red dots correspond to tokens, i.e. payments, to be transferred between parties. Opening and closing payment channels between two parties, a payer and a payee, requires on-chain operations; therefore, establishing channels among all participants is not feasible. Instead, a payer can join the network by establishing a channel with any other party connected to the payee, enabling a transfer through intermediary parties. Unlike on-chain transactions, payment channel transfers do not require any fees. However, intermediaries in the network have an incentive to charge fees for the provision of their own channels, resulting in a competitive fee market and a need for optimal routing policies. Our solution platform facilitates this market by employing an efficient network flow optimization algorithm to minimize total costs[7].

## Inner Workings of Micropayment Channels

In this system, parties create off-chain ledger entries, called balance proofs, which can be considered as certified checks issued back and forth between the two participants. The balance proof shows the final sum of all transfers to each party up to a certain point in time, digitally signed by the sender. It therefore acts as the bill for the channel.

© CashBet 2018

CashBet Initial Coin Offering



*Figure 8 – A network of off-chain micropayment channels*

Multiple off-chain transfers can be executed back and forth between the participants, successively rebalancing the channel during the process. Eventually, one of the parties claim or pay their outstanding balance by submitting their final balance proof to the smart contract, i.e. closing the channel. The party who did not initiate closing the channel should then either submit their own balance proof or take no action in absence of transfers. Both parties can then withdraw deposits if any. Balances are distributed according to the closing party's proof, in case the second party fails to submit its own balance proof within a specified period of time. Consequently, each party has the right to access its own funds upon request.

It is important to note that although it may occur infrequently, a party can have relatively large winning amounts. Our network design includes off-chain hot and warm wallets to cover arbitrary sums. The hot wallet is designed to cover immediate bets, whereas the warm wallet replenishes the hot wallet instantaneously in presence of a large win.

To be able to cover large wins, one needs to determine the optimal safety stocks to keep in the warm wallet and when to replenish the warm wallet. Warm wallet is replenished from a cold storage and transfers from the cold to the warm wallet are not instantaneous and require some time.

© CashBet 2018

## Creating the Channel

The player-CashBet operator payment network uses the CryptoGo implementation of off-chain channel technology.

A participant must create a micropayment channel with another participant in order to participate in this payment network. This is accomplished through ledger entries (ledger transactions). A ledger transaction can be created by either participant. Suppose the participants are R and S, representing recipient and sender respectively. The output for a ledger transaction is a single 2-of-2 multisig address e.g. "RS". Figure 9 illustrates the processes that take place for secure payments, initiated by the recipient R.

### Transaction Signatures

Any spend on the ledger entry, called Commitment Transaction in Figure 8, consists of a one half-signed transaction. The one on the left in the figure is the commitment transaction where the recipient sends its signature, whereas the one on the right is the one for the sender. Either party can broadcast the commitment transaction by signing their version upon receiving the other party's signature. The channel is open for further transactions once a transaction is committed to the blockchain.

### Hashed Timelock Contract

With a network of payment channels, a blockchain enforced contract must be constructed to prevent sender, recipient, and intermediaries from delaying or stealing funds. Our system constructs a blockchain enforced contract within the network of micropayment channels in order to prevent sender and recipient from delaying or stealing funds. To this end, a hashed timelock contract is opened once a commitment agreement is in place. For secure transfer, the recipient first generates some random data D, which is used as an argument to a hash function, to produce H = hash(D).

© CashBet 2018

CashBet Initial Coin Offering



*Figure 9 – Microchannel payment processing*

The recipient then provides H and his bitcoin address to the party sending the funds. The recipient can choose to redeem the transaction by disclosing the data D once the sender

© CashBet 2018

CashBet Initial Coin Offering

routes the payment and hence the recipient receives the transaction in the micropayment channel. Disclosing the data D corresponding to H enables the recipient to pull funds from the sender. The ultimate purpose of this mechanism is to require some random data D to be known and disclosed within a specified time period in order to broadcast the transaction on the blockchain. As an example, suppose this time period if 4 hours, party R is the recipient of 100 CBC, party S is the sender. This mechanism then would result in the following clearing and settlement contract:

1. Party S should pay out according to the terms in the contract and close out the contract.
2. Party S settles the contract by paying Party R 100 CBC, only if Party R can provide to Party S an unknown 30-byte random input data D from a known hash function *hash(). (Settlement process in Figure 9).*
3. The clearing process is invalidated if the clause in (2) above is null. If this is the case, neither party can claim the payment after 4 hours (4 hrs and 30-byte random data are used as examples here). *(Timeout process in Figure 9).*
4. A penalty comprised of the funds locked up in this contract is incurred in case of any violation of the above terms, which is to be paid to the participant not violating the terms.

## PAYOUT TIMELINE

## CashBet Coin Solves the Payment Delay



*Figure 10 - CryptoGo technology solves the payout delay problem facing today's casinos.*

## Methodology for Warm Wallet Depletion

CashBet manages its cryptocurrency reserves with the following wallets:

- A hot wallet that contains the appropriate amount of reserves to cover necessary bets. This is single signature that is controlled by the system.

- A warm wallet that is accessible by the system to cover unexpected losses

- A daily "sweep" (depletion from the warm wallet) into cold storage backed by a hardware wallet with multi-sig

© CashBet 2018

CashBet Initial Coin Offering

The solution of finding optimal warm wallet safety stock levels lies in the fact that the average casino win per specific time periods (e.g. day) can be observed historically. We present our derivation in this section by noting that finding the threshold until which to deplete the warm wallet is similar to the problem of determining economic order quantity under stochastic demand and lead time. Here, demand corresponds to losses to players, and lead time is the time it takes to bring the warm wallet funds to a high level with no risk of a stock-out, via winning a series of bets. A stock-out occurs when there are not enough funds in the warm wallet to cover the hot wallet, which is where payouts to the players occurs.

A depletion point (DP) is defined to be the warm wallet funds level until which we deplete the warm wallet. The depletion point for stochastic demand and stochastic lead time is the expected demand during lead time and an extra safety stock. Here, safety stock is held in excess of expected demand due to variable demand rate and/or variable lead time. Therefore, safety stock (SS) serves to reduce the probability of experiencing a stockout due to unexpected losses and/or variable lead times. Formally, we have:

DP = Expected demand during lead time + Safety stock

Another concept we have is the service level (SL). SL is the probability that demand will not exceed supply during lead time (i.e., the probability of no stockout).

Hence, the probability of a stockout is 1 − SL.

In our case the amount of safety stock depends on

1. The desired service level (1-$\alpha$)
2. Daily demand random variable, $D_i$. The unit of $D_i$ can be losses per day. We can observe these historically from the data and find its expectation and standard deviation ($\mu_D, \sigma_D$).
3. Lead time random variable $L$. $L$ can have minutes, hours, or days as units, as desired. We can observe historically its expectation and standard deviation ($\mu_L, \sigma_L$) from the data.

Demand is a random variable, so is the lead time demand, i.e., demand during lead time, $D_L$. We have

$$D_L = \sum_{i=1}^{L} D_i$$

Given that periodic demands (e.g., daily, hourly, etc.) are independent and identically distributed random variables and that they are independent of the lead time, we can compute the expectation $E[D_L]$ and standard deviation $V[D_L]$ of $D_L$:

$$E[D_L] = E[\sum_{i=1}^{L} D_i] = \mu_L \mu_D$$

$$V[D_L] = V[\sum_{i=1}^{L} D_i] = \mu_L \sigma_D^2 + \sigma_L^2 \mu_D^2$$

Page **24** of **39**

© CashBet 2018

CashBet Initial Coin Offering

By the central limit theorem, $D_L$ follows a Normal Distribution with mean $E[D_L]$ and variance $V[D_L]$. We choose the depletion point DP such that the probability of no stockout is at least 1-$\alpha$, that is,

Prob ( $D_L$ < DP ) > 1-$\alpha$.

Standard algebra using the fact that $D_L$ follows a Normal Distribution gives:

$$DP = E[D_L] + z_\alpha\sqrt{V[D_L]} = \mu_L\mu_D + z_\alpha\sqrt{\mu_L\sigma_D^2 + \sigma_L^2\mu_D^2}.$$

Hence, the depletion point for a desired no-stockout probability can be found using the above equation and the underlying data.

## About CashBet

CashBet was founded in 2012 by a team of industry veterans with a vision of using their extensive gaming software experience to build a next generation mobile-first monetization platform for social and mobile gaming. Previously the team successfully built and sold 2 other gaming platforms to CyberArts and US Digital Gaming (USDG).

Fast-forward 5 years later and CashBet has built a well-established, robust, mobile-first iGaming platform which has been licensed for real-money gaming and operational in several jurisdictions for over 4 years. The platform supports real-money gaming, skill-based gaming, and social gaming.  The company has two patents for its technology platform (U.S. Patent No. 9,830,770 and 9,830,772 ). Several additional patents are expected to be filed in relation to current technology efforts.  There are 8 operators within multiple segments of gaming using the platform worldwide. CashBet is a profitable company and is now looking to continue scaling operations worldwide with our revolutionary gaming platform.

### Company Highlights

- Launched in December of 2012

- Incorporated in the Channel Islands (Alderney, within the Bailiwick of Guernsey)

- Licensed by top tier gambling regulators: AGCC and UKGC since 2013

- 8 enterprise software customers

- 10s of millions of dollars wgered through the platform

- Hundreds of thousands of active players

- Venture-backed and profitable

© CashBet 2018

CashBet Initial Coin Offering

## CashBet Team

Dr. Reaves and Dr. Weinberg founded CashBet in 2012. After meeting for the first time in 1993 at Lawrence Livermore National Laboratory, they have worked together for over 25 years, founding 3 companies together. They've built and deployed online gaming systems for lotteries, casino operators, and tribal gaming organizations throughout Europe and the United States. The CashBet team are iGaming veterans who have successfully developed and sold 2 prior online gaming platforms. CashBet's head of software architecture and other key members of the engineering team are active in the blockchain community, having developed and published Bitcoin wallets .

Today CashBet has a very strong and diverse team of over 30 employees with offices in Oakland, California and Sofia, Bulgaria.

*Management Team*



**Mike Reaves**
**CEO and Co-founder**
Mike has over 20 years of software development and IT experience, focused on gaming, search, and advertising. He led the product development team at US Digital Gaming, and Products and Services at CyberArts, where he expanded the online eGaming company's product line from poker to casino games, bingo, and back-of-house systems. Mike holds a Ph.D. in Physics from the University of Connecticut.
https://www.linkedin.com/in/mikereaves/



**George Weinberg**
**CTO and Co-founder**
George brings 20 years of software development experience in multiple areas of game systems, including high level architecture design, creation of front ends, implementation of game mechanics and accounting, integration with third-party systems, the development of computer players, automated testing systems, and compliance. George holds a Ph.D. in Physics from Texas A & M University.
https://www.linkedin.com/in/george-weinberg-07b4b541/

© CashBet 2018

CashBet Initial Coin Offering



**Fred Hsu**
**Chairman**
 As CTO and co-founder of Oversee, Fred grew the domain and marketing services company to $230M annual revenue  in 8 years. In 2011, he founded and bootstrapped mobile DSP Manage.com from $0 to $80M in under 4 years.
https://www.linkedin.com/in/fredhsu/



**Daniel Edwards**
**VP of Finance**
Daniel has over 10 years of experience in corporate development, operations and finance. Prior to joining CashBet, Daniel worked as an Investment Banker at Financial Technology Partners, D.A. Davidson, Well Fargo and Wachovia. He advised technology companies on mergers & acquisitions, capital raising and strategic corporate development. He has successfully closed over 15 M&A and capital raise transactions. Daniel also is a board member and mentor to several technology companies spanning from London to Silicon Valley. He graduated with a B.S. in Finance & Chemistry from Oregon State University.
https://www.linkedin.com/in/dan-edwards-99050123/



**Tarun Gaur**
**VP of Engineering**
Tarun's experience with technology ranges from thorough understanding of enterprise architecture to future of smart world aka Internet of things. In his leadership roles at AOL, Microsoft and Deloitte, Tarun has established and run teams, processes; managed product life cycles, development of point solutions and turnkey apps. Under Tarun's leadership, tringapps, Inc. has "mobilized" more than 320+ brands.
https://www.linkedin.com/in/techgypsy/



**Jeremie Kanter**
**VP of Compliance**
Jeremie is responsible for ensuring CashBet's regulatory compliance. He has previously held leadership roles at Playtech, most recently serving as their Head of B2C and Network Services Compliance.
https://www.linkedin.com/in/jeremiekanter/

© CashBet 2018

CashBet Initial Coin Offering



**Patrick Ross**
**VP of Product Quality**
Patrick has 17 years of experience working in software development and IT, including  12 years focused exclusively in the online gambling industry. His technical experience has given him insight into the design of front end game presentation and back end game server architecture. Prior to becoming a founding team member at CashBet, Patrick worked on platform development at CyberArts and Ultimate Gaming.
https://www.linkedin.com/in/patrick-ross-pmp-670b9525/



**Tim Cogswell**
**Director of Product Management**
Tim has over 17 years of experience in product development with over a decade of interactive gaming expertise.  He has driven interactive product strategy for IGT, one of the largest game suppliers in the industry as well as launched one of the first tribal social casino products in California with San Manuel Digital. Tim was vital in integrating IGT's game portfolio into DoubleDown Interactive's game library.
https://www.linkedin.com/in/tim-cogswell-1335351/

*Other Select Team Members*





**Brian Hill**
**Systems Manager**
https://www.linkedin.com/in/brianchill/

**Miroslav Georgiev**
**Senior Software Engineer**
https://www.linkedin.com/in/miroslavgeorgiev/

© CashBet 2018

CashBet Initial Coin Offering



**Adriyan Stanchev**
**Android Developer**
https://www.linkedin.com/in/adriyan-stanchev-631a0
3107/



**Vivian Kim**
**Marketing Lead**
https://www.linkedin.com/in/viviantrankim/



**Kiril Kyutov**
**iOS Developer**
https://www.linkedin.com/in/kirilkyutov/



**Ian Lesnevskiy**
**Senior Software Engineer**
https://www.linkedin.com/in/ian-lesnevski-941604a/



**Luc Martin**
**HTML5/JavaScript Developer**
https://www.linkedin.com/in/lucmartinsanfrancisco/



**David Montgomery**
**Senior Software Engineer**
https://www.linkedin.com/in/davidlmontgomery/

© CashBet 2018

CashBet Initial Coin Offering



**Kyle Piasecki**
**Casino Manager**
https://www.linkedin.com/in/kylepiasecki/

*Advisory Board*



**Stuart Lewis-Smith**
Stuart is the Senior Vice President and General Manager of GSN Games/Sony. Previously, he served as CEO at Idle Games (acquired by GSN Games), a social casino mobile games developer. He has spent over 10 years managing mobile social and iGaming companies.
https://www.linkedin.com/in/stuartlewissmith/



**Gavin Yeung**
Gavin is the CEO and Founder of Cryptomover, a transparent digital asset index fund. He is an experienced portfolio manager, whose first venture was installing wireless cards for college students. Gavin is a founding member of Bitcoin Association of HK, and previously worked at Deutsche Bank as a trader.
https://www.linkedin.com/in/gavin-yeung-3a32141/



**Joyo Wijaya**
Joyo is an active angel investor and advisor, and is a member of Astia Angels and Stanford Angels and Entrepreneurs, as well as Principal of Tandem Entrepreneurs. Previously, Joyo was VP of Analytics and Monetization at Bash Gaming (acquired by GSN).
https://www.linkedin.com/in/joyowijaya/

© CashBet 2018

CashBet Initial Coin Offering



**Ben Gorlick**
Chief Strategist, angel investor and lead advisory board member. Ben is CTO of Crowd Machine. He's an entrepreneur, computer scientist, investor, adviser, Bitcoin, Blockchain, Cryptography, and AI enthusiast.
https://www.linkedin.com/in/ben-gorlick-6782865/



**Matteo Monteverdi**
Matteo is an international executive with over 20 years of experience in designing, deploying, and growing digital transformational initiatives for B2B and B2C organizations, including IGT, GTECH and Lottomatica.
https://www.linkedin.com/in/matteomonteverdi/



**Lars Wahlström**
Lars has extensive experience from the online gaming industry, both B2B and B2C. He currently works at Jackpotjoy Sweden and was Head of Nordic Markets at Gamesys.
https://www.linkedin.com/in/larsbw/



**Kevin Flood**
Kevin is the CEO of Gameinlane and FitCentrix. He has worked for and with US land based casino operators helping them evaluate social casino and iGaming platforms for the purpose of joint ventures and acquisitions in addition to launching online gambling operations in Europe.
https://www.linkedin.com/in/keflood/



**Tjaden Hess**
Tjaden is an Ethereum DAPP developer. At 1protocol, he designed and built the smart contract systems for decentralized staking protocols and staking pools. At ConsenSys, he developed large smart contract systems, inter-chain relays, smart contracts, libraries, and tools for blockchain app development.
https://www.linkedin.com/in/tjaden/

© CashBet 2018

CashBet Initial Coin Offering



**Shay Chinn**
Shay has been CTO, Chief Architect and/or Technology Founder at companies including eToys, dotTV, Oversee, Looksmart and is currently CTO at Agent.ai an AI-enhanced customer service software company.
https://www.crunchbase.com/person/shay-chinn



**Analisa Burden**
Analisa is Creative Director and Partner at Hot Streak Studio. She has over 20 years of experience in game content development and design, having worked at Konami, WagerWorks, IGT, and Bash Gaming. Analisa has deep expertise in creating compelling real-money, social, and skill-based games.
https://www.linkedin.com/in/analisa-burden-b57195b/

© CashBet 2018

CashBet Initial Coin Offering

## Customers and Partners

CashBet has a diverse, international footprint with eight operators using our platform worldwide. We are also the only platform on the market that is currently supporting real-money gaming, social gaming, and skill-based gaming clients.

















*Figure 11 - Selected CashBet partners*

© CashBet 2018

CashBet Initial Coin Offering

## CashBet Roadmap

The project will be scoped and delivered as follows:



*Figure 12 - CashBet Roadmap*

## Token Sale

### Total Token Supply

- 430,000,000 ERC20 CashBet Coin Tokens
- No additional tokens will be created beyond this amount

### Token Distribution

For every one token which is sold, three tokens will be distributed according to the following plan:



*Figure 13 - Token Distribution Plan*

© CashBet 2018

CashBet Initial Coin Offering

## Token Sale Structure

The token sale event allows you to contribute to CashBet to receive CBC ERC20 Tokens.

CashBet's token sale will consist of two pre-sales and a public sale as defined below. A soft cap of $5 million equivalent value will be enforced.  The ICO will end early if the hard cap is reached prior to the end of the public sale.

*First Pre-Sale*

| | |
|---|---|
| **Start Date** | Wednesday, January 24 2018, 5:00 p.m. GMT |
| **End Date** | Tuesday, February 20 2018, 5:00 p.m. GMT |
| **Minimum Purchase** | $25,000 USD equivalent |
| **Discount** | 20% discount on the initial token price of $0.50 USD |
| **Participation** | Open to all participants meeting the Participation Eligibility Rules |
| **Contract Type** | Future tokens will be offered through the sale and issuance of Simple Agreements for Future Tokens (SAFTs) to certain (i) accredited Investors, as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended, and (ii) other parties who are not deemed to be U.S. persons within the meaning of Rule 902 of Regulation S of the Securities Act of 1933, as amended. |

*Second Pre-Sale*

| | |
|---|---|
| **Start Date** | Tuesday, March 27 2018, 5:00 p.m. GMT |
| **End Date** | Tuesday, April 3 2018, 5:00 p.m. GMT |
| **Minimum Purchase** | $10,000 USD equivalent |
| **Discount** | 16% discount on the initial token price of $0.50 USD |
| **Participation** | Open to all participants meeting the Participation Eligibility Rules |
| **Contract Type** | Future tokens will be offered through the sale and issuance of Simple Agreements for Future Tokens (SAFTs) to certain (i) accredited Investors, as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended, and (ii) other parties who are not deemed to be U.S. persons within |

© CashBet 2018

CashBet Initial Coin Offering

|  | the meaning of Rule 902 of Regulation S of the Securities Act of 1933, as amended. |
|---|---|

*Public Sale*

| Start Date | Tuesday, April 10 2018, 5:00 p.m. GMT |
|---|---|
| End Date | Friday, April 27 2018, 5:00 p.m. GMT |
| Discount | <ul><li>10% discount during first 24 hours</li><li>6% discount during second 24 hours</li><li>No further discounts will be offered after this</li></ul> |
| Participation | Open to all participants meeting the Participation Eligibility Rules |

## Participation Eligibility Rules

- We will accept token purchases worldwide except where forbidden by law.
- Token purchases by US citizens may only be made by accredited investors who do not reside in the state of New York (due to Bitlicense law.) Automated accredited investor checks will be performed and the purchaser will be required to input the necessary data.
- "Know-Your-Customer" (KYC) and Anti-Money Laundering (AML) processes will be performed during the purchase process to ensure we meet the criteria of our regulators.
- Unused value on account will be automatically converted into CBC tokens.
- No refunds will be given except in the case of failure to pass KYC, AML, or accredited investor checks.

## Token Price Rate & Increase Schedule

CashBet Coin will be initially priced at $0.50 USD per token. During the Pre-Sales, the price will stay fixed at this initial rate. During the Public Sale, the price per token will increase to $0.60 on April 17 at 5:00pm GMT, and to $0.75 on April 22 at 5:00pm GMT.

© CashBet 2018

CashBet Initial Coin Offering



*Figure 14 - Token Pricing Rate Schedule for Public Sale*

## Currencies Accepted

- Bitcoin
- Bitcoin Cash
- Ethereum
- Ethereum Classic
- Litecoin
- US Dollars (USD)

## Token Issuance

- Within two weeks of the conclusion of the token sale, CashBet Coin will be distributed proportionately to purchasers on a pro-rata basis.
- CashBet Coin tokens will be physically transferred to purchasers' ERC20-compatible Ethereum wallets, which will have been have specified in the purchasers' profiles at coin.cashbet.com.
- Tokens distributed to team members through CashBet's retention program will be released gradually, over a 18-month period, in order to avoid flooding the market with tokens.
- Any unsold tokens will be destroyed.

## Use of ICO Proceeds

The use of proceeds from the coin sale will depend on the total value of tokens sold, as detailed in the scenarios below.

© CashBet 2018

CashBet Initial Coin Offering



*Figure 15 - Use of ICO proceeds if company raises $5 million to $29 million*



*Figure 16 - Use of ICO proceeds if company raises $30 million or more*

© CashBet 2018

CashBet Initial Coin Offering

## Financial Plan

We believe that the use of proceeds in either scenario will allow CashBet to reach our vision of building out the world's first crypto-ready comprehensive iGaming platform. Proceeds above our goal will act as a catalyst for our global growth. They will allow us to hire additional resources for furthering technology development and expanding into more markets at a quicker pace. CashBet became a profitable company in 2017 and plans continued operations into the foreseeable future as a profitable company. The ICO proceeds will enable CashBet to execute on its vision of offering the world's first crypto-ready comprehensive iGaming platform and result in tremendous financial growth and strong revenue for years to come.

## Disclaimer

Caution: CashBet will never ask for your private key or ask for transfer to a private address. All contribution wallet addresses will only be on the official ICO sites, coin.cashbet.com and ico.cashbet.com. Should anyone request for you to transfer any currency to them via Private messages or any other channels other than the official ones listed below, it could be a phishing attempt to scam you of your coins. If you discover anyone or any website masquerading as us, please email us at ico@cashbet.com.

## Official Sites and Pages

Official CashBet Site: http://www.cashbet.com

Official CashBet ICO Site: http://coin.cashbet.com

Official CashBet Facebook: https://www.facebook.com/cashbetcoin/

Official CashBet Twitter: https://twitter.com/CashBetCoin

Official CashBet Coin Telegram Chat: https://t.me/cashbetcoin

Official CashBet Telegram Channel: https://t.me/cashbet

## Document Revision History

| | | |
|---|---|---|
| 1.1 | 15-Sep-2017 | Initial version |
| 1.2 | 25-Sep-2017 | Technical Review |
| 1.3 | 06-Oct-2017 | Added |
| 1.4 | 17-Oct-2017 | Updated tech sections micropayment channel description. |
| 1.5 | 01-Nov-2017 | Revised pay-as-you-go description and token utility. |

© CashBet 2018

CashBet Initial Coin Offering

1.6     09-Nov-2017   Updated token loyalty program and token distribution details.

1.7     18-Nov-2017   Additional details on Betcoin VIP program.

1.8     16-Dec-2017 Rollout phases

2.0     22-Dec-2017 CryptoRGS and About Cashbet

2.1     23-Dec-2017   Revisions to formatting, fixed typos, final team review

2.2     1-Jan-2018 Final English version

2.3     7-Jan-2018 Formatting of CashBet team section, update to select graphics

2.4     8-Jan-2018 Update to Token Sale section, update to total token supply

2.5     10-Jan-2018 Update to Token Sale section, token pricing now in ETH not USD; added advisor

2.6     16-Jan-2018 Update to Token Sale section, token pricing now reverted to USD; added additional terms to address BTC and ETH pricing volatility

2.7     20-Jan-2018 Update to listed time and timezone of token sale

2.8     20-Jan-2018 Updated advisors

2.9     22-Jan-2018 Update to Token Sale section: pre-sale terms, participation eligibility, currencies accepted

3.0     7-Feb-2018 Update to Team section and Bibliography

3.1     15-Mar-2018 Update to Token Sale section and refinements to Figures 2, 9

3.2     26-March-2018 Update Executive Summary, The iGaming & Cryptocurrency Opportunity, The CashBet Coin Token: Utility, and Token Sale sections; Clarification to number of players; added graph on regulated gaming growth; clarified that CBC can be used on social gaming sites; added CBC use case as a payment method; clarified mechanism of the VIP program; added 2nd pre-sale information; clarified terms of sale.

3.3     30-March-2018 Update to CashBet Coin Utility section, update to Token Price Increase section

3.4     5-April-2018 Update to CashBet Coin Utility section

3.5     10-April-2018 Update to CashBet Team and Utility sections

# Bibliography

1. http://www.jeffcoleman.ca/state-channels/

© CashBet 2018

CashBet Initial Coin Offering

2. https://www.coindesk.com/bought-first-bitcoin-ether-now-brace-fees/

3. Provably fair is a regime of third-party certification of cryptocurrency iGaming platforms and outcomes.

4. https://www.coindesk.com/maltas-government-may-test-cryptocurrency-in-regulatory-sandbox/

5. https://medium.com/blockchannel/the-ico-rat-pack-gambling-tokens-b79e04ac76cb

6. Thompson, James R. Counterparty Risk in Financial Contracts: Should the Insured Worry About the Insurer? The Quarterly Journal of Economics, Volume 125, Issue 3, 1 August 2010.

7. Ahuja, R.K., Magnanti, T. L., Orlin, J. B. Network Flows, Theory, Algorithms and Applications, Prentice Hall, NJ.

© CashBet 2018

# EXHIBIT D

# **Mobile Gaming Technologies, Inc.** – 'D' on 3/27/18

*On:* **Tuesday, 3/27/18, at 1:45pm ET** · *Effective:* **3/27/18** · *Accession #:* **1570256-18-1** · *File #:* **21-308649**

*Previous 'D':* **'D'** on 2/25/13 · *Latest 'D':* **This Filing**

Find [_____] in [this entire Filing.] Show [Docs searched] & [each "hit".] ↓Hints

| As Of | Filer | Filing | For·On·As | Docs:Size |
|---|---|---|---|---|
| 3/27/18 | Mobile Gaming Technologies, Inc. | D | 3/27/18 | 1:6K |

### **Notice of an Offering of Securities Made Without Registration — Form D**
### **Filing Table of Contents**

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: D | Notice of an Offering of Securities Made Without Registration -- primary_doc.xml/7.8 | HTML | 7K |

*This document is an XML File that may be rendered in various formats:*

FORM D  –  Plain Text  –  EDGAR System  –  SEC Website  –  XML Listing  –  <?xml?> File

---

# Wayfair: Official Site

Enjoy up to 70% Off Retail Prices & Free 2-Day Shipping on Thou

---

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
### FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

---

### 1. Issuer's Identity

| CIK (Filer ID Number) | Previous Names | [X] None | Entity Type |
| --- | --- | --- | --- |

**1570256**
Name of Issuer
**Mobile Gaming Technologies, Inc.**
Jurisdiction of Incorporation/Organization
**DELAWARE**
Year of Incorporation/Organization
[X] Over Five Years Ago
[ ] Within Last Five Years (Specify Year)
[ ] Yet to Be Formed

Entity Type:
[X] Corporation
[ ] Limited Partnership
[ ] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
**Mobile Gaming Technologies, Inc.**

Street Address 1                                        Street Address 2

| 344 20th Street | | SUITE 310 | |
|---|---|---|---|
| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| OAKLAND | CALIFORNIA | 94612 | (510) 419-0545 |

---

**3. Related Persons**

| Last Name | First Name | Middle Name |
|---|---|---|
| Reaves | Michael | |
| Street Address 1 | Street Address 2 | |
| 344 20th Street | Suite 310 | |
| City | State/Province/Country | ZIP/PostalCode |
| Oakland | CALIFORNIA | 94612 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Weinberg | George | |
| Street Address 1 | Street Address 2 | |
| 344 20th Street | Suite 310 | |
| City | State/Province/Country | ZIP/PostalCode |
| Oakland | CALIFORNIA | 94612 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Hsu | Fred | |
| Street Address 1 | Street Address 2 | |
| 344 20th Street | Suite 310 | |
| City | State/Province/Country | ZIP/PostalCode |
| Oakland | CALIFORNIA | 94612 |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

**4. Industry Group**

[ ] Agriculture

Banking & Financial Services

   [ ] Commercial Banking

   [ ] Insurance

   [ ] Investing

   [ ]

Health Care

   [ ] Biotechnology

   [ ] Health Insurance

   [ ] Hospitals & Physicians

   [ ] Pharmaceuticals

[ ] Retailing

[ ] Restaurants

Technology

   [ ] Computers

   [ ] Telecommunications

☐ Investment Banking

☐ Pooled Investment Fund

Is the issuer registered as
an investment company under
the Investment Company
Act of 1940?

☐ Yes          ☐ No

☐ Other Banking & Financial Services

☐ Business Services

Energy

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

☐ Other Health Care

☐ Manufacturing

Real Estate

☐ Commercial

☐ Construction

☐ REITS & Finance

☐ Residential

☐ Other Real Estate

☒ Other Technology

Travel

☐ Airlines & Airports

☐ Lodging & Conventions

☐ Tourism & Travel Services

☐ Other Travel

☐ Other

---

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))

☐ Rule 504 (b)(1)(i)

☐ Rule 504 (b)(1)(ii)

☐ Rule 504 (b)(1)(iii)

☐ Investment Company Act Section 3(c)

☐ Section 3(c)(1)          ☐ Section 3(c)(9)

☐ Section 3(c)(2)          ☐ Section 3(c)(10)

☐                          ☐

| | | |
|---|---|---|
| ☐ Rule 505 | ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☒ Rule 506(b) | ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Rule 506(c) | ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Securities Act Section 4(a)(5) | ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| | ☐ Section 3(c)(7) | |

## 7. Type of Filing

☒ New Notice   Date of First Sale **1/22/18**   ☐ First Sale Yet to Occur

☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   ☐ Yes ☒ No

## 9. Type(s) of Securities Offered (select all that apply)

| | |
|---|---|
| ☐ Equity | ☐ Pooled Investment Fund Interests |
| ☐ Debt | ☐ Tenant-in-Common Securities |
| ☐ Option, Warrant or Other Right to Acquire Another Security | ☐ Mineral Property Securities |
| ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | ☒ Other (describe) |

**INVESTMENT CONTRACT, RIGHT TO ACQUIRE A NON-SECURITY TOKEN IN THE FUTURE**

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   ☐ Yes ☒ No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $**10,000** USD

## 12. Sales Compensation

Recipient                                            Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None          (Associated) Broker or Dealer CRD Number                    ☒ None

Street Address 1                                      Street Address 2

City                                                 State/Province/Country                          ZIP/Postal Code

☐                    ☐

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States

All States          Foreign/non-US

---

**13. Offering and Sales Amounts**

Total Offering Amount      $4,390,593 USD  or  ☐ Indefinite

Total Amount Sold             $533,269 USD

Total Remaining to be Sold $3,857,324 USD  or  ☐ Indefinite

Clarification of Response (if Necessary):

---

**14. Investors**

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:         8

---

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD  ☐ Estimate

Finders' Fees $0 USD  ☐ Estimate

Clarification of Response (if Necessary):

---

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD  ☐ Estimate

Clarification of Response (if Necessary):

---

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against it in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Mobile Gaming Technologies, Inc. | Michael Reaves | Michael Reaves | Director | 3/27/18 |

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

↑Top

Filing Submission 0001570256-18-000001  –  Alternative Formats (Word / Rich Text, HTML, Plain Text, et al.)

# Start Download - Convert From
Get PDF King for OSX. 100% Safe & Secure, Download Free!

Copyright © 2018 *Fran Finnegan & Company*. All Rights Reserved.
*About* – *Privacy* – *Redactions* – *Help* — Sun., Dec. 2, 1:50:59.0pm ET

# EXHIBIT E

# cashbet coin

# Infrastructure for iGaming

## May 2018

Private & Confidential – Do Not Distribute



# First Tier 1 Licensed Crypto Casino Platform



**Telegram 30k**




**First Crypto Sports Sponsorship**




**Biggest Crypto Gaming Partnership Ever**



**Multi-billion Dollar Lottery**

  




# Complete iGaming Infrastructure

## CashBet solves inadequacies in iGaming



Private & Confidential – Do Not Distribute

# Our mission is to solve the issues facing crypto-gaming operations today:
# trust, speed, cost, content and access



Platforms are not optimized for mobile



Less than 5% offer a cryptocurrency payment solution



Lack of regulation for crypto casinos



Lack of overall transparency



Not content aggregation provider catering to crypto casinos



No licensable imaging platform exists for cryptocurrency based igaming



Transaction fees are high



Blockchain transactions are slow



# Company Differentiators

- Gaming veterans

- Team of 35 worldwide

- Licensed by multiple tier 1 jurisdictions

- Venture backed and profitable

 **5** Years in Business

 **770%** Player Increase Since 2015

 **515%** Revenue Growth Since 2015



## Leadership



**Mike Reaves**
**CEO**
Ph.D. in Physics
20yrs+ in software industry
Start-up experience






**George Weinberg**
**CTO**
Ph.D. in Physics
20yrs+ in software industry
Start-up experience






**Fred Hsu**
**Chairman**
20yrs+ leading tech companies
Startup investor
2 successful acquisitions







**Daniel Edwards**
**VP, Finance & Ops**
10yrs+ in finance industry
5yrs in gaming industry
Start-up experience







**Patrick Ross**
**VP, Product Quality**
20yrs+ in gaming industry
Start-up experience





**Tim Cogswell**
**Director, Product**
13yrs+ in gaming industry
Start-up experience




## Advisors



**Stuart Lewis Smith**



**Tjaden Hess**



**Lars Wahlström**


**Shay Chinn**

**Kevin Flood**



**Vivian Kim**

**Gavin Yeung**


**Simon Wacjenberg**




© 2018 Mobile Gaming Technologies, Inc.    Page | 6    Private & Confidential – Do Not Distribute



# Our Global Reach

- 4.25M monthly active players

- 750+ games powered

- 200+ countries

- Amplified by 142M strong Arsenal fan base





# Product Roadmap



**CASHBET COIN VIP**
Launch CashBet Coin VIP Program



**CBC DEPOSIT & WAGER**
Accept CBC deposit and wager on all apps & websites powered by CashBet



**CRYPTORGS™**
Launch CryptoRGS, our crypto-friendly casino content aggregation platform. Crypto casinos will be required to support CBC.



**FAIRPLAY**
Provably fair interface feature for games integrated into our platform



**CRYPTOGO™**
Launch of CryptoGo, our state channel-based pay-as-you-go platform on all apps & websites powered By CashBet



# We Will Be The First…

- Crypto casino platform licensed by a Tier 1 Regulator

- Blockchain sponsor of a major sports club

- Crypto-enabled gaming distribution platform: CryptoRGS™







# Official Crypto Partner of Arsenal F.C.



CashBet Coin is the official cryptocurrency partner of Arsenal Football Club

Feb 3 2018: CashBet Coin LED pitchside ad at Emirates Stadium during Arsenal v. Everton match

**3.5B** people watch football

**260M** play the game

**46%** of all **people** are interested in football

Private & Confidential – Do Not Distribute



# Novomatic / Greentube Will Accept CashBet Coin on All GameTwist Games







**4M+**
monthly
unique players

**150+**
games

**20+**
Languages

**ALL**
devices

Private & Confidential – Do Not Distribute



# Lottery.com partners with CashBet





## $5B
**Lottery for social good**

## Worldwide
**software provider**

## CBC Accepted
**used in lottery**



# Socially Responsible Online Gaming

- $5B lottery for social good with Lottery.com

- Only casino ICO with a responsible gambling module

- Built in support for national exclusion schemes

- Donates casino profits to treatment and charities

   

© 2018 Mobile Gaming Technologies, Inc.    Page  |  13   Private & Confidential – Do Not Distribute    

# Tokenomics

## Our token is engineered to provide long-term value



- Single CBC token issuance

- Crypto casino platform customers must support CBC

- VIP Program incentivizes players to hold 1,000 tokens

- CBC deposit/wager iGaming partnerships

© 2018 Mobile Gaming Technologies, Inc.   Page | 14        Private & Confidential – Do Not Distribute



# ICO Details



**3 APR**

**PRE-SALE ENDS**

**10 APR**

**PUBLIC SALE BEGINS**

**27 APR**

**PUBLIC SALE ENDS**

**MAY DISTRIBUTION**



# $30M
## of tokens already sold

© 2018 Mobile Gaming Technologies, Inc.    Page | 15                Private & Confidential – Do Not Distribute





# coin.cashbet.com

© 2018 Mobile Gaming Technologies, Inc.   Page | 16   Private & Confidential – Do Not Distribute



# EXHIBIT F

# STEAM PALACE APP

to use CashBet Coin

IMPERIAL PLAY



